**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| EXPRESS MOBILE, INC., | |
|        Plaintiff, | Case No. 6:20-cv-801-ADA |
| v. | |
| EXPEDIA, INC. ET AL., | |
|        Defendant. | |
| v. | |
| EBAY INC., | Case No. 6:20-cv-802-ADA |
|        Defendant. | |
| v. | |
| FACEBOOK, INC. | Case No. 6:20-cv-803-ADA |
|        Defendant. | |
| v. | |
| GOOGLE LLC, | Case No. 6:20-cv-804-ADA |
|        Defendant. | |
| v. | |
| ATLASSIAN CORP. PLC ET AL., | Case No. 6:20-cv-805-ADA |
|        Defendant. | |

**DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................................ 1

II.     BACKGROUND ................................................................................................................ 1

        A.      Background of the '397 and '168 Patents.......................................................... 1

        B.      Background of the '755, '287, and '044 Patents ................................................ 2

        C.      Person of Ordinary Skill in the Art ..................................................................... 2

III.    DISPUTED TERMS ........................................................................................................... 2

        A.      Disputed Terms of the '397 and '168 Patents..................................................... 2

                1.      "virtual machine" ................................................................................... 2

                2.      "at least one run time file" ..................................................................... 6

                3.      "run time engine" / "runtime engine" .................................................... 9

                4.      "time lines" ........................................................................................... 12

        B.      Disputed Term of the '397 Patent ..................................................................... 15

                1.      "A method to allow users to produce Internet websites on and for
                        computers having a browser and a virtual machine capable of
                        generating displays, said method comprising:" ...................................... 15

        C.      Disputed Terms of the '755, '287, and '044 Patents ......................................... 16

                1.      "Application" / "application"................................................................. 16

                2.      "Player" / "player" ............................................................................... 19

                3.      "registry"............................................................................................... 22

                4.      "UI object" ............................................................................................ 24

        D.      Disputed Term of the '287 Patent ..................................................................... 26

                1.      "An authoring tool configured to . . . a Player ...................................... 26

IV.     CONCLUSION................................................................................................................. 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abbot Labs. v. Andrx Pharms., Inc.*,
 473 F.3d 1196 (Fed. Cir. 2007)...............................................................................................13

*Bicon, Inc. v. Straumann Co.*,
 441 F.3d 945 (Fed. Cir. 2006)..................................................................................................15

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
 289 F.3d 801 (Fed. Cir. 2002)..................................................................................................15

*CCS Fitness, Inc. v. Brunswick Corp.*,
 288 F.3d 1359 (Fed. Cir. 2002)................................................................................................12

*Chemtall, Inc. v. United States*,
 878 F.3d 1012 (Fed. Cir. 2017)................................................................................................24

*Collaborative Agreements, LLC v. Adobe Sys. Inc.*,
 No. A-14-CV-356, 2015 WL 2250391 (W.D. Tex. May 12, 2015) .........................................15

*CollegeNET, Inc. v. MarketLinx, Inc.*,
 No. A-09-CA-544-SS, 2010 WL 11566364 (W.D. Tex. Sept. 14, 2010).................................1

*Digital–Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*,
 672 F.3d 1270 (Fed. Cir. 2012)................................................................................................12

*Digital Retail Apps, Inc. v. H-E-B, LP*,
 No. 6-19-CV-00167-ADA, 2020 WL 376664 (W.D. Tex. Jan. 23, 2020).........................15, 16

*Express Mobile, Inc. v. eGrove Sys. Corp.*,
 No. 1:17-cv-703-RGA (D. Del. Aug. 6, 2018) ...........................................................................9

*Express Mobile, Inc. v. GoDaddy.com, LLC*,
 No. 1:19-cv-01937-RGA (D. Del. Dec. 7, 2020)........................................................................9

*Express Mobile, Inc. v. Svanaco, Inc.*,
 No. 2:17-CV-00130-JRG-RSP, 2018 WL 746472 (E.D. Tex. Feb. 7, 2018)........................2, 9

*Express Mobile, Inc. v. Wix.com, Ltd.*,
 No. 3:19-cv-06559-RS (N.D. Cal. Feb. 12, 2021).....................................................................9

*GE Lighting Sols., LLC v. AgiLight, Inc.*,
 750 F.3d 1304 (Fed. Cir. 2014)................................................................................................23

*Indivior Inc. v. Dr. Reddy's Lab'ys, S.A.*,
    930 F.3d 1325 (Fed. Cir. 2019).........................................................................4

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
    381 F.3d 1111 (Fed. Cir. 2004).......................................................................13

*Mangosoft, Inc. v. Oracle Corp.*,
    525 F.3d 1327 (Fed. Cir. 2008).........................................................................4

*MEMS Tech. Berhad v. Int'l Trade Comm'n*,
    447 F. App'x 142 (Fed. Cir. 2011) ..................................................................16

*Motion Games, LLC v. Nintendo Co.*,
    No. 6:12-cv-878-JDL, No. 6:12-cv-878-JDL, 2015 WL 243447 (E.D. Tex.
    Jan. 16, 2015)...........................................................................................25, 26

*Multiform Desiccants, Inc.v. Medzam, Ltd.*,
    133 F.3d 1473 (Fed. Cir. 1998).......................................................................13

*Pacing Techs., LLC v. Garmin Int'l, Inc.*,
    778 F.3d 1021 (Fed. Cir. 2015).........................................................................7

*Pitney Bowes, Inc. v. Hewlett–Packard Co.*,
    182 F.3d 1298 (Fed. Cir. 1999).......................................................................15

*Purdue Pharma L.P. v. Endo Pharm. Inc.*,
    438 F.3d 1123 (Fed. Cir. 2006).......................................................................22

*Sinorgchem Co., Shandong v. Int'l Trade Comm'n*,
    511 F.3d 1132 (Fed. Cir. 2007)..................................................................13, 24

*Sunovion Pharm., Inc. v. Teva Pharm. USA, Inc.*,
    731 F.3d 1271 (Fed. Cir. 2013).......................................................................21

*Thorner v. Sony Comp. Entm't Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012).......................................................................23

*Vasudevan Software, Inc. v. Int'l Bus. Machs. Corp.*,
    No. C 09-05897 RS, 2011 WL 196884 (N.D. Cal. Jan. 20, 2011) ............................................4

*X.Commerce, Inc. v. Express Mobile, Inc.*,
    No. 17-cv-02605-RS, 2018 WL 10704439 (N.D. Cal. Sept. 12, 2018)......................... *passim*

## I.    INTRODUCTION

Plaintiff's proposed constructions appear calculated to broaden the asserted claims so that Plaintiff can avoid sharing its infringement positions until trial.  While "no construction" may be appropriate in some instances, when the parties disagree on the meaning of a claim term, the Court should construe it.  *See CollegeNET, Inc. v. MarketLinx, Inc.*, No. A-09-CA-544-SS, 2010 WL 11566364, at *6 (W.D. Tex. Sept. 14, 2010).  The claim constructions proposed by Defendants[1] are supported by the intrinsic and extrinsic record, explain and clarify the meaning of the challenged terms, and are consistent with how a person of ordinary skill in the art would have understood the disputed terms at the time of the claimed inventions.

## II.    BACKGROUND

Two families of patents are at issue: (1) U.S. Patent Nos. 6,546,397 and 7,594,168 (Ex. A "the '397 patent," Ex. B "the '168 patent," and collectively "the '397 patent family"); and (2) U.S. Patent Nos. 9,063,755, 9,471,287, and 9,928,044 (Ex. C "the '755 patent," Ex. D "the '287 patent," Ex. E "the '044 patent," and collectively "the '755 patent family").

### A.    Background of the '397 and '168 Patents

The '397 patent family generally describes browser-based methods for web page and web site design that purport to allow the creation of so-called "dynamic" web pages.  The specification discloses that the amount of work the creator must do to change or update web pages can be minimized by storing display attributes in a database separate from the runtime files that are executed by a "virtual machine" on the end user's computer when he or she browses to the web page.  *See* Schmandt Decl. § VI.A.

---

[1] The "Defendants" are Expedia, Inc. and Homeaway, Inc. (both together, "Expedia"), eBay, Inc. ("eBay"), Facebook, Inc. ("Facebook"), Google LLC ("Google"); and  Atlassian Corp. Plc and Atlassian, Inc. (both together, "Atlassian").  The '755 patent, the '287 patent, and the '044 patent are not asserted against eBay and eBay takes no position with regard to the proper construction of terms in those patents.

**B.      Background of the '755, '287, and '044 Patents**

The '755 patent family describes two concepts: (1) an authoring tool that allows the creator of a web page to customize the web page display for receiving inputs and displaying outputs of web services; and (2) an authoring tool that generates two sets of code—a device-independent Application and a device-specific Player that allow a client to view this creator-customized web page on his or her device.[2]  *See* Schmandt Decl. § VI.B.

**C.      Person of Ordinary Skill in the Art**

In the context of the patents-in-suit, a person of ordinary skill in the art would be someone with at least a Bachelor of Science in Computer Science or three years of experience as a web developer.  Such a person of ordinary skill would be well versed in HTML, JavaScript, and CSS and would be familiar with server-side scripting and developing programs using higher level languages, such as Java, C++, or Visual Basic.  *See* Schmandt Decl. ¶ 60.

**III.   DISPUTED TERMS**

**A.      Disputed Terms of the '397 and '168 Patents**

**1.      "virtual machine"**

| Express Mobile's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary<br><br>*Alternatively*, an abstract machine that is emulated in software | abstract machine that is emulated in software and that executes intermediate code |

The term "virtual machine" was a term of art with a meaning familiar to POSAs at the time the '397 patent was filed:  It referred to an abstract (not physical) machine emulated in software that executed intermediate code—that is, code derived from more human-readable code written by a programmer, and that the virtual machine would turn into the machine language of the computer it was running on.  Schmandt Decl. ¶¶ 83, 93-102.  Defendants' proposed construction—"abstract machine that is emulated in software and that executes intermediate code"—reflects that plain and ordinary meaning, and has already been adopted by Judge Payne in another case.  *Express Mobile,*

---

[2] Both families of patents discuss creating web pages and then accessing these web pages after they are created.  Herein, Defendants generally refer to the "creator" as the user that builds the web page and the "end-user" generally as the user that accesses the web page.

*Inc. v. Svanaco, Inc.*, No. 2:17-CV-00130-JRG-RSP, 2018 WL 746472, at *5 (E.D. Tex. Feb. 7, 2018). Numerous textbooks and technical dictionaries—including every dictionary that either party's expert has cited—also define the term consistent with Defendants' proposal. Schmandt Decl. ¶¶ 93-99. And that construction is consistent with the sole reference to a "virtual machine" in the specification or prosecution history. But Plaintiff's proposal that the term should be left unconstrued ignores the fact that this definition, while well-understood to POSAs, will not be apparent to a lay jury. And its suggestion that a virtual machine "is a machine that is virtual, rather than physical," simply raises more questions than it answers: It suggests to a jury that any type of machine, from a toaster to a printing press, qualifies, even though a court construing the term in a prior Express Mobile case explained that "[t]here [was] no dispute between the parties that a person of ordinary skill in the art would understand 'virtual machine' in the context of these patents to refer to a software program that emulates the functions of a **hardware processor**." *X.Commerce, Inc. v. Express Mobile, Inc.*, No. 17-cv-02605-RS, 2018 WL 10704439, at *2 (N.D. Cal. Sept. 12, 2018) (emphasis added). And it fails to inform a jury of what it means for a machine to be "virtual."

The intrinsic evidence also supports Defendants' construction. The sole reference to the term "virtual machine" in the specification and prosecution history of the '397 patent is a passing reference to the Java virtual machine. '397 patent at 35:34–38. There is no dispute that the Java virtual machine features intermediate code and satisfies Defendants' proposed construction. Schmandt Decl. ¶ 82; ECF No. 57 ("Pl.'s Br.")[3] at 5. Moreover, the intrinsic evidence makes clear that Plaintiff's proposed construction cannot be correct: the role of the virtual machine in the claims is to generate displays of webpages, and Plaintiff's expert opines that its proposed construction encompasses a browser component called a JavaScript engine, which executes the

---

[3] The ECF numbers in this brief refer to the Opening Claim Construction Brief filed in the *Express Mobile v. Facebook* matter, Case No. 6:20-cv-803.

JavaScript programming language.[4]  The problem is that JavaScript is discussed extensively in the '397 patent,[5] but the specification *disparages* the use of JavaScript to write web applications, stating that "it is virtually impossible to write a web publishing application in HTML and JavaScript."  '397 patent at 1:22–25; *see also id.* at 1:11-21 (noting that conventional scripting languages like JavaScript have "numerous inherent limitations"); *id.* at 1:40–50.  Consistent with this description, the sole inventor of the '397 patent, Steven Rempell, testified that there was no "JavaScript virtual machine" at the time the patent was filed:  Ex. F (Mar. 29, 2018 Tr. of Steven Rempell, *Express Mobile, Inc. v. BigCommerce,* No. 2:17-cv-00130 (E.D. Tex.)) at 124:9–14, 127:21–128:3.  Plaintiff's construction is meant to cover JavaScript engines, but that is precisely what the '397 patent specification makes clear is ***not*** a virtual machine that can be used to practice the claimed invention.  *Indivior Inc. v. Dr. Reddy's Lab'ys, S.A.*, 930 F.3d 1325, 1337 (Fed. Cir. 2019) ("A specification may disclaim an embodiment by repeatedly disparaging it.").  In addition, a number of the asserted claims refer to "a browser and a virtual machine."  '397 patent at 65:45–46, 66:3–5, 68:43–46.  But if Express Mobile were correct, a browser's JavaScript engine—a part of the browser—would itself be a virtual machine.  Schmandt Decl. ¶ 92.  Thus, under Plaintiff's construction, a browser would necessarily include a virtual machine and there would be no reason to separately claim "a browser and a virtual machine."  Constructions that render words superfluous should be avoided.  *See Mangosoft, Inc. v. Oracle Corp.*, 525 F.3d 1327, 1330 (Fed. Cir. 2008); *Vasudevan Software, Inc. v. Int'l Bus. Machs. Corp.*, No. C 09-05897 RS, 2011 WL 196884, at *3 (N.D. Cal. Jan. 20, 2011).

Plaintiff's arguments to the contrary fail.  First, Plaintiff complains that the term "intermediate code" is not found in the specification or file history, but that is to be expected as executing intermediate code is part of what it means to *be* a virtual machine.  Pl.'s Br. at 5, 6.  The

---

[4] ECF No. 57-7 (Pl.'s Ex. 6, "Weadock Decl.") ¶¶ 30, 31.  Note that JavaScript, despite its name, is a completely different language from the Java programming language.  Schmandt Decl. ¶ 91.

[5] *See, e.g.*, '397 patent at 1:10–50, 1:61–67, 3:4–6, 9:5–32, 10:60–11:21, 11:66–12:21.

words "abstract machine that is emulated in software," found in Plaintiff's own proposed construction, appear nowhere in the specification or file history either.

Second, Plaintiff claims that there are "a myriad of virtual machines" that do not use intermediate code. *Id.* But virtual machines used with the programming languages that Plaintiff mentions—Basic, Lisp, Tcl, and Ruby—*did* use intermediate code, and neither Express Mobile nor its expert cite any example of a virtual machine used with those languages that did *not* use intermediate code. Schmandt Decl. ¶ 113.

Third, Plaintiff claims that "professors and experts in computer science" support its position Pl.'s Br. at 5, but following the citations reveals that it is relying on lecture notes that appear to originate with *one* professor, and those lecture notes in fact make clear that virtual machines need intermediate code, and that the "interpreters and just-in-time compilers" Plaintiff contends are virtual machines are *not* virtual machines—they merely simulate them. Schmandt Decl. ¶¶ 108-12.

Fourth, Plaintiff spends two full paragraphs arguing against the position that a "virtual machine" should be limited to a "Java virtual machine," Pl.'s Br. at 5–6, but it is unclear why, as no party has advanced that position. Mr. Schmandt identified numerous virtual machines other than the JVM that existed as of the priority date, along with corresponding intermediate languages, showing that Defendants' proposed construction is not limited to the JVM—it encompasses all virtual machines as that term was used in 1999. Schmandt Decl. ¶¶ 78-83.

Fifth, Plaintiff misstates the facts when it claims that "[m]ultiple district courts" rejected Defendants' construction. The *X.Commerce* order it cites did not address an "intermediate code" limitation at all—it rejected a proposal that virtual machines be limited to those that execute *compiled* code, not intermediate code. That proposal was too narrow, because although "compiled code" is one form of intermediate code that may be executed by a virtual machine, the fact that the intermediate code is "compiled" refers to *how* it was created, not *what* it actually is.

Finally, Plaintiff's attempt to find support for its proposed construction in the specification's references to "full-featured programming languages" or "more robust versions of

programming languages" fails for the simple reason that the cited portions of the specification do not mention or have anything to do with "virtual machines."  Pl.'s Br. at 5 (citing '397 patent at 32:21-25, 62:33-36); Schmandt Decl. ¶ 90.  In fact, one of the "full-featured programming languages" explicitly mentioned in the specification, C++, did not use a virtual machine at all, showing that a "full-featured programming language" does not have to do with, and does not require, a virtual machine.  *Id.*

### 2.    "at least one run time file"

| Express Mobile's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| one or more files, including a run time engine, that are downloaded or created when the browser is pointed to a web page or website | one or more files, including a run time engine, that are downloaded or created, **and executed by a browser to display a webpage**[6] when the browser is pointed to a webpage |

The only dispute is whether the run time file(s) are "executed" and whether the execution must be "by a browser to display a web page."  Intrinsic evidence demonstrates that both are required.

The applicant confirmed during prosecution that the claimed run time files are files that are executed.  During prosecution, the applicant argued that the "***claimed*** invention" (and thus, the ***claimed*** run time files) used to ***generate web pages*** consists of only executable files and does not include every downloaded file.  Specifically, to overcome prior art, the applicant represented that "the claimed invention generates web pages using two features: ***a run time engine*** and ***a database of user settings***."  Ex. G ('397 FH Jan. 17, 2002 Applicant Response) at 5.  The browser executes both files.  Plaintiff agrees that the run time engine is executed (Pl. Br. at 9), and the '397 patent makes clear that both the run time engine ***and*** database are executed.  *See*,'397 patent at Abstract, 8:24-28.  Thus, the applicant explained during prosecution exactly what defendants now argue: that the ***claimed*** "run time files" are the executed files (*i.e.*, the run time engine and database).  *See*

---

[6] Emphasis is added where not otherwise noted.

*Pacing Techs., LLC v. Garmin Int'l, Inc.*, 778 F.3d 1021, 1024 (Fed. Cir. 2015) (explaining that statements made by the patentee describing the "present invention" are limiting).

That is consistent with the claims, which state that the "run time file" is used to "display" web pages. '397 patent at claims 1, 2, 39. The claims require that the "run time file" is executed because the claims require that the run time file perform an action. Specifically, the run time file uses database information to "generate virtual machine commands." *See* '397 patent at claim 1. To "generate" such commands (or perform any action), the computer system upon which the run time file operates must be directed via executed commands. Schmandt Decl. ¶¶ 65-70, 119. Plaintiff's construction ignores what the claims require the run time file to do.

The specification further confirms that the "at least one run time file" is executed. *See* Schmandt Decl. ¶¶ 118-19. The abstract states the claimed build tools "construct a single run time file and an associated database that describe, and when *executed*, produce the web page." '397 patent at Abstract. The specification shows that CAB and JAR files are downloaded from a web site, and from these CAB and JAR files "the *executable files and database*" are extracted. *Id.* at 5:53-57, 8:20-36, 44:36-45:17. To be sure, the specification shows "[t]he CAB and JAR files" contain the *claimed* run time files: "both include the runtime engine and database in compressed *executable form*." *Id.* at 8:24-28.

Plaintiff attempts to counter Defendants' construction by pointing to image, audio, and other files that are downloaded but not "executed." Pl.'s Br. at 7-8. But the fact that the CAB and JAR files may contain other non-executable files does not change fact that the *claimed* "run time file" must be executable. Schmandt Decl. ¶ 120. For example, when Plaintiff argues that the claim term "must include" downloaded image files that come within CAB/JAR file libraries, Plaintiff is mistaken. Pl.'s Br. at 8. Indeed, if the claimed "run time file[s]" included such files, the term

would nonsensically apply to files that are incapable of performing the claimed behavior associated with the run time file.  Schmandt Decl. ¶ 120.

On the second issue, the specification confirms that the run time files must be executed *by the browser* (as opposed to by something else).  The specification describes how the browser executes initialization code that "'sniffs' the current browser … to determine its type" and generate "appropriate HTML code," where the code "defines whether the executable files and database will be extracted from inside a compressed CAB file or a compressed JAR file."  '397 patent at 45:3-17.  The patent then states that HTML code "cause[s] the browser to immediately execute the run time engine."  *Id.* at 45:18-43.  If the run time files could be executed by an "entity other than the browser"—as Plaintiff asserts, but fails to identify—there would be no need to identify the type of browser in conjunction with processing the CAB or JAR run time files.

Plaintiff's argument that the claimed run time files need not be executed by a browser misreads the specification.  Plaintiff begins by citing a specification passage that refers to a browser that "calls" the run time engine.  Pl.'s Br. at 8 (citing '397 patent at 5:57-59).  But as explained above, the specification explains that a browser "calling the customized run time engine," means that the browser "execute[s] the run time engine."  *See* '397 patent at 45:18-43, Fig. 28.  This is consistent with the usage of "call" elsewhere in the specification.  *See, e.g.*, *id.* at 45:3-25, Fig. 28 (stating that the "browser [] executes the HSF's [(HTML shell file's)] JavaScript initialization code" and then explaining that the "JavaScript code is called"); Schmandt Decl. ¶ 121.

Plaintiff also suggests that the run time files need not be executed by the browser because the claim states that the run time files can "instruct[]" the browser.  Pl.'s Br. at 8.  But nothing precludes the run time files from being executed by the browser and then "instructing" the

browser, just as a processor may execute software that then instructs the processor how to operate.

### 3. "run time engine" / "runtime engine"

| Express Mobile's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| a file that is executed at runtime **that utilizes** information from the database | a file that is executed at runtime **that reads** information from the database **and generates commands to display a web page or web site** |

Just six months ago, in a different patent case involving the '397 patent, Plaintiff itself proposed the exact same construction that Defendants are proposing in this case. Ex. I (Joint Claim Constr. Chart at 7, *Express Mobile, Inc. v. GoDaddy.com, LLC,* No. 1:19-cv-01937-RGA (D. Del. Dec. 7, 2020), ECF No. 42). Although Plaintiff ultimately changed its position in that case to eliminate the "reads" language, Plaintiff maintained the requirement that the runtime engine "generates commands to display a web page or website." Ex. J (Memorandum Op. at 16, *GoDaddy.com,* (June 1, 2021), ECF No. 121). Indeed, Plaintiff has previously proposed constructions that include the "generates" requirement in at least five other patent cases. Ex. K (Joint Claim Constr. Br. at 28, *Express Mobile, Inc. v. eGrove Sys. Corp.,* No. 1:17-cv-703-RGA (D. Del. Aug. 6, 2018), ECF No. 33); Ex. L (Opening Claim Constr. Br. at 11, *Express Mobile, Inc. v. Wix.com, Ltd.,* No. 3:19-cv-06559-RS (N.D. Cal. Feb. 12, 2021). ECF No. 98); Ex. M (Order Construing Claims at 7, *X.Commerce, Inc. v. Express Mobile, Inc.,* No. 17-cv-02605-RS (N.D. Cal. Sept. 10, 2018), ECF No. 79); Ex. N (Claim Constr. Memorandum Op. and Order at 10, *Express Mobile, Inc. v. Svanaco, Inc.,* No. 2:17-CV-00130-JRG-RSP (E.D. Tex. Feb. 7, 2018); ECF No. 57-33 (Pl.'s Ex. 8, "Shopify Order") at 5. Ultimately, the *GoDaddy* court adopted Plaintiff's original proposed construction, noting that Plaintiff had already "accepted [it] as an alternative construction." Ex. J (*GoDaddy.com* Memorandum Op.) at 16, 17. Moreover, at least two other courts have adopted this construction. *X.Commerce, Inc.*, 2018 WL 10704439, at *6; ECF No. 57-33 (Pl.'s Ex. 8, "Shopify Order") at 5-6.

Plaintiff now seeks to run from the intrinsic record and a construction that it proposed, and which several courts adopted. Plaintiff now disputes that the claimed runtime engine must (1) read

information from the database and (2) generate commands to display a web page or website. Plaintiff is wrong on both counts.

The intrinsic record confirms both requirements.  As for reading the database, the claims show that the run time engine generates the website from "data extracted from the provided database." '168 patent at claim 1; Schmandt Decl. ¶ 123.  Consistent with this, the specifications[7] explain that once the browser executes the run time engine, the "run time engine then ***begins to read the database*** and down load image, audio and video files, ***while simultaneously drawing the first web page***." '168 patent at 5:53-58, Fig. 2; Schmandt Decl. ¶ 124.  The specification explains—as part of the description of the general "Run Time Process" of the invention—that "FIG. 29 shows the techniques employed by the run time engine ***to read the external database and to generate the necessary web page objects***." '168 patent at 45:6-19, Fig. 29; Schmandt Decl. ¶ 123.

Further, the reading requirement also is consistent with statements the applicant made during prosecution of the '397 patent regarding the operation of the "***claimed invention***": "[t]he websites are generated ***by the runtime engine reading and interpreting the external database*** and then ***building the web pages dynamically***."  Ex. H ('397 Patent Prosecution, June 5, 2001 Applicant Response) at 10; Schmandt Decl. ¶ 125.

Plaintiff argues that the "reads" language in Defendants' construction improperly limits the term and that the word "utilizes" should be employed instead.  Pl.'s Br. at 9-10.  But the only intrinsic support that Plaintiff provides is claim language from the '397 patent relating to the "run time file," not the claimed "run time engine." *See id.* at 9.  And while the run time engine is itself a run time file, the intrinsic record confirms that it utilizes information in the database by reading from it, as discussed above.

Plaintiff's arguments in support of its "utilizes" language similarly fall flat.  First, Plaintiff suggests that the run time engine need not "read" a database because the specification explains

---

[7] Because the '397 and '168 patents share a specification, Defendants cite to only the '168 patent's specification.

that "initial values" for settings "can be set from the JavaScript database" ('168 patent at 30:25-29).   But "set[ting]" "initial values" from a JavaScript database does not obviate the clear disclosures in specification and arguments by the applicant that the run time engine *reads* the database.  There is no support for Plaintiff's apparent suggestion that "set[ting]" from a database and "reading" from a database (and then "setting" after the data is "read") are mutually exclusive.  Further, the specification passage on which Plaintiff relies for this argument fails to *even mention* the "run time engine."  Schmandt Decl. ¶ 128.

Second, Plaintiff suggests that statements in the file history regarding a "template shell" somehow suggest that the runtime engine need not "read" but only "utilize" data in the database. Pl.'s Br. at 10.  This argument confuses a passage that merely discusses *how* the database information can be used *once it has been read* for one about how the information *is obtained* (read). Schmandt Decl. ¶ 127.  Furthermore, in the cited excerpt from the file history, the applicant explained that after the runtime engine is downloaded and initialized, it generates virtual machine commands by "sequentially ***reading***" the database.   ECF No. 57-32 (Pl.'s Ex. 7) at XMO_000000901.  This is consistent with the other segments of the prosecution history, discussed above, in which the applicant repeatedly and unequivocally stated that the "runtime engine ***read[s]***" information from the database.

Regarding the "generated" language, the applicant described the operation of the claimed invention consistent with Defendants' construction.  Applicant sought to distinguish the claims from prior art by stating "[t]he claimed invention, in contrast, generates ***a run time engine*** and a database that are then used to ***produce virtual machine commands*** on the fly." Ex. G ('397 Patent Prosecution, Jan. 17, 2002 Applicant Response) at 6.  The applicant specifically discussed "[t]he claimed invention's DRAW ***COMMAND,***" which may be used for "the ***display*** of 10 individual text characters at different positions on a web page."  *Id.* at 6-7.  As the applicant summarized: "the claimed invention generates web pages by combining a database and run time files to ***generate virtual machine commands***."  *Id.* at 7.  Plaintiff should not be allowed to now alter the scope of the claims after it represented to the Patent Office that the run time engine generates commands,

including commands to display a web page or web site, a requirement Plaintiff itself agreed to in numerous prior cases.

Plaintiff provides no explanation for its about face.  Plaintiff argues that the "generates commands" requirement would render superfluous separate claim language requiring the run time engine to be "configured to generate the web-site," but that is not the case.  A runtime engine can generate commands and a website, through execution of the commands.  Plaintiff's single case citation is also misplaced.  The court in that case rejected a proposed construction as superfluous because the construction recited verbatim the same language appearing elsewhere in the claims. *See Digital–Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*, 672 F.3d 1270, 1274-75 (Fed. Cir. 2012).  Here, however, Defendants' construction does not repeat existing claim language, but rather reflects the meaning of the term based on the specification and prosecution history.

### 4.     "time lines"

| Express Mobile's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| No construction necessary | a sequence of changes that define the attributes of a text button or image object as the changes occur |

The specification provides that "[a] time line *is* an independent asynchronous process that defines the existence of a given text button or image object." '397 patent at 36:50-52.  Defendants' proposed construction, which was adopted in the *Magento* litigation, comports with the specification's express definition of "time line" and further clarifies, in plain terms, what an "independent asynchronous process" is in the context of defining a text button or image object's existence.  *See X.Commerce, Inc.,* 2018 WL 10704439, at *6.

Contrary to Plaintiff's assertions, "time line" is expressly defined in the specification, rendering the ability of a layman to understand the plain and ordinary meaning of "time line" irrelevant.  *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) (explaining a claim term "will not receive its ordinary meaning if the patentee acted as his own lexicographer and clearly set forth a definition of the disputed claim term in either the specification or prosecution history.")  The Federal Circuit has stated that "the word 'is,' again a term used here in the

specification, may 'signify that a patentee is serving as its own lexicographer.'" *Sinorgchem Co.,*

*Shandong v. Int'l Trade Comm'n*, 511 F.3d 1132, 1136 (Fed. Cir. 2007) (quoting *Abbot Labs. v.*

*Andrx Pharms., Inc.*, 473 F.3d 1196, 1210 (Fed. Cir. 2007)).  Courts do not require that the patentee

use quotation marks or magic words like "defined" or "herein" to find lexicography; all that is

required is that the patent applicant set out the different meaning in the specification in a manner

sufficient to give one of ordinary skill in the art notice of the change from ordinary meaning.  *See*

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004).

Here, the patent applicant has done just that by unambiguously stating what a time line "is" and

providing constraints on that definition that would not be included in an ordinary meaning (*e.g.*,

limiting time line to text button objects and image objects). '168 patent at 36:21-24.  This *is*

definitional language and Plaintiff should be bound by it.  *See X.Commerce, Inc.,* 2018 WL

10704439, at *6; *Sinorgchem*, 511 F.3d at 1136.

　　　　Plaintiff attempts to escape the express definition by (i) pointing to various types of objects

referenced in the specification and (ii) identifying instances in which the specification uses "time

lines with respect to objects, in the general sense" to ask the Court to *infer* that "time lines" could

be associated with any object.  *See* Pl.'s Br. at 11.  Given the express definition of the term, this

Court need not analyze every reference to time line to determine whether the term is capable of a

broader interpretation.  *See Multiform Desiccants, Inc.v. Medzam, Ltd.*, 133 F.3d 1473, 1478 (Fed.

Cir. 1998) ("When the specification explains and defines a term used in the claims, without

ambiguity or incompleteness, there is no need to search further for the meaning of the term.")

Moreover, none of the cited passages is inconsistent with the express definition, which

unambiguously limit time lines to text button or image objects.  For example, Plaintiff cites the

specification's statement that "[t]he child object(s) enter animation type, speed, and animation

resolution" ('397 patent at 37:29-51) as disclosing use of time lines in a "general sense."  Far from

use in a general sense, the cited language describes the sixth of eight "currently available settings,

*for both text button or image objects.*" '397 patent at 37:15.  Plaintiff's argument that the express

definition would exclude embodiments rests on a similar inference.  Pl.'s Br. at 12 (citing '397

patent at 48:47-54). The "general" language that Plaintiff cites is in reference to Fig. 31, which clearly refers to a "text button and image object time line." '397 patent at Fig. 31; Schmandt Decl. ¶ 130 (discussing column 37 of the '397 patent) *see also* '397 patent at 52:30-32. Plaintiff does not cite any language which explicitly refers to an object other than a text button object or image object being defined by a time line. *See* Schmandt Decl. ¶¶ 131-33.

Defendants' proposed construction also correctly provides that a time line must include a "sequence of changes." The phrase "sequence of changes" merely restates the "independent asynchronous process" express definition is simpler language. Schmandt Decl. ¶ 130; Ex. M, (Magento Order) at 13. Plaintiff's argument that a time line may define a static object with "no change at all" is nonsensical and contrary to the specification. Schmandt Decl. ¶ 134. In other words, a value that solely specifies the size of an image object at the time a webpage loads is not a *time line* because no subsequent changes are defined based on time. *See e.g.*, '168 patent at 36:21-26 ("[a]n object's time line ***begins*** at the time a given web page makes its appearance, either through an immediate draw or through a transition animation.") A time line is a ***process*** that dictates at least one change occurring at least one time. It cannot simply be a single point in time.

Plaintiff's reliance associated with a time line occurring "simultaneously" likewise misses the mark. The cited section refers to an entry animation, a transformation animation, and an exit animation, all associated with a single time line, which "may be executed simultaneously." *See also* '397 patent at Fig. 33 (illustrating the architecture of executing a time line.) In other words, XMO cites to animations that may be executed simultaneously as part of a single sequential time line. Further, the individual frames of each animation/transformation are still executed sequentially. *See* '397 patent at 59:6-57 and 60:52-57; Schmandt Decl. ¶ 134. These simultaneous actions in no way contradict Defendants' proposed construction.

### B.      Disputed Term of the '397 Patent

**1.      "A method to allow users to produce Internet websites on and for computers having a browser and a virtual machine capable of generating displays, said method comprising:"**

| Express Mobile's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary. The preamble is not limiting | The preamble is limiting |

Claim 1 of the '397 patent is limiting because it serves as antecedent basis for the claim term "virtual machine" and because the preamble is essential for understanding the remaining limitations in the body of the claim.

"[A] preamble limits the invention if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (quoting *Pitney Bowes, Inc. v. Hewlett–Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999). By contrast, courts generally find "preamble" language non-limiting if it "merely states the purpose or intended use of an invention." *Bicon, Inc. v. Straumann Co*., 441 F.3d 945, 952 (Fed. Cir. 2006). This Court has used the following Federal Circuit "guideposts" to determine "whether the preamble is limiting: (1) preamble provides antecedent basis, (2) preamble is essential to understand limitations or terms in the claim body, (3) preamble recites 'additional structure or steps underscored as important by the specification,' and (4) 'clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art.'" *Digital Retail Apps, Inc. v. H-E-B, LP*, No. 6-19-CV-00167-ADA, 2020 WL 376664, at *7 (W.D. Tex. Jan. 23, 2020) (citing *Catalina,* 289 F.3d at 808-09).

At least two of those "guideposts" exist here. First, the preamble recites a "virtual machine capable of generating displays," '397 patent at 65:45-46, and the remainder of the claim then recites "where at least one of said user selectable setting in said panel corresponds to commands to ***said virtual machine***." *Id*. at 65:52-54. Plaintiff does not dispute that "said virtual machine" in the body of the claim relies on the preamble's recitation of a "virtual machine capable of generating displays." The preamble therefore serves as antecedent basis for a claim term, and it is therefore limiting. *See, e.g., Collaborative Agreements, LLC v. Adobe Sys. Inc.*, No. A-14-CV-

356, 2015 WL 2250391, at *11 (W.D. Tex. May 12, 2015) (finding preambles limiting based on the antecedent basis of the term "a transaction"); *see also Digital Retail Apps*, 2020 WL 376664, at *8 ("Thus, the Court finds the preamble limiting because the preamble provides the antecedent basis for limitations in the body.").

Second, the preamble is essential to understand limitations in the claim body. The preamble recites a method to "produce Internet websites on and for computers having a browser and a virtual machine capable of generating displays." '397 patent at 65:44-46. The preamble clarifies that the "websites" generated by the invention are "viewable by computers having a browser and a virtual machine capable of generating displays," both of which are concepts that are not explicitly recited in the remainder of the claim. At the same time, the preamble dictates that the "virtual machine" is "capable of generating displays." While the body of the claim recites the step of "generating a display," the preamble provides the crucial context that the "virtual machine" itself must be capable of performing that step. *See MEMS Tech. Berhad v. Int'l Trade Comm'n*, 447 F. App'x 142, 154 (Fed. Cir. 2011) (holding preambles limiting where they were essential to understanding terms in the body).

### C.    Disputed Terms of the '755, '287, and '044 Patents

#### 1.    "Application" / "application"

| Express Mobile's Proposed Construction | Defendants' Proposed Construction[8] |
|---|---|
| Device-independent software code containing instructions for a device | Device-independent code which contains instructions for a device, is separate from the Player, and is interpreted or executed by the Player |

Both sides agree[9], consistent with the intrinsic record, that the application is "device-independent code containing instructions for a device." The parties' disputes focus on (1) whether

---

[8]  To simplify the disputes, the Defendants have combined the alternative constructions initially proposed.

[9]  Plaintiff also adds the limitation that the code is "software code." Plaintiff does not identify any distinction between "code" and "software code."

the Application and Player are "separate" and (2) whether the Application is interpreted or executed by the Player. Both of these requirements are supported by the intrinsic record.

First, the patent and the file history support construing Application and Player as "separate" components.[10] The asserted claims refer to the Application and Player as distinct claim elements, suggesting they are each separate sets of code. *See, e.g.*, '755 patent at claim 1; '044 patent at claim 1; '287 patent at claim 1; *see also* Schmandt Decl. ¶ 143. Second, during prosecution, the applicant distinguished the invention from the prior art because the claimed invention included "two separate codes" provided by an authoring tool: "a device-dependent code (such as the claimed Player) and device-independent code (such as the claimed Application)." Ex. O ('755 FH AMEND. "A", Mar. 6, 2013) at 11. The applicant continued to emphasize this separation throughout prosecution, touting how it simplified providing software to different devices. *See* Ex. P ('755 FH AMEND., Jan. 16, 2014) at 13 ("The claimed invention, in contrast, operates by partitioning the code required for functionality into device-independent and device-dependent code. The inventors have found that this greatly simplifies providing software to a variety of devices."). Later, in an appeal brief that led to the issuance of the '755 patent, the applicant extolled the advantages of the separate device-independent Application and device-dependent Player of the invention, telling the Patent Office that it was advantageous for maintaining websites and updating specific devices. Ex. Q ('755 FH Appeal Brief, Nov. 26, 2014) at 8 ("In one aspect of the present invention, the device-independent application and device-dependent Player are both provided to a device .... By partitioning code … into an Application and a Player has an advantage for maintaining websites."); *see also* Schmandt Decl. ¶¶ 144-47.

Notably, Plaintiff recognizes that the claimed Application and Player are "separate," agreeing that the Application and Player are "functionally separate" and recited with "separation" in the asserted claims. Pl.'s Br. at 16-17. Plaintiff raises two concerns with including "separate"

---

[10] Indeed, both times this term was previously construed, the district court construed Application (and Player) to include the requirement that the Application and Player are separate. ECF No. 57-33 (Pl.'s Ex. 8, Shopify Order) at 6-14 (construing Application and Player); Ex. J (GoDaddy Order) at 23-25 (construing Application).

in the construction, neither of which has any merit.  First, Plaintiff asserts that the "separate" language is "superfluous" because the Application and the Player are separately recited in the claim.  But without making clear to the jury that the Application and Player are separate, Plaintiff could attempt to disregard the intrinsic record and accuse the same instrumentality as both the Application and the Player.  Second, Plaintiff argues that including the word "separate" would "add confusion" about "what kind of separation would be required." Plaintiff's concerns are misplaced because they address a dispute that has not been raised.  Defendants' proposal does not advocate for a "physical barrier" between the Application and the Player.  Rather, Defendants ask the Court to hold the Plaintiff to the statements it emphasized to the Patent Office to get the asserted claims allowed.

Second, the patent and the prosecution history are clear that the Application is interpreted or executed by the Player.  Indeed, the specification expressly states that the Player "interprets or executes the Application[.]" '755 patent at 6:6-7; *see also* 6:9-11; *see also* Schmandt Decl. ¶ 153. During prosecution, the applicant doubled down, confirming that the Player interprets or executes the Application.  *See* Ex. O ('755 AMEND. "A", Mar. 6, 2013) at 9 ("the Player interprets the Application"); *id.* at 11 ("the Player then interprets the Application"); Ex. P ('755 AMEND., Jan. 16, 2014) at 9 ("the Player . . . is executed to interpret non-binary, device independent contained in the Application." [sic]); Ex. Q ('755 Appeal Brief, Nov. 26, 2014) at 8 ("the execution of the Player on the device causes the Application to be interpreted . . ."); *see also* Schmandt Decl. ¶¶ 153-54.

Critically, Plaintiff does not identify a single embodiment where the Application is not interpreted or executed by the Player.[11]  Plaintiff's assertion that the specification "discloses that the application may be executed directly by the device" is based on a mischaracterization of the specification.  Pl's Br. at 18-19 (*citing* '755 patent at 13:46-49 ("intended programming is carried

---

[11] Plaintiff's expert speculates about hypothetical embodiments where a Player "could" perform functions that do not require interpretation or execution of the Application, but none of those hypothetical embodiments are described in the specification.  Schmandt Decl. ¶ 157.

out on device 130 when the device, having the appropriate device Player, receives, and executes the device-independent Application.").  The most reasonable interpretation of the language is that the Player on the device executes the Application.  *See* Schmandt Decl. ¶ 154.   The remaining portions of the specification cited by Plaintiff's expert further supports Defendants' proposed construction.  *See* Schmandt Decl. ¶¶ 155-56.

### 2.    "Player" / "player"

| Express Mobile's Proposed Construction | Defendants' Proposed Construction[12] |
|---|---|
| software code that facilitates the execution of an application on a device | device-specific code, that is separate from the Application and interprets or executes the Application<br><br>or<br><br>device specific code, <u>produced by the authoring tool</u>, that is separate from the Application and interprets or executes the Application [Expedia Defendants Only for '755 claim 12] |

Defendants' proposed construction of "Player" is the only proposed construction consistent with the applicant's description of its invention and the intrinsic record.  In contrast, Plaintiff's proposed construction finds no support in the intrinsic record.   The disputes between the parties' constructions are: (1) whether the Player is "device-specific code"; (2) whether the Player is separate from the Application and (3) whether the Player interprets or executes the Application.

The intrinsic record, including the specification, repeatedly describes the Player as a device-specific implementation.  *See, e.g.*, '755 patent at Abstract ("**Devices are provided with Players specific to each device** and Applications that are device independent.")[13]; 5:8-24 ("to provide instructions to each of the plurality of devices 130 in the form of a **device- or device-platform specific instructions for processor 135 of the device, referred to herein and without limitation as a 'Player'**"); 5:49-55 ("**A Player need be provided once** or updated as necessary,

---

[12] To simplify the disputes, the Defendants have combined the alternative constructions initially proposed.
[13] Emphasis was added to each of the quotations in this paragraph.

and thus may be **used to display a large number of Applications**. **This is advantageous** for the authoring process, **since all of the device-dependent programming is provided to a device only once (or possibly for some small number of upgrades)**, permitting a smaller Application, which is the same for each device 130."); 23:43-46 ("**Authoring platform 110 then generates** an Application and **a Player specific to device 130** of FIG. 4B."); *see also* Schmandt Decl. ¶ 165 (discussing how these citations and others support Defendants' proposed construction).

Likewise, during prosecution the applicant repeatedly represented to the Patent Office that the "Player" was device-specific. Critically, in the appeal brief that led to issuance of the application, the applicant told the patent office that "[t]he present patent application consistently use[s] [sic] the words 'Application' (with a capital A) and 'Player' (with a capital P) to refer to code that is provided to devices for accessing web services, where … a Player is **device-dependent code**." Ex. Q ('755 FH Appeal Brief, Nov. 26, 2014) at 9-10 n.2 (emphasis in original). The applicant made similar statements representing the Player as device-specific throughout prosecution:

> The files include a Player (sometimes referred to herein as a "first code") **specific to each device (that is, the code is "device-dependent")** and an Application (sometimes referred to herein as a "second code") that is device-independent. **The device-dependent Player** is activated by a web browser….**In one aspect of the present invention**, the device-independent Application and **device-dependent Player are both provided to a device**, such as a smartphone. Both codes are executed or interpreted on the same device, which communicates with a web service.

*Id.* at 8; *see also* Ex. O ('755 FH AMEND. "A", Mar. 6, 2013) at 11 ("There is no teaching or suggestion in *McCain* of an authoring tool that provides two separate codes: a device-dependent code (such as the claimed Player) and device-independent code (such as the claimed Application)."); *id.* at 12 ("There is no teaching or suggestion in *McCain* of using such a solution database in an authoring tool to generate both a device-dependent and device-dependent codes, as claimed."). Based on these "repeated and consistent remarks," in the *Shopify* case the Court construed the claimed "Player/player" to be device-specific. ECF No. 57-33 (Pl.'s Ex. 8, Shopify Order) at 10-14.

In contrast, Plaintiff identifies a single isolated passage to support its argument that the Player may be device-independent. (Pl.'s Br. at 19-20) (citing '755 patent at 1:55-67). That lone passage is at best, ambiguous, and cannot override the consistent description in the specification and the repeated statements in the prosecution history that the Player is device-specific. *See Sunovion Pharm., Inc. v. Teva Pharm. USA, Inc.*, 731 F.3d 1271, 1276 (Fed. Cir. 2013) ("[P]rosecution history may be critical in interpreting disputed claim terms because it contains the complete record of all the proceedings before the Patent and Trademark Office, including any express representations made by the applicant regarding the scope of the claims."). As explained by Defendants' expert, that statement in the specification can only reasonably be read to describe features of the language of the thin client device, not characteristics of the Player. Schmandt Decl. ¶¶ 161-64.

Regarding the remaining two arguments: (1) whether the Player is separate from the Application and (2) whether the Application is interpreted or executed by the Player, Defendants incorporate by reference their arguments from the Application term.

\*\*\*\*\*

The Expedia Defendants further submit that in Claim 12 of the '755 patent, the term "Player" must be construed as being produced by the authoring tool. This "produced-by-the-authoring-tool" limitation is expressly recited in Claim 1 of the '755 patent but is absent from Claim 12[14] But Express Mobile disclaimed the scope of "Player" by distinguishing cited prior art based on the fact that the claimed "Player" was produced by the authoring tool, specifically in the context of Claim 12.

In its January 16, 2014 Reply to Office Action of October 18, 2013, Express Mobile disavowed the scope of its claimed "Player" to traverse a rejection based on combinations of "McCain," "Paddon," and "Benedetti" references.

**Independent Claims 1 and 12 each recite an authoring tool that**

---

[14] Plaintiff asserts Claim 12 of the '755 patent only against the Expedia Defendants. As such, the arguments related to the construction of "Player" in the context of Claim 12 of the '755 patent are submitted on behalf of the Expedia Defendants only.

**produces a (device-dependent) Player and a (device-independent) Application, both of which are provided to a device having a display**. McCain teaches an authoring tool that generates a device-dependent Player provided to a device with a display. Paddon teaches providing device-dependent code to a device with a display and providing device-independent code to a server, and not the device having a display. **There is thus no teaching to provide a Player and an Application to a device with a display**.

There is also no suggestion in the references of sending both a Player and an Application to a device having display….The rejection states that **Benedetti teaches providing device dependent code to the display device. Applicants note, however, that Benedetti, teaches only generating device independent code, and cannot find any teaching or suggestion about Benedetti generating or providing device dependent code (a Player).**

Ex. P (Jan. 16, 2014 Reply to Office Action of Oct. 18, 2013) at 11.

The patentee stated clearly, unambiguously, and unequivocally that Claims 1 and 12 of the '755 patent require the authoring tool to produce the Player in order to traverse cited prior art. *See* ECF No. 57-33 (Pl.'s Ex. 8, Shopify Order) at 13 (finding prosecution history disclaimer "when the patentee explicitly characterizes an aspect of his invention in a specific manner to overcome prior art.") (citing *Purdue Pharma L.P. v. Endo Pharm. Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006). This was a clear and unmistakable disavowal of claim scope. *Id.*

### 3. "registry"

| Express Mobile's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary | database, XML file, or Portable Description Language file that exists on a computer |

Defendants' proposed construction of "registry" comes straight from the specification, which defines the claimed registry as "a database, XML file, or PDL [i.e., Portable Description Language] file[15] that exists on a computer." '755 patent at 8:20-22. The specification does not limit this definition to one embodiment, nor does the specification provide any guidance to a POSA on potential "registries" aside from a database, XML file, or PDL file. Plaintiff contends that there

---

[15] The specification uses PDL as an acronym for Portable Description Language. '755 patent at 6:4-6.

is no support for Defendants' purported "narrow construction," Pl.'s Br. at 23, but Plaintiff never identifies any registries supported by the specification that would not be encompassed by Defendants' proposed construction.

"Registry" is a term of art, the definition of which varies by context.  Schmandt Decl. ¶ 170.  Plaintiff refers to what it argues is a "standard technical dictionary" definition of "registry," but this definition is in fact defining a specific Windows Registry, not registries generally. Schmandt Decl. ¶ 173.  And in any event, as the definition quoted by Plaintiff makes clear, a POSA would recognize that the Windows Registry is a database on a computer and therefore satisfies Defendants' proposed construction.  *Id.*

Plaintiff offers no competing construction of its own and does not identify the issues with Defendants' proposed construction other than to say that Defendants' construction is too narrow. Given Plaintiff's unwillingness to provide a construction of its own or to explain the plain and ordinary meaning, it is unclear whether Plaintiff is seeking to exclude a single database, XML file, or PDL file from the definition of "registry."  Plaintiff's reliance on *Thorner* and *GE Lighting Sols.* to distance itself from the specification is misplaced.  Defendants' proposed construction of "registry" does not represent a departure from the plain and ordinary meaning of the term when read in the context of the specification.  *See GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) (evaluating whether the patentee acted as its own lexicographer where proposed construction was a departure from the undisputed plain meaning of the term "IDC connector").  As such, whether the lexicography standard has been met is irrelevant.  *See*, *e.g.*, *Thorner v. Sony Comp. Entm't Am. LLC*, 669 F.3d 1362, 1365-66 (Fed. Cir. 2012) (characterizing the lexicography rule as an exception to the general rule that claim terms are "generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history").

Plaintiff's separate argument that a registry need not exist "on a computer" as Defendants propose, Pl.'s Br. at 23, has no support.  Again, Plaintiff criticizes Defendants' proposed construction as being too narrow, *id.*, but fails to identify any other location of the registry that is

not "on a computer." Plaintiff argues that the claimed registry can also exist on a "server," but the specification confirms the unremarkable proposition that servers are computers and thus, this portion of Defendants' proposed construction is supported by the intrinsic record as well. *See* '755 patent at 8:19-22 (explaining that the registry "exists on a computer *that may be a server* previously described or another server 120").

### 4. "UI object"

| Express Mobile's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary | object(s) placed on a canvas that are intended for interaction with a user of a device. |

The specifications provide an express definition for the term "UI Object." "Objects placed on canvas 35 are intended for interaction with user of device 103 and are referred to herein, without limitation, as objects or UI (user interface) objects." '755 patent at 14:15-18; Schmandt Decl. ¶¶ 175-76. The statement is definitional (i.e., "are referred to herein") as opposed to merely a description of a preferred embodiment. *See Chemtall, Inc. v. United States,* 878 F.3d 1012, 1023 (Fed. Cir. 2017) (finding lexicography where patentee prefaced definition of term with "as used herein"). As is clear from the subsequent paragraphs, the phrase "without limitation" in the definition merely clarifies that the "UI Objects" of the '755 patent is a genus of which several species are discussed, such as text fields, text areas, choice objects, single item selection lists, check boxes, slide shows, text buttons, etc. '755 patent at 14:22-51 (identifying various exemplary "input UI objects" and "response UI objects"); Schmandt Decl. ¶ 179. Plaintiff must be bound by the express definition in the specification. *Sinorgchem,* 511 F.3d at 1136.

Plaintiff's attempts to avoid this express definition are unpersuasive. First, Plaintiff argues that Defendants' definition of UI Object "restricts the scope of the term 'objects' to only those objects 'that are intended for interaction with a user of a device." Pl.'s Br. at 26. But Plaintiff itself argues immediately above that the customary meaning of "user interface" is a means "through which a user of a device interacts with the device." *Id.* at 25. In the *Shopify* litigation, Plaintiff said it even more plainly: in the context of the '755 patent family, UI Objects "are nothing

24

more than 'objects' *intended for 'user interaction.'*"  Ex. R (Joint Claim Constr. Br. (Shopify)) at 87.  None of Express Mobile's citations – "e.g., media related UI objects" – are inconsistent with the specification's express definition of UI objects as being "[o]bjects … intended for interaction with the user of a device."  *See* Schmandt Decl. ¶¶ 178-79.

Second, Plaintiff points to a single, vague reference in the specification to a "UI Page Object" to argue that a "UI object need not always be on a 'canvas' … because it could be placed on a page."  Pl.'s Br. at 26-27 (citing '755 patent at 20:7).  But, in the '755 patent family, UI Objects must first be placed on a canvas before being recreated as part of a page or screen of an Application.  Schmandt Decl. ¶ 177 ("[F]or an object to be considered a 'UI object,' it must be an object placed on the canvas during the design process.")  The abstract describes the invention as "a full-featured WYSIWYG authoring environment."  '755 patent at Abstract.  An authoring tool is provided as part of the WYSIWYG environment that can be used to both place UI Objects on a canvas and bind attributes of UI Objects of an Application.  *Id.* at 8:58-63, 11:61-64. Later when the Application is executed by the Player, pages or screens of the Application recreate the UI Object based on the bound attributes on where the UI Object was placed on the canvas.  *See id.* at 15:59-62 (UI Objects are arranged "on an Applications Page by placing the objects canvas 305.").  None of Plaintiff's cited portions of the specification are inconsistent with the specification's express definition of UI Objects as being "placed on a canvas."  Indeed, every described embodiment in the specification contemplates UI Objects being placed a canvas to add the UI Object to an Application.

Finally, Plaintiff criticizes Defendants' proposed construction as "circular" and confusing because it utilizes the term "object."  Pl.'s Br. at 27.  If, as Plaintiff states elsewhere, "'object' similarly has a 'plain and ordinary meaning'" (*id.* at 25), then any of Plaintiff's articulated concerns regarding jury confusion is mere pretext.[16]

---

[16] Defendants further note that neither of Express Mobile's two formulations of the plain-and-ordinary meaning of "object" is consistent with the "object" of the '755 patent. The cited *Motion Games* court considered "object" in the non-analogous context of robotic assembly using *physical*

**D.      Disputed Term of the '287 Patent**

**1.      "An authoring tool configured to . . . a Player**

| Express Mobile's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary | an authoring tool configured to … produce a Player |

Claim 1 of the '287 patent recites a system that comprises an "authoring tool configured to" perform several tasks, highlighted in yellow below, including to "produce" an "Application." The parties dispute whether the recited "Player" is something that is produced by the "authoring tool" (like the preceding "Application" limitation), or whether the "Player" is completely separate from and unrelated to the claimed "authoring tool."

---

objects, such as "tools," "conveyer parts," "hooks," etc. *Motion Games, LLC v. Nintendo Co.*, No. 6:12-cv-878-JDL, No. 6:12-cv-878-JDL, 2015 WL 243447, at *3 (E.D. Tex. Jan. 16, 2015). Similarly, the cited Microsoft Computer Dictionary provides three definitions of "object," including for *graphics* (cited by Express Mobile) and for *computer programming*. The more relevant Microsoft Computer Dictionary definition is the one related to computer programming: "a variable comprising both routines and data that is treated as a discrete entity." ECF No. 57, Pl.'s Ex. 13, *The Microsoft Computer Dictionary* 337 (3d ed.) (object definition 2).

> an authoring tool configured to:
>
> **define a (UI) object for presentation on the display,**
> where said defined UI object corresponds to a web
> component included in said registry selected from
> a group consisting of an input of the web service
> and an output of the web service, where each
> defined UI object is either: 1) selected by a user of
> the authoring tool; or 2) automatically selected by
> the system as the preferred UI object correspond-
> ing to the symbolic name of the web component
> selected by the user of the authoring tool,
>
> **access said computer memory** to select the symbolic
> name corresponding to the web component of the
> defined UI object,
>
> **associate   the   selected   symbolic   name** with   the
> defined UI object, where the selected symbolic
> name is only available to UI objects that support
> the defined data format associated with that sym-
> bolic name, and
>
> **produce an Application** including the selected sym-
> bolic name of the defined UI object, where said
> Application is a device-independent code; and
> a Player, where said Player is a device-dependent
> code, wherein, when the Application and Player
> are provided to the device and executed on the
> device, and when the user of the device provides
> one or more input values associated with an input
> symbolic name to an input of the defined UI
> object,

The structure of the claim itself confirms that Defendants' proposed construction is correct, such that the "authoring tool" "produce[s]" the claimed "Application" and "Player." Following the recitation of the "authoring tool," the claim recites—as sub-elements all indented at the same level—a series of *actions* that the "authoring tool" is configured to perform:  to "*define* a (UI) object," "*access* said computer memory," "*associate* the selected symbolic name," and "*produce* an Application." The claim recites the "Player" among that same set of tasks, demonstrating under a straightforward reading of the claim structure that the "authoring tool" is configured to do something with respect to the "Player"—namely, it "produce[s]" both the "Application" and the "Player." Indeed, the claim as structured makes no sense if no verb precedes "a Player."

The prosecution history of the '287 patent confirms that the "authoring tool" must "produce" the "Application" and the "Player," consistent with Defendants' proposed construction. During prosecution, the patentee amended Claim 1 of the '287 patent to (1) clarify the scope of

the claimed "UI object," and (2) to add other limitations, including the "Application" and "Player." Ex. S ('287 patent, July 16, 2015 Office Action) at 3-4.   In the Remarks accompanying that amendment, the patentee explained:

> Claim[] l [is] amended to recite that the <u>defined UI object corresponds to the web component included in said registry selected from the group consisting of an input of the web service and an output of the web service, where each defined UI object is either: 1) selected by a user of the authoring tool; or 2) automatically selected by the system as the preferred UI object corresponding to the symbolic name of a web component selected by a user of the authoring tool</u>…***The other amendments of Claim[] 1 … are identical to amendment to the claims made in …US. Patent No. 9,063,755. Support for these amendments may be found in the file history of that patent.***

*Id.* at 8.

During prosecution of the '755 patent, the applicant amended the independent claims to include requirements that the authoring tool be configured to (1) "produce an Application" and (2) "produce a Player, where said Player is a device-dependent code." Ex. O ('755 patent, Mar. 6, 2013 Office Action) at 2. Because the patentee asserted that amendments made to Claim 1 of the '287 patent are ***identical*** to amendments made to the '755 patent, the patentee unambiguously intended the "Player" amendment of the '287 patent to be identical to the "Player" amendment of the '755 patent—that is, the Player of the '287 patent, like that of the '755 patent, is "produced" by the authoring tool.

Indeed, the applicant subsequently authorized the Examiner to amend Claim 1 of the '287 patent to make clear that the Player is associated with—and not a separate component from—the authoring tool. During prosecution of the '287 patent, the applicant and the Examiner discussed Claim 1 in an interview in which "[a]uthorization to do the examiner's amendment is given [] to put the case in condition for allowance." Ex. T ('287 patent, Examiner-Initiated Interview Summary, June 8, 2016).   The amendment authorized by the applicant included a change to the indentation of the claim to clarify that the Player ***is a part of what the authoring tool is***

28

*configured to produce:*



*Compare* Ex. S ('287 patent, July 16, 2015 Office Action) at 3-4 (left, annotation added) *with* Ex. U ('287 patent, Notice of Allowability) at 2-3 (right, annotation added).  The semicolon is thus not intended to represent the Player as a component of the claim in the same manner as the authoring tool.

Plaintiff argues that its interpretation—in which no verb applies to "Player"—is grammatically correct based on the claim's use of semicolons.  To the contrary, Defendants' proposed construction is the one that is consistent with the patentee's use of semicolons in Claim 1 as a means of distinguishing between phrases.  For example, Claim 1 includes the limitation "each defined UI object is either: 1) selected by a user…; or 2) automatically selected…."  '287 patent at 38:1-5.  In that part of the claim, the semicolon distinguishes between the two ways a defined UI object can be selected. Similarly, a semicolon distinguishes between the two types of code that an authoring tool is configured to produce: "produce an Application … where said Application is a device-dependent code; and a Player, where said Player is a device-dependent code." *Id.* at 38:16-20. The semicolon before "and a Player" thus clarifies that the Player is modified by the earlier recitation of "produce," and is not an additional description of the Application itself.

For at least the reasons above, the Court should adopt Defendants' proposed construction to clarify that "produce" in Claim 1 acts on the "Player" as well as the "Application."

## IV.     CONCLUSION

For the foregoing reasons, Defendants request that the Court adopt Defendant's proposed constructions.

Dated: June 22, 2021

*/s/ Heidi L. Keefe*
Heidi L. Keefe
Elizabeth Stameshkin
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304
Telephone:     (650) 843-5000
Fax:  (650) 849-7400
hkeefe@cooley.com

Phillip E. Morton
COOLEY LLP
1299 Pennsylvania Avenue
NW, Suite 700
Washington, DC 20004-2400
Telephone:  (202) 842-7800
Facsimile:    (202) 842-7899

Deron R. Dacus (TX 00790553)
THE DACUS FIRM, PC
821 ESE Loop 323, Suite 430
Tyler, TX 75701
Telephone: (903) 705-1117
Facsimile: (903) 581-2543
ddacus@dacusfirm.com

**Attorneys for Defendant Facebook, Inc.**

*/s/ Jeffrey J. Catalano*
Melissa R. Smith
Texas Bar No. 24001351
melissa@gillamsmithlaw.com
**GILLAM & SMITH, LLP**
303 South Washington Avenue
Marshall, Texas 75670
Tel: (903) 934-8450
Fax: (903) 934-9257

Jeffrey J. Catalano
IL Bar No. 6289197
Email: jcatalano@freeborn.com
Troy D. Smith
IL Bar No. 6297657
Email: tsmith@freeborn.com
FREEBORN & PETERS LLP
311 South Wacker Drive, Suite 3000
Chicago, IL 60606
Telephone: (312) 360-6000
Facsimile: (312)-360-3520

31

Sarah A. Gottlieb
FL Bar No. 125232
Email: sgottlieb@freeborn.com
FREEBORN & PETERS LLP
201 North Franklin Street, Suite 3550
Tampa, FL 33602
Telephone: (813) 488-2920

***Attorneys for Defendants Expedia, Inc. and
HomeAway.com, Inc.***


/s/ *Will Melehani*

Melissa R. Smith
Texas Bar No. 24001351
melissa@gilliamsmithlaw.com
GILLIAM & SMITH, LLP
303 South Washington Ave.
Marshall, TX  75670
Tel: (903) 934-8450
Fax: (903) 934-9257

Jared Bobrow (pro hac vice)
jbobrow@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE
LLP
1000 Marsh Road
Menlo Park, CA  94025-1015
Tel: (650) 614-7400
Fax: (650) 614-7401

Will Melehani (pro hac vice)
wmelehani@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE
LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Tel: (415) 773-5700
Fax: (415) 773-5759

***Attorneys for Defendant eBay Inc.***

*/s/ Ameet A. Modi*
J. Mark Mann
State Bar No. 12926150
mark@themannfirm.com
G. Blake Thompson
State Bar No. 24042033
blake@themannfirm.com
**MANN | TINDEL | THOMPSON**
300 West Main St.
Henderson, Texas 75652
Tel: (903) 657-8540
Fax: (903) 657-6003

Ameet A. Modi (*pro hac vice*)
amodi@desmaraisllp.com
**DESMARAIS LLP**
101 California Street
San Francisco, California 94111
Tel: (415) 573-1900
Fax: (415) 573-1901

John M. Desmarais (*pro hac vice)*
jdesmarais@desmaraisllp.com
Jun Tong (*pro hac vice*)
jtong@desmaraisllp.com
**DESMARAIS LLP**
230 Park Avenue
New York, New York 10169
Tel: (212) 351-3400
Fax: (212) 351-3401

*Attorneys for Defendant Google LLC*


*/s/ Adam R. Brausa*
DARALYN J. DURIE (*Pro Hac Vice*)
ddurie@durietangri.com
TIMOTHY C. SAULSBURY (*Pro Hac Vice*)
tsaulsbury@durietangri.com
ADAM R. BRAUSA (*Pro Hac Vice*)
abrausa@durietangri.com
VERA RANIERI (*Pro Hac Vice*)
vranieri@durietangri.com
RAGHAV R. KRISHNAPRIYAN (*Pro Hac Vic*
rkrishnapriayn@durietangri.com
ERIC C. WIENER (*Pro Hac Vice*)
ewiener@durietangri.com
**DURIE TANGRI LLP**
217 Leidesdorff Street
San Francisco, CA  94111
Telephone:     415-362-6666
Facsimile:     415-236-6300

MOON HEE LEE (*Pro Hac Vice*)
mlee@durietangri.com
**DURIE TANGRI LLP**
953 East 3rd Street
Los Angeles, CA 90013
Telephone:     213-992-4499
Facsimile:     415-236-6300

MELISSA R. SMITH (TX SBN 24001351)
melissa@gillamsmithlaw.com
**GILLAM & SMITH, LLP**
303 South Washington Avenue
Marshall, TX 75670
Telephone:     903-934-8450
Facsimile:     903-934-9257

*Attorneys for Defendants*
*ATLASSIAN CORP. PLC and*
*ATLASSIAN, INC.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 22, 2021 the within document was filed with the Clerk of the Court using CM/ECF which will send notification of such filing to the attorneys of record in this case.

*/s/ Melissa R. Smith*

_____

Melissa R. Smith