# EXHIBIT L

Laurie Edelstein (Bar No. 164466)
STEPTOE & JOHNSON LLP
One Market Plaza
Spear Tower, Suite 3900
San Francisco, CA 94105
Phone: (415) 365-6700
Fax: (415) 365-6699
ledelstein@steptoe.com

James R. Nuttall (admitted *pro hac vice*)
Michael Dockterman (admitted *pro hac vice*)
Katherine H. Johnson (admitted *pro hac vice*)
Tron Fu (admitted *pro hac vice*)
Robert F. Kappers (admitted *pro hac vice*)
STEPTOE & JOHNSON LLP
227 West Monroe Street, Suite 4700
Chicago, IL 60606
Phone: (312) 577-1300
Fax: (312) 577-1370
jnuttall@steptoe.com
mdockterman@steptoe.com
kjohnson@steptoe.com
tfu@steptoe.com
rkappers@steptoe.com

Christopher A. Suarez (admitted *pro hac vice*)
STEPTOE & JOHNSON LLP
1330 Connecticut Ave NW
Washington, DC 20036
Phone: (202) 429-3000
Fax: (202) 429-3902
csuarez@steptoe.com

Timothy Devlin (admitted *pro hac vice*)
DEVLIN LAW FIRM LLC
1526 Gilpin Avenue
Wilmington, Delaware 19806
Telephone: (302) 449-9010
Facsimile: (302) 353-4251
tdevlin@devlinlawfirm.com

*Attorneys for Plaintiff Express Mobile, Inc.*

*STEPTOE & JOHNSON LLP*
*One Market Plaza, Spear Tower, Suite 3900*
*San Francisco, CA 94105*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

EXPRESS MOBILE, INC.,

                    Plaintiff,

     v.

WIX.COM, LTD. AND WIX.COM, INC.,

                    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 3:19-cv-06559-RS

**PLAINTIFF EXPRESS MOBILE, INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

Date: March 19, 2021
Time: 10:00 A.M.
Courtroom: 3, 17th Floor
Judge: Hon. Richard Seeborg

# TABLE OF CONTENTS

I. INTRODUCTION .................................................................................................. 1

II. BACKGROUND ................................................................................................... 1

    A. The '397 Patent and the '168 Patent ........................................................ 1

    B. The '755 Patent, the '287 Patent and the '044 Patent .............................. 3

III. LEGAL STANDARDS ......................................................................................... 4

    A. Claim Construction .................................................................................. 4

    B. Person of Ordinary Skill in the Art ......................................................... 5

IV. DISPUTED CLAIM TERMS ............................................................................... 5

    A. Terms of the '397 and '168 Patents ......................................................... 6

        1. virtual machine ............................................................................ 6

        2. virtual machine commands / commands to said virtual machine ............... 9

        3. at least one run time file / one or more run time files ............................. 10

        4. run time engine / runtime engine ..................................................... 11

        5. database ................................................................................... 13

        6. contemporaneously / substantially contemporaneously ...................... 14

    B. Terms of the '755, '287, and '044 Patents ............................................. 15

        1. application ................................................................................. 15

        2. player ...................................................................................... 19

        3. device-dependent code / device dependent code ............................... 22

        4. web component .......................................................................... 24

# TABLE OF AUTHORITIES

**Cases**                                                                     **Page(s)**

*Aventis Pharms., Inc. v. Amino Chems. Ltd.*,
    715 F.3d 1363 (Fed. Cir. 2013)..................................................................................4

*Epos Techs. Ltd. v. Pegasus Techs. Ltd.*,
    766 F.3d 1338 (Fed. Cir. 2014)..................................................................................5

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
    381 F.3d 1111 (Fed. Cir. 2004)................................................................................20

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
    358 F.3d 898 (Fed. Cir. 2004)....................................................................................7

*Markman v. Westview Instr., Inc.*,
    517 U.S. 370 (1996)....................................................................................................4

*Omega Eng'g, Inc. v. Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003)..................................................................................5

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)......................................................................... *passim*

*ResQNet.com, Inc. v. Lansa, Inc.*,
    346 F.3d 1374 (Fed. Cir. 2003)................................................................................21

*SynQor, Inc. v. Artesyn Techs., Inc.*,
    709 F.3d 1365 (Fed. Cir. 2013)..................................................................................5

*Trading Techs. Int'l, Inc. v. Open E Cry, LLC*,
    728 F.3d 1309 (Fed. Cir. 2013)................................................................................21

*Williamson v. Citrix Online, LLC*,
    792 F.3d 1339 (Fed. Cir. 2015)..................................................................................5

STEPTOE & JOHNSON LLP
One Market Plaza, Spear Tower, Suite 3900
San Francisco, CA 94105

Plaintiff Express Mobile, Inc. hereby submits its Opening Claim Construction Brief in accordance with Patent Local Rule 4-5(a) regarding claim terms from U.S. Patent No. 6,546,397 ("the '397 Patent"), U.S. Patent No. 7,594,168 (" the '168 Patent"), U.S. Patent No. 9,063,755 (" the '755 Patent"), U.S. Patent No. 9,471,287 (" the '287 Patent"), and U.S. Patent No. 9,928,044 (" the '044 Patent").

## I.     INTRODUCTION

This Court previously construed several terms of the '397 and '168 patents. (Ex. 14, *X.Commerce, Inc. v. Express Mobile, Inc.*, No. 17-cv-2605-RS, Dkt. 81 (N.D. Cal. Sept. 12, 2018) ("Magento Order")).[1]  With respect to the disputed claim terms of those patents, Express Mobile generally applies the Court's prior constructions, while Wix generally deviates from this Court's constructions and proposes constructions that were either already rejected or that attempt to redefine terms contrary to their ordinary meaning and well-established law.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13, 1323 (Fed. Cir. 2005). Express Mobile's constructions are consistent with the terms' plain meaning, this Court's prior rulings, and are supported by the intrinsic and extrinsic evidence and the understanding of one of skill in the art.[2]

The disputed terms of the '755, '287, and '044 patents are before this Court for the first time.  Express Mobile submits that its proposed constructions for those terms are consistent with the specification, claims, and prosecution histories of those three patents, and that Wix's proposed constructions are unduly narrow.  Wix's constructions are again a transparent attempt to rewrite the claims to try to avoid liability and should be rejected.

## II.     BACKGROUND

### A.     The '397 Patent and the '168 Patent

The '397 and '168 patents are directed toward groundbreaking innovations in web design technology.  The invention of the '397 and '168 patents "includes a Browser Based build

---

[1]  The Declaration of Christopher A. Suarez is submitted concurrently herewith and exhibits hereinafter are referred to as "Ex. __".

[2]  Glenn Weadock has an engineering degree from Stanford University and has nearly 30 years of experience in computer programming, web design, and the IT field.  (Ex. 6 ¶¶ 3-13).

STEPTOE & JOHNSON LLP
One Market Plaza, Spear Tower, Suite 3900
San Francisco, CA 94105

engine," and a "Browser Based Interface . . . between the web designer and the build engine," which allow a user to easily build a website. (Ex. 1, '397 Patent at 1:52-56). The user interface allows the user to select settings within the browser that allow the user to build (and see) the development of a website in real time, and the system associates those user selectable settings with values in a database.  These settings include "colors, fonts, images, audio clips, video clips, text areas, URLs and thread objects." (Ex. 1, '397 Patent at 2:9-10). The patent describes a simplified architecture that allows one to implement website building seamlessly, including "a run time generation procedure that creates a compressed web site specific customized run time engine program file, with its associated database and a build engine generated HTML shell file." (Ex. 1, '397 Patent at 2:10-14). The patents explain that "[t]he entire web site build process is WYSIWYG (what you see is what you get), with the web designer working directly on and with the final web page." (Ex. 1, '397 Patent at 2:34-37). The browser-based interface has "interface objects with a look and feel that is identical to that of MS Windows, yet includes technologies that equal or surpass those of high end word processors, desk top publishers, and image processing software programs, particularly in the areas of interaction, animation, and timeline technologies." (Ex. 1, '397 Patent at 2:51-57). And "[t]he run time engine includes multimedia capabilities often rivaling the digital processing capabilities seen on television and in the movies." (Ex. 1, '397 Patent at 2:57-59).

The '397 patent issued on April 8, 2003. During the prosecution of the '397 patent, the examiner allowed the claims because, as he explained:

> [T]he prior art of record does not disclose or make obvious a system and method for producing web sites including a viewable menu of a user selectable panel of settings to describe elements on a website, at least one of said user selectable settings corresponding to commands of a virtual machine, a browser to generate a display in accordance with one or more user selected settings contemporaneously with the selection thereof, a database for storing information representative of said one or more user selected settings and wherein a run time utilizes information stored in said database to generate at least a portion of a web page, in combination with all the limitations recited in [the claims].

(Ex. 8, '397 Prosecution History, Notice of Allowance, XMO_WIX00000919).

Additionally, with regard to the closest prior art—Faustini (U.S. Patent No. 5,842,020) and

STEPTOE & JOHNSON LLP
One Market Plaza, Spear Tower, Suite 3900
San Francisco, CA 94105

Wishnie (U.S. Patent No. 6,148,311)—the examiner explained that those references "d[id] not show a run time file utilizing user selected settings stored in a database to generate virtual machine commands for generating web sites as recited in [the claims]." (*Id*).

The '168 patent issued on September 22, 2009. The issued claims of the '168 patent were likewise allowed over the prior art because those claims are directed to additional and related features, such as object styles, transformations, and timelines, in combinations that were not disclosed in or rendered obvious by any of the prior art. As the examiner explained, "[i]n combination with the other claimed features, producing a database of the constituent objects of a plurality of webpages including styles that include transformations and timelines for those objects in the manner claimed such that the web sites can be created from the database cannot be suggested by a combination of the prior art." (Ex. 9, '168 Prosecution History, Notice of Allowance, XMO_WIX00001663).

## B.     The '755 Patent, the '287 Patent and the '044 Patent

The '755, '287, and '044 patents are of significant importance.  The '755, '287, and '044 patents relate to an improved method for the display of web service content (such as weather information, RSS feeds, or other data obtained from a network) in a seamless and efficient way. Specifically, the claims cover a new and improved architecture and method for the display of web service content on a device platform by, among other things, associating symbolic names with the inputs and outputs of web services using a registry.  In some embodiments, "[t]he system includes a database of web services obtainable over a network and an authoring tool. The authoring tool is configured to define an object for presentation on the display, select a component of a web service included in said database, associate said object with said selected component, and produce code that when executed on the platform, provides said selected component on the display of the platform." (Ex. 3, '755 Patent at 1:35-42). In other embodiments, the claims recite a method that performs similar functionality. (*Id*. at 1:51-58). Within the claimed architecture, the invention includes the use of symbolic names that are used to associate inputs and outputs of web services with objects on a display. (*Id*. at 37:16-23 (claim 1)). And the invention includes software code, including an application and a player, wherein the

STEPTOE & JOHNSON LLP
One Market Plaza, Spear Tower, Suite 3900
San Francisco, CA 94105

1    application is a device independent code that provides instructions for a device and, in some

2    embodiments, may be interpreted by the player. (*Id.* at 2:1-3).

3          The prosecution histories of the '755, '287, and '044 patents validated the novelty and the

4    importance of the technologies described and claimed in those patents. The '755 patent issued

5    on June 23, 2015. Its claims were allowed because the prior art did not anticipate or render

6    obvious the recited architecture to facilitate the display of web services on devices. (Ex. 10, '755

7    Prosecution History, Notice of Allowability, XMO_WIX0003039-40). The examiner further

8    explained that "[a]t best the previous prior arts of record," including McCain (U.S.

9    2005/0273705), "disclose[d] a method and system for automatically creating network software

10   applications," and was thus distinguishable. (*Id.* at XMO_WIX00003040).

11         The '287 and '044 patents issued from continuation applications from the '755 patent,

12   have certain additional inventions and features, and were allowed for similar reasons as the

13   claims of the '755 patent. (Ex. 11, '287 Prosecution History, Notice of Allowability,

14   XMO_WIX00003290-91; Ex. 12, '044 Prosecution History, Notice of Allowability,

15   XMO_WIX00003514-15). The claims of the '044 patent are somewhat different from those of

16   the '755 and '287 patents in that they involve the use of databases, among other things. (*See* Ex.

17   5, '044 Patent, at 37:48-40:55).

18   **III.   LEGAL STANDARDS**

19         **A.   Claim Construction**

20         Claim construction is a matter of law. *Markman v. Westview Instr., Inc.*, 517 U.S. 370,

21   384 (1996), and must always begin with the words of the claim itself. *Phillips v. AWH Corp.*,

22   415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). There is a "heavy presumption that claim terms

23   are to be given their ordinary and customary meaning" because "the words of the claims

24   themselves . . . define the scope of the patented invention." *Aventis Pharms., Inc. v. Amino

25   Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013).

26         In the context of claim construction, "ordinary and customary" means how a person of

27   skill in the art at the time of the invention would have understood the term as it is used in the

28   claim. *Phillips*, 415 F.3d at 1313. Where the ordinary meaning of claim language is readily

**STEPTOE & JOHNSON LLP**
One Market Plaza, Spear Tower, Suite 3900
San Francisco, CA 94105

PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF                    CASE NO. 19 CIV. 06559 (RS)

understood by a person of skill in the art, claim construction "involves little more than the application of the widely accepted meaning of commonly understood words." *Id*. at 1314.

When necessary to construe a claim, intrinsic evidence is typically "the single best guide to the meaning of a disputed term." *Phillips*, 413 F.3d at 1315 (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). Of course, the claims are "read in view of the specification, of which they are a part." *Phillips* at 1315. Generally, however, it is a "cardinal sin" to read a limitation from the specification into the claims. *Id*. at 1320; *see also Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1346- 47 (Fed. Cir. 2015). This holds even if the specification describes only one embodiment. *Epos Techs. Ltd. v. Pegasus Techs. Ltd.*, 766 F.3d 1338, 1341 (Fed. Cir. 2014). Conversely, it is rarely correct to exclude from the scope of the claims a preferred embodiment of the specification: "a claim construction that excludes the preferred embodiment is rarely, if ever, correct." *SynQor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365, 1378-79 (Fed. Cir. 2013) (quotations omitted).

Although a patent's prosecution history is relevant to the claim construction analysis, any disclaimer of claim scope based on prosecution history must be "clear and unmistakable." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325-26 (Fed. Cir. 2003).

## B. Person of Ordinary Skill in the Art

According to Express Mobile's expert, Mr. Glenn Weadock, a person of ordinary skill in the art ("POSA") of the patents-in-suit would include someone who had a bachelors or graduate degree in computer science, mathematics, engineering, or a similar discipline together with knowledge of software development and web design and development with graphical user interfaces and systems, together with approximately two or three years of experience in the field relating to web design and development. (Ex. 6 ¶¶ 14-17).

## IV. DISPUTED CLAIM TERMS

Pursuant to Patent L.R. 4-3(c), the parties identified the following disputed claim terms, in no particular order, whose constructions will be most significant to the resolution of the case.

A. **Terms of the '397 and '168 Patents**

1. **virtual machine**

| Express Mobile's Proposed Construction | Wix's Proposed Construction |
|---|---|
| an abstract machine that is not built in hardware but is emulated in software | abstract machine that is emulated in software and that executes intermediate code in the instruction set of that machine |

For this particular term, Express Mobile proposes the exact construction of virtual machine that this Court adopted previously—"an abstract machine that is not built in hardware but is emulated in software." (Ex. 14, *X.Commerce, Inc. v. Express Mobile, Inc.*, 17-cv-2605-RS, Dkt. 81, at 5-6 (N.D. Cal. Sept. 12, 2018) ("Magento Order"). Express Mobile's construction is supported by the claims, specification, prosecution history and extrinsic evidence. (Ex. 6 ¶¶ 23-32). The claims use the term virtual machine broadly without limitation: claim 1, for example, recites "virtual machine commands" that correspond to "user selectable settings" and are used to render the web page. (Ex. 1, '397 Patent at 65:53-54).

The specification and prosecution history also use the virtual machine term broadly. To the extent that the '397 patent specification mentions a virtual machine, it refers to an exemplary Java Virtual Machine. (Ex. 1, '397 Patent at 35:36-37). At the same time, it also specifies that other programming languages besides Java may be used to practice the invention as browser technology develops over time, and as full-featured programming languages develop. (*See* Ex. 1, '397 Patent at 32:21-25 ("Provisions are made in the invention so that as the then popular browsers support more robust versions of programming languages, those new capabilities can be employed to further enhance the capability of the invention."; 62:33-36 ("As the full-featured programming languages supported by browsers evolve, the run time engine may be configured to respond to other user interactions . . . ."). The prosecution history, meanwhile, confirms that the claims were broadly amended to refer to virtual machine, and nothing in the prosecution history suggests that the term was intended to be limited to a specific type of virtual machine, or to a virtual machine that has limited functionality relative to its plain and ordinary meaning. (*See, e.g.*, Ex. 18 at XMO_WIX000076263 (new claim 2), XMO_WIX000076268-269 (remarks)). Indeed, neither "intermediate code" nor "instruction set"—two elements that Wix seeks to add to

STEPTOE & JOHNSON LLP
One Market Plaza, Spear Tower, Suite 3900
San Francisco, CA 94105

the instruction—appear in the Applicant's remarks during prosecution, in the prosecution

generally, or in the claims or specification at all. Nor did the Applicant distinguish the invention

over the prior art based on the presence of a virtual machine.

Wix improperly attempts to add two extraneous limitations: "that executes intermediate

code" and "in the instruction set of that machine" that are unsupported by the intrinsic or

extrinsic evidence. This Court previously rejected similar arguments and limitations and both of

these limitations were specifically rejected by another court, and neither should be adopted here.

(Ex. 14, Magento Order at 6 ("It simply does not follow . . . that the patent claims are limited to

virtual machines that execute compiled code."); Ex. 15, *Shopify Inc. v. Express Mobile, Inc.*, 19-

cv-439-RGA, Dkt. 137, at 4-5 (D. Del. June 23, 2020) ("Shopify Order") ("In *X.Commerce, Inc.

v. Express Mobile, Inc.*, the court rejected the similar argument that this term is limited to

'compiled code.' . . . The court concluded that although 'the specification was drafted to explain

the invention in the context of the JVM, . . . [i]t simply does not follow . . . that the patent claims

are limited to virtual machines that execute compiled code.' I agree, and I see no reason that

'executes intermediate code in the instruction set of that machine' should be any different.").

Wix apparently asserts that these two extraneous limitations should be read into the

construction because the specification discloses Java Virtual Machine as a preferred

embodiment. Even assuming, arguendo, that the Java virtual machine is the only preferred

embodiment the claims should not be limited to that embodiment. (Ex. 6 ¶¶ 26-30). Indeed,

addressing that very embodiment, this Court already rejected a requirement that the virtual

machine "execute compiled code, such as bytecode," and explained that regardless of the

patent's disclosure of a virtual machine, "[i]t simply does not follow . . . that the patent claims

are limited to virtual machines that execute compiled code," or to bytecode. (Ex. 14, Magento

Order at 5-6). *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004)

("Even when the specification describes only a single embodiment, the claims of the patent will

not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim

scope using 'words or expressions of manifest exclusion or restriction.'"). That is consistent

with the Court's order in the *Shopify* case, where the court explained that "the 'Java Virtual

STEPTOE & JOHNSON LLP
One Market Plaza, Spear Tower, Suite 3900
San Francisco, CA 94105

Machine' mentioned in the specification is clearly just one possible embodiment, not the invention itself," and expressly agreed with this Court's analysis in the *X.Commerce* matter. (Ex. 15, Shopify Order at 4-5).

Furthermore, as noted above, the specification discloses that other programming languages can be used to practice the invention, particularly as browsers develop over time. (*See* Ex. 1, '397 Patent at 32:21-25, 62:33-36). One of ordinary skill in the art would understand a "full-featured programming language" and "popular browsers" with "more robust versions of programing languages" to disclose the use of other virtual machines. (Ex. 6 ¶ 27). Most browser programming languages rely on virtual machines that do not execute intermediate code. (Ex. 6 ¶¶ 28-32). Thus, the specification contemplates the use of a variety of virtual machines without limiting to intermediate code.

Wix, in sum, attempts to read in alleged limitations of a preferred embodiment into the claims. But the patentee made no mention at all, much less limiting or defining statements, that intermediate code was critical or a necessary part of the Virtual Machine. The Court should reject Wix's invitation to do so.

Lastly, no Court has adopted, and two courts have specifically rejected, Wix's extraneous and improper "in the instruction set of that machine" limitation. (Ex. 16, Svanaco Order at 9 (finding it "both redundant and potentially confusing to the jury"); Ex. 15, Shopify Order at 4-5 ("reject[ing] Shopify's proposed construction" that includes the "in the instruction set of that machine" language)). To the extent Wix and its experts attempt to argue that certain processors, such as ARM and Intel processors, include "instruction sets," Wix's argument is incorrect because not all virtual machines are tied to a particular processor, not all virtual machines emulate a particular physical machine, and other virtual machines—such as JavaScript engines or browser rendering engines—can emulate the functionality of software or hardware without being tied to a particular instruction set, and that virtual machines are not necessarily tied to any particular platform. (Ex. 7, Weadock Supp. Decl. ¶¶ 11-16). This argument by Wix and its expert is simply another irrelevant red herring in an attempt to read Wix's extraneous and improper limitations into the claims.

**2.   virtual machine commands / commands to said virtual machine**

| Express Mobile's Proposed Construction | Wix's Proposed Construction |
|---|---|
| No construction necessary | code in the instruction set of the virtual machine |

The term "virtual machine" is already being separately construed and it is unnecessary to construe "commands," a common term well-known in the field of computing. (Ex. 6 ¶¶ 33-35). Wix's counsel and expert previously used this term in its construction of runtime engine without ever suggesting that "commands" needs its own construction. (Ex. 16, Svanaco Order at 10). Defendants and their experts changed their position and now argue that virtual machine commands should be limited to code in the instruction set. But Wix's construction suffers from multiple problems. First, commands are broader than just "code." The specification describes various types of commands common in computing, including actions the virtual machine can perform that are not code, such as "user commands (actions)." (Ex. 1, '397 Patent at 6:15, 10:33-34, 19:44-45; Ex. 6 ¶ 34). Additionally, commands that are available through the menu bar and commands, icon commands, and other commands may not exist discretely in the instruction set of a machine, but may represent combinations of many individual instructions; these composite commands would still be understood to be virtual machine, and would not necessarily be code. (Ex. 6 ¶ 34). Indeed, definitions of "command" underscore that commands are simply *instructions to computer* programs, which is not the same as the code *in the computer program.* (Ex. 6 ¶ 34 (citing dictionaries)).   As do disclosures in the specification pertaining to high-level display formatting commands that cause the virtual machine to perform the appropriate formatting and display actions, which are commands to—and not in—the virtual machine. (Ex. 1, '397 Patent at 66:1-2, 69:2-4, 70:14-16; Ex. 7, Weadock Supp. Decl. ¶¶ 32-33). This is also consistent with the claim language of "commands to the virtual machine," which Mr. Schmandt admits should be accorded the same meaning as "virtual machine commands." (Ex. 7, Weadock Supp. Decl. ¶ 31).

Second, Wix's attempt to import the limitation of "in the instruction set of the virtual machine" is both unsupported by the intrinsic evidence (see discussion above of "virtual

STEPTOE & JOHNSON LLP
One Market Plaza, Spear Tower, Suite 3900
San Francisco, CA 94105

STEPTOE & JOHNSON LLP
One Market Plaza, Spear Tower, Suite 3900
San Francisco, CA 94105

1  machine") and introduces needless ambiguity of what constitutes an instruction set of the virtual

2  machine.  (Ex. 6 ¶ 35).

3          **3.**     **at least one run time file / one or more run time files**

| Express Mobile's Proposed Construction | Wix's Proposed Construction |
|---|---|
| one or more files, including a run time engine, that are downloaded or created when the browser is pointed to a web page or website | one or more files, including a run time engine, that are downloaded or created, and executed by a browser to display a webpage when the browser is pointed to a webpage |

       Express Mobile proposes that this term be construed as "one or more files, including a run time engine, that are downloaded or created when a browser is pointed to a web page or website."  This is the exact construction Wix's counsel previously agreed was appropriate when representing Shopify.  (Ex. 17, Shopify JCCB at 1 (construction of "one or more run time files / at least one run time file")).

       Express Mobile respectfully submits that this construction is correct and that the construction should not include a requirement that the "one or more run time files" are "executed by a browser" as Wix proposes and the Court previously found.  The specification makes clear that the "one or more run time files" are not necessarily files that are executed by browsers, and can be other files, including image, audio, and video files.  (Ex. 1, '397 Patent at 2:60-66; Ex. 6 ¶ 40).  From the perspective of the POSA, therefore, there can be more than one run time file, and those other files would not necessarily be executable.  (Ex. 6 ¶¶ 40-42).

       To the extent that this Court previously held that "image files and other similar files" are not "run time files," Express Mobile respectfully requests that the Court reconsider this issue because the specification discloses that image files are expressly part of the "run time files."  The specification expressly states, as Wix's expert acknowledges, that "run time files . . . *(includ[e] HTML shell, CAB/JAR files and a customized runtime engine)*."  (Ex. 1, '397 Patent at 5:53-62 (emphasis added); Ex. 13, Schmandt Decl. ¶ 135).  The specification states that the "image objects" are part of those "CAB and JAR files," as Mr. Schmandt obliquely admits.  (Ex. 1, '397 Patent at 44:37-41; Ex. 13, Schmandt Decl. ¶ 137 ("CAB and JAR files may contain other non-executable files, such as image files")).  Indeed, the specification states explicitly that the "CAB

and JAR Files contain the compressed versions of all necessary JAVA class files, image file, the 'Websitename'.class, customized run time engine file, and the 'Websitename'.dta database file." (Ex. 1, '397 Patent at 44:47-51). The scope of the "one or more run time files" claim term therefore must include the image files within the CAB and JAR files. The specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Philips*, 415 F.3d at 1315.

Moreover, even if all "run time files" within the '397 patent must be executable (and they need not be), the run time files need not necessarily be executed by a *browser*. The claims, for example, suggest that the "one or more run time files" can "instruct[]" the browser ('397 patent claim 26), suggesting that the run time files might be executed by a program other than the browser. Also, the specification contemplates that a browser might call a run time file. (Ex. 1, '397 Patent at 5:57-59 ("The web page(s), when viewed by a web surfer, are activated by the browser calling the customized run time engine.")). Even if a browser were to make a function call to a run time file, an entity other than the browser could perform the execution. (Ex. 7, Weadock Supp. Decl. ¶ 58).

Ultimately, to the extent that a run time file is executable at all, the *run time engine* is the only file that must be executable in the context of the '397 patent. That the *run time engine* is executable, but that files within the "one or more runtime files" are not necessarily executable, is consistent with both parties' construction of the run time engine term, as discussed below. The Court should therefore not include "and executed by the browser" in the construction of this term.

### 4. run time engine / runtime engine

| Express Mobile's Proposed Construction | Wix's Proposed Construction |
|---|---|
| file that is executed at runtime that utilizes information from the database and generates commands to display a web page or website | file that is executed at runtime that reads information from the database and generates virtual machine commands to display a web page or web site |

This Court previously construed this term to mean "file that is executed at runtime that reads information from the database and generates commands to display a web page or website."

STEPTOE & JOHNSON LLP
One Market Plaza, Spear Tower, Suite 3900
San Francisco, CA 94105

STEPTOE & JOHNSON LLP
One Market Plaza, Spear Tower, Suite 3900
San Francisco, CA 94105

(Ex. 14, Magento Order at 7-8).  Express Mobile generally agrees with the Court's prior construction, but respectfully disagrees with the previously adopted construction to the extent that it requires that run time files are limited to "read[ing] information from the database," given that the claims of the '397 patent more broadly recite that "run time files *utilize* information stored" in databases, rather than simply "read" that information.  (Ex. 1, '397 Patent at 65:66-67, 66:19-20, 69:1-2, 70:13-14 (Claims 1, 2, 37, 39)).  Thus, Express Mobile believes that a more appropriate alternative construction of this term is "file that is executed at runtime that ***utilizes*** information from the database and generates commands to display a web page or website," consistent with the claim language.

The Court's prior order noted that the "facilitates the retrieval of information" language in Express Mobile's prior proposed construction "introduce[d] unwarranted ambiguity."  (Ex. 14, Magento Order at 7).  Express Mobile's current proposed construction resolves this issue as "utilizes information from the database" construction eliminates the Court's concern expressed in its previous opinion while maintaining fidelity to the claim language.  "Utilizes information" is not vague, is consistent with the specification's exemplary use of "read from the database," and is expressly supported by the intrinsic record.  (Ex. 7 ¶ 57.).  For example, the specification in certain places states that the "settings" of a webpage "can be set from the JavaScript database," without reference to whether the database settings are "read" or "utilized." (Ex. 1, '397 Patent at 30:52-58)  Moreover, the prosecution history confirms that a run time engine can utilize information from the database in a number of ways, including by acting as a template shell that is combined with a database (thereby utilizing information from the database) to generate the appropriate commands. (Ex. 18 at XMO_WIX00076281).

To be sure, the specification discloses in certain preferred embodiments that the run time engine reads from the database, but it is improper—indeed, a "cardinal sin"—to limit a claim's construction to preferred embodiments recited in the specification.  *Phillips* at 1320.  This is particularly true here, where the claim language, specification, and prosecution history underscore that the word "utilizes," rather than "reads," would be more appropriate in the

1  construction.[3]  Therefore, the proper construction of "runtime engine" should not be unduly

2  limited to purely "reading."  Express Mobile respectfully submits that this alternative

3  construction is proper and supported by the intrinsic record.

4  Regardless of whether a "runtime engine" reads from a database, utilizes information

5  from a database, or both, Wix attempts to add an additional requirement that a runtime engine is

6  limited to generating "virtual machine commands."  This Court already rejected a proposal that

7  includes this language.  (Ex. 14, Magento Order at 7-8).  Moreover, the court in the *Shopify* case

8  also rejected this argument, "find[ing] that the [run time] file executes 'commands,' not

9  necessarily 'virtual machine commands.'" (Ex. 15, Shopify Order at 5-6).  Consistent with these

10 prior rulings, the claims broadly recite that the "runtime engine is configured to generate the

11 web-site from the objects and style data extracted from the provided database" and do not refer

12 to such commands. (Ex. 2, '168 Patent at 65:3-6). Aside from virtual machine commands, the

13 specification also confirms that a run time engine can generate other types of commands to

14 display a web page or website, such as commands for downloading image, audio and video files.

15 (*See id.* at 5:49-68; Ex. 6 ¶¶ 67-69; Ex. 7 ¶ 55). The phrase "virtual machine" in Wix's

16 construction also does not appear in any of the '168 patent claims, yet Wix's construction would

17 import it into those claims.

18  **5.  database**

| Express Mobile's Proposed Construction | Wix's Proposed Construction |
|---|---|
| an electronic information storage system offering data storage and retrieval | an electronic information storage system offering data storage and retrieval and that stores information on a record-by-record basis, each record divided into one or more fields |

24  A database would be understood to be "an electronic information storage system offering

25 data storage and retrieval" as previously adopted by this Court.  (Ex. 14, Magento Order at 9).

26 This definition is consistent with the understanding of a person of ordinary skill in the art.  (Ex. 6

---

[3] The "reading" requirement also promotes further improper attempted narrowing arguments through restrictive interpretations of the word "read."

STEPTOE & JOHNSON LLP
One Market Plaza, Spear Tower, Suite 3900
San Francisco, CA 94105

¶ 43).  It is also consistent with a contemporaneous definition of database from <u>Webster's New World Computer Dictionary, Tenth Edition </u>(2003), which is "[a] collection of related information about a subject organized in a useful manner that provides a base of foundation for procedures, such as retrieving information."  (Ex. 19 at XMO_WIX00075873).  Accordingly, as this Court explained, Express Mobile's proposal "adequately captures the meaning of the term as it would have been understood by a person of ordinary skill in the art."  (Ex. 14, Magento Order at 9).

Wix's exact proposed construction has already been rejected by this Court, which characterized Wix's proposal as a "lengthy construction" that is not "warranted."  (Ex. 14, Magento Order at 9).[4]  So too here, it would not be appropriate to limit the database term to "such a specific listing of database attributes," as databases can take many different structural forms to allow one to store and retrieve electronic information.  (Ex. 7, Weadock Suppl. Decl. ¶¶ 38-39).

**6.     contemporaneously / substantially contemporaneously**

| Express Mobile's Proposed Construction | Wix's Proposed Construction |
| --- | --- |
| occurring immediately after | at the same time<br>at the same time from a human perspective |

Express Mobile proposes that "contemporaneously" and "substantially contemporaneously" both be construed consistent with this Court's prior construction of these terms as "occurring immediately after."  (Ex. 14, Magento Order at 9-11).  Wix proposes that these terms be construed as "at the same time" and "at the same time from a human perspective."

Express Mobile's construction of these terms as "occurring immediately after" is consistent with the specification.  In the context of the claims, these claim terms refer to the timing of the generation of a website preview that appears in response to a user entering settings.  The specification makes clear that the response to such user selection occurs immediately after.

---

[4] Although Express Mobile agreed to Wix's proposed construction in some previous cases, Express Mobile respectfully submits that its proposal and this Court's prior construction is the correct construction of this term.

STEPTOE & JOHNSON LLP
One Market Plaza, Spear Tower, Suite 3900
San Francisco, CA 94105

(*See* Ex. 1, '397 Patent at 10:16-53 (noting that user settings are "immediately processed by the build engine 352 and displayed in the build frame); 22:66-23:32 (noting that in one implementation a polling loop detects selections of user settings using "a polling loop . . . at a poll rate of once every 100 milliseconds or less"); Ex. 6 ¶ 37).

Wix's construction that "contemporaneously" means "at the same time" is nonsensical. As Mr. Weadock explains, "[s]uch a construction would exclude all the disclosed embodiments for generating a preview." (Ex. 6 ¶ 37; Ex. 7 ¶¶ 34-35). And even Mr. Schmandt, Wix's expert, recognized "that from a technical perspective, events happening 'at the same time' may not be feasible." (Ex. 13, Schmandt Decl. ¶ 83). Thus, as this Court previously explained, "[i]t is clear that the patentee did not use 'contemporaneously'" to mean "'occurring at the *same* time,'" and that "the context makes clear that 'contemporaneously' means the second event occurs immediately after the first, with no significant delay." (Ex. 14, Magento Order at 9-10). Moreover, to the extent that Wix adds the language "from a human perspective" to its proposed construction of "substantially contemporaneously," this Court explained that "including that phrase in the construction does not add clarity or assist in distinguishing between 'substantially contemporaneously' from 'contemporaneously.'" (Ex. 14, Magento Order at 10).

## B. Terms of the '755, '287, and '044 Patents

### 1. application

| Express Mobile's Proposed Construction | Wix's Proposed Construction |
| --- | --- |
| device-independent code containing instructions for a device | device-independent code that is partitioned from the Player and is interpreted or executed by the Player |

The appropriate construction of "application" is "device-independent software code containing instructions for a device." The parties agree that "application" is code that is "device-independent." This is consistent with the specification, which repeatedly refers to the "application" as being "device-independent." (Ex. 3, '755 Patent at Abstract, 2:1-2; 5:14-15, 6:4-6).

Express Mobile's construction includes, consistent with the specification, that device-independent application code is "software code containing instructions for a device." (*See*, e.g.,

STEPTOE & JOHNSON LLP
One Market Plaza, Spear Tower, Suite 3900
San Francisco, CA 94105

STEPTOE & JOHNSON LLP
One Market Plaza, Spear Tower, Suite 3900
San Francisco, CA 94105

Ex. 3, '755 Patent at 5:34-41, 56-59, 11:44-51, 13:46-49; Ex. 6 ¶¶ 92-93). In the *Shopify* case, the Court agreed that this portion of the construction "seems to make sense." (Ex. 15, Shopify Order at 8).

Wix's construction impermissibly imports limitations from preferred embodiments, including requiring the device-independent code be (1) "interpreted or executed by the Player"; or (2) "partitioned from the Player." (Ex. 6 ¶¶ 94-96).

First, an application is not required to be interpreted or executed by the Player but may be executed directly by the device. (*See* e.g., Ex. 3, '755 Patent at 5:32-41, 12:6-10, 13:42-49, 34:51-64). The patent makes clear elsewhere that the "***device***" itself, "having the appropriate device platform player," can "***receive[] and execute[] the device-independent Application***." (*Id.* at 13:46-49). The claim language of independent claim 12 of the '755 patent explicitly confirms that "the Application and Player are provided to the device ***and executed on the device.***" (*Id.* at 38:41-42). Just as the Player does not necessarily need to execute the Application in claim 12, it also need not interpret it in claim 12. Claim 21, which depends from claim 12, expressly claims the embodiment where the "Player interprets . . . values of the web component defined in the Application." (*Id.* at 39:18-21). This confirms that claim 12 does not require that the Player interpret (let alone execute) the Application. This is all consistent with the disclosures in the patent that the "Application can be *intercepted*, via a Player" or that the Player can "*adapt[] the* Application to the resources and limitations of any particular device"—and not necessarily interpret or execute it. (*Id.* at 8:27-35, 34:51-64; Ex. 6 ¶ 96; Ex. 7 ¶ 77). The prosecution history reinforces that, to the extent the Application is "interpreted" by the Player, this is disclosed in a paragraph describing "***one example*** of the operation of the Application and Player." (Ex. 18 at XMO_WIX00076421 (emphasis added)).

Given these disclosures, it is no surprise that another court has already rejected the "interpreted or executed by the Player" language that Wix proposes. As the court explained in the *Shopify* case, the disclosures in the specification that reference the Application being interpreted or executed by the player "appear to be describing embodiments, not the invention itself." (Ex. 15, Shopify Order at 8). Therefore, as in *Shopify*, this Court should reject Wix's

attempt to add this improper and unnecessary limitation.

Second, the "Application" is not necessarily "partitioned from the Player"—it can also be an integrated whole with the "Player." (Ex. 6 ¶ 95; Ex. 7 ¶ 78). The specification notes that "[i]n one embodiment," the Application can be extended "on the Player so that it is efficiently integrated into a comprehensive client/server Application." (Ex. 3, '755 Patent at 7:30-37, 17:66-18:3). Unsurprisingly, therefore, no court has included Wix's proposed claim language within the construction of "Player." In the *Shopify* case, for example, the court expressly declined to hold that the Application is "partitioned from the Player" because doing so "could be read as excluding an embodiment described in the specification"—in particular, the embodiment referenced above that integrates a Player and Application "on a single server." (Ex. 15, Shopify Order at 8 (citing *MBO Labs, Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007) ("[A] claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct.")).

To the extent that any separation between the Application and Player code may exist, that separation is conveyed by the claims, which separately recite the Application (which the parties agree is "a device-independent code") and a Player, which is not necessarily device-independent. Mr. Schmandt, Wix's expert, admits as much stating that, "[t]he asserted claims refer to the Player and Application separately." (Ex. 13, Schmandt Decl. ¶ 169). Claims 1 and 12 of the '755 patent, for example, separately recite "an Application including the selected symbolic name of the defined UI object, where said Application is a device-independent code" and a "Player, where said Player is a device-dependent code," and functions to "receive[] the output symbolic name and corresponding one or more output values and provides instructions for a display of the device to present an output value in the defined UI object." (Ex. 3, '755 Patent at 37:26-30, 36:43-46, 37:36-40, 37:53-56).[5] In the '044 patent, another (different) distinction is drawn between the Application and Player: there, a device-independent "application consist[s] of one or more web page views from at least a portion of [a] database" that "utilize[s] at least one player,"

---

[5]    Independent claims 1 and 15 of the '287 patent contains nearly identical language. (Ex. 4, '287 Patent at 38:16-25, 38-34-37, 39:14-16, 39:44-51, 40:8-11).

STEPTOE & JOHNSON LLP
One Market Plaza, Spear Tower, Suite 3900
San Francisco, CA 94105

and "the player receives [a] output symbolic name . . . and provides instructions for the display of the device to present an output value in the defined UI object." These recitations, despite their differences, each convey separation between the functions of the Application and Player code to the extent any separation exists, and therefore any construction of Application that requires "partitioning" or "separation" from the Player is both superfluous and unnecessary.

Moreover, to the extent that Wix relies on prosecution history to support its "partitioned from the Player" requirement, Wix is also incorrect. The court in *Shopify* expressly considered the prosecution history and rejected the "partitioned from the Player" construction. (Ex. 15, Shopify Order at 8). To be sure, the prosecution history did contain certain statements about "partitioning" or "separation" between the Application and the Player, but those statements are entirely consistent with the separate nature and functionality of the Application and Player that is already recited in the claims, as explained above. They are also consistent with Express Mobile's effort to distinguish the invention from the McCain reference, which as Express Mobile explained "ta[ught] only providing *a self-contained, device-dependent code to a device that can communicate with a web service*." (Ex. 18 at XMO_WIX00076430 (emphasis added); Ex. 7, Weadock Supp. Decl. ¶ 78; *see also* Ex. 20, Weadock Dep. at 181:9-183:12). Each of the claims, unlike McCain, require both a device *independent* Application (as the parties agree) and a Player that renders the separate functionalities described above. In the prosecution history, Express Mobile explained that having some separation between the device-independent Application and the Player "was advantageous," but nothing in the claims, specification or prosecution history suggests that the Application and Player must be "partitioned." For these reasons, Wix's construction should be rejected. Moreover, no requirement of "separate from the player" should be imposed for the same reasons. Express Mobile respectfully disagrees with the *Shopify* court's previous conclusion that the Application claim term be construed such that the Application is "separate from the Player." (Ex. 15, Shopify Order at 8).

Finally, it appears that Wix is attempting to construe this term to add a "partitioning" requirement that goes a step beyond even the court's "separate from the Player" construction in *Shopify*. For example, Mr. Schmandt's declaration asserts that "the application and player must

PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF

CASE NO. 19 CIV. 06559 (RS)

STEPTOE & JOHNSON LLP
One Market Plaza, Spear Tower, Suite 3900
San Francisco, CA 94105

be *entirely different* sets of code" that are updated "independently and separately." (Ex. 13, Schmandt Decl. ¶¶ 171, 173 (emphasis added)). Wix's attempt to bootstrap these additional limitations as part of its "partitioned from the player" requirement should be rejected. Any suggestion that the Application and Player must be "entirely different" or "independent" from one another is belied by the specification, which repeatedly conveys an interdependency between the Application and Player. For example, to be properly executed on a device, an Application may be intercepted by a device with the appropriate Player code. (Ex. 3, '755 Patent at 8:27-35, 13:46-49). And, to be executed properly, an Application is sometimes adapted by the Player to the "resources and limitations of any particular device." (Ex. 3, '755 Patent at 34:51-64). The Application and Player are also described as working in tandem to generate "designed displays" of web service content. (Ex. 3, '755 Patent at 5:32-41). Given these disclosures, the Application and Player are neither "entirely different" nor "independent," and Wix's construction is unduly limiting and improper. Once again, the claim language speaks for itself with regard to any separation that might exist between the Application and Player.

      2.      **player**

| Express Mobile's Proposed Construction | Wix's Proposed Construction |
|---|---|
| software code that facilitates the execution of an application on a device | executable device-specific code that is partitioned from the Application and interprets or executes the Application |

For the Player term, the appropriate construction is "software code that facilitates the execution of an application on a device." (Ex. 6 ¶¶ 97-100). The specification of the '755 patent in the "Disclosure of the Invention" section explains that the invention "produc[es] code that, when executed on the platform, provides . . . selected component on the display of the platform," and that one of the produced codes is a "Player." (Ex. 3, '755 Patent at 1:55-67). The "Player" can be such that it has "*no device specific dependencies*" (i.e., device-independent), or it can be such that it "extends the operating system and/or virtual machine of the device" (i.e., device-dependent). (*Id*). In either case, a Player is a type of code that can facilitate the execution of an application on a device, and it performs functions distinct from those of the device-independent Application, as reflected in the distinct claim language that references each of the claim terms.

STEPTOE & JOHNSON LLP
One Market Plaza, Spear Tower, Suite 3900
San Francisco, CA 94105

STEPTOE & JOHNSON LLP
One Market Plaza, Spear Tower, Suite 3900
San Francisco, CA 94105

Wix again seeks to import several improper limitations.  *First*, Wix suggests that the Player must be "executable."  But the Player can "adapt[] the Application to the resources and limitations of any particular device," or extend the operating system.  (Ex. 6 ¶ 98; Ex. 7, Weadock Suppl. Decl. ¶ 80).  This means that the Player "contains *instructions* that, eventually, are executable," and thus the *Shopify* Court rejected a requirement that a Player be an "executable file."  (Ex. 15, Shopify Order at 14).  Wix's attempt to add "executable" language to this claim term is therefore improper, and would only inject unnecessary confusion into the case.

*Second*, Wix suggests that the code or instructions generated by the Player must have "device-specific code."  But importing a "device specific" limitation is also improper.  The specification explains that a Player can have "no device specific dependencies," and the Player "*may*"—but not must—"include code that is device-specific."  (Ex. 3, '755 Patent at 1:55-67, 6:9-11; Ex. 6 ¶ 99; Ex. 7 ¶¶ 81-83).  Thus, "Players" within the '755 patent family may be either device-dependent or device-independent as shown in the specification.  (*See, e.g.*, Ex. 3, '755 Patent at 3:58-62, 5:8-24, 42-55, 56-6:3, 6:9-17, 7:13-20, 30-40, 8:7-17, 27-35, 9:4-10, 11:41-51, 17:66-18:3, 23:43-46, 33:12-15, 26-28, Figs. 2A, 2B).  Although the Abstract of the '755 patent states that "[d]evices are provided with Players specific to each device," that language does not restrict Players to device-specific code in light of the "device-independent" disclosures above.  (Ex. 6 ¶ 99).  *See Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1121 (Fed. Cir. 2004) (patent abstract "does not weigh heavily when considering" the meaning of a claim term).

Moreover, the differences in claim language across the '755, '287, and '044 patents reflect the patentee's intent to claim embodiments of the player that are—or are not—device dependent.  *Compare* '755 claims 1, 12, 27 and '287 claim 1, *with* '044 claims 1, 15.  In the '755 and '287 patents, each of the independent claims consistently refer to Players—using an uppercase "P"—that are expressly "device dependent."  By contrast, in the '044 patents refer to a player—using a lowercase "p"—without any such "device-dependent" language in the claims.  (*See also* Ex. 7 ¶¶ 83-84). There are also other substantive differences between the independent claims of the '755 and '287 patents and those of the '044 patent, including differences pertaining

to the Player's role in the invention. For example, the independent claims of the '044 patent, unlike the '755 and '287 patents, recite a requirement that the "player utilizes information stored in [a] database to generate for the display of at least a portion of said one or more web pages." (Ex. 5, '044 Patent at Claims 1, 15). Indeed, the claims of the '755 and '287 patents do not recite a database requirement at all.

Likewise, distinctions between the prosecution history in the '755, '287, and '044 patents reinforce the distinctions between the '755 and '287 patent's treatment of the "Player" term, and the '044 patent's treatment of that term underscore that a Player should not be deemed "device-specific" across the three patents. In the '755 patent prosecution history (which again involved patent claims that expressly recited a device-dependent Player), the patentee expressly stated that "[t]he present patent application consistently use[s] the words 'Application' (with a capital A) and 'Player' (with a capital P) to refer to code that is provided to devices for accessing web services, where an Application is device-[in]dependent code and a Player is device-dependent code." (Ex. 18 at XMO_WIX00076422-23). In the '044 patent prosecution history, by contrast, the Applicant did not make any affirmative statements or characterizations of the invention as necessarily containing a "device-dependent" or "device-specific" Player, reflecting that the claims of the '044 patent had substantive differences from the claims of the '755 and '287 patents. The material differences between the prosecution history and claims of the '755 and '287 patents, and those of the '044 patent, underscore that this court should not construe the "Player" recited in *all three patents* to require device-specific code. *See Trading Techs. Int'l, Inc. v. Open E Cry, LLC*, 728 F.3d 1309, 1323 (Fed. Cir. 2013) (noting that "arguments made in a related application do not automatically apply in a separate application," and that "disclaimers do not apply" "[w]hen . . . purported disclaimers are directed to specific claim terms that that have been omitted or materially altered in subsequent applications"); *ResQNet.com, Inc. v. Lansa, Inc.*, 346 F.3d 1374, 1383 (Fed. Cir. 2003) ("Although a parent patent's prosecution history may inform the claim construction of its descendent . . . prosecution history is irrelevant to the meaning of [a] limitation [if] the two patents do not share the same claim language.").

Moreover, to the extent that the patentee made a distinction between the invention and

McCain during prosecution, it needed only to distinguish from an invention that *only used device-dependent Player code*, and did not have an Application, as alluded to above.  As Express Mobile explained during prosecution, "*McCain* does not teach the 'Application'," and "does not discuss or consider providing a device-independent code to a device for accessing a web service."  (Ex. 18 at XMO_WIX000076424-25; *see also id.* at XMO_WIX00076430 ("*McCain* teaches only providing a self-contained, device-dependent code to a device that can communicate with a web service.").  As noted above, the parties agree that the Application in each of the '755, '287, and '044 patents must be device-independent.  Therefore, the claims of all three patents have a device-independent Application and a functionally distinct player, unlike McCain, which solely had a single, device-dependent code representing a Player.  Thus, the *Shopify* Court's disclaimer analysis went too far.  It simply was not necessary for the claims of the '755, '287, and '044 to have both a device-independent Application and a device-dependent Player to distinguish McCain—having a device-independent Application and a Player (whether device-independent or not) was enough to distinguish *McCain*.  For this additional reason, the POSA would understand that the patentee did not intend to limit the Player to be device-dependent.  (*See also* Ex. 7 ¶ 78).

Wix also asserts, finally, that the Player is "partitioned from the Application" and that it "interprets or executes the Application."  For the reasons stated above with respect to the Application claim term, Wix is incorrect.  (*See* Application section above).

### 3.      device-dependent code / device dependent code

| Express Mobile's Proposed Construction | Wix's Proposed Construction |
|---|---|
| code that is specific to the operating system, programming language, or platform of a device | code that is specific for and runs only on particular device platforms |

Express Mobile's construction of device-dependent code, "code that is specific to the operating system, programming language, or platform of a device" is consistent with the specification of the '755 patent family.  This was the construction that was expressly adopted by the Court in the *Shopify* case.  (Ex. 15, Shopify Order at 15).

This construction is consistent with both the specification and the POSA's understanding

STEPTOE & JOHNSON LLP
One Market Plaza, Spear Tower, Suite 3900
San Francisco, CA 94105

1    of this claim term. The specification expressly states that "device-specific" routines are "codes

2    that are specific to the operating system, programming language, or platform of specific

3    devices," tracking Express Mobile's construction almost verbatim. (Ex. 3, '755 Patent at 3:58-

4    62). Moreover, the specification refers to device-specific functionality (such as "device type or

5    extended device-specific functions") that the Player could in the claimed invention could

6    "become aware of." (Ex. 3, '755 Patent at 34:4-11, 34:51-64). Indeed, the *Shopify* Court

7    recognized in the context of discussing device-dependent code that "[t]he specification does

8    describe software in one embodiment as being 'aware' of device functions." (Ex. 15, Shopify

9    Order at 15 (citing '755 patent at 34:4-11)). This would reinforce to the POSA that "device-

10   dependent" code specific to the operating system, programming language, or platform of a

11   device can provide functionality that is aware of, or accounts for, the characteristics of a

12   particular operating system, programming language, or platform of a device. (Ex. 6 ¶ 101; Ex. 7

13   ¶ 85).

14       Wix nonetheless seeks a construction of "device-dependent" code of "code that is

15   specific for and runs only on particular device platforms," which is both unduly narrow and

16   generates confusion. At bottom, through this proposal, Wix seeks a construction that requires

17   "***executable code*** . . . written for the specific device's processor or operating system and ***cannot***

18   ***be run on devices or platforms with different processors*** (e.g. an Intel Processor vs. an ARM

19   processor) or operating systems (e.g. Windows vs. MacOS)." (Ex. 22, Schmandt Suppl. Dec. ¶

20   108 (emphasis added)). In other words, Wix's proposal does nothing more than repackage its

21   prior construction, "executable code that differs depending on the device platform." (*Id.* ¶ 107

22   (noting that "[i]nstructions for a processor are executable code that differs depending on the

23   device platform")). The *Shopify* Court rejected this construction as including "the unnecessary

24   word 'executable'" and as being unduly narrow in allowing the code to "differ based only on the

25   device 'platform.'" (Ex. 15, Shopify Order at 14-15; *see also* Ex. 7, Weadock Supp. Decl. ¶¶ 86-

26   87; Ex. 3, '755 Patent at 6:51-53, 6:49-51, 7:1-3 (illustrating references to non-executable code)).

27   Nonetheless, Wix attempts to impart the same requirements here with its rebranded construction.

28       Wix's requirement that the device-dependent code "runs only on particular device

PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF          CASE NO. 19 CIV. 06559 (RS)

STEPTOE & JOHNSON LLP
One Market Plaza, Spear Tower, Suite 3900
San Francisco, CA 94105

platforms" would read out embodiments of "device-dependent" code that account for different device specific functionalities, such as code that might execute on multiple devices, but would execute *differently* depending on the device based on the use of conditional branching or logic within the code. The specification references such code when it explains that the Player can be designed to "adapt[] the Application to the resources and limitations of any particular device," and provide other extensions to "device specific facilities." (Ex. 3, '755 Patent at 34:51-64). Such code would be "specific to the operating system programming language or platform of a device" because it may run differently depending on which operating system or platform is used, but the code as a whole would not be designed to "run[] *only on* particular device platforms" as Wix proposes. Moreover, the specification describes the notion of a "Universal Player," which includes device dependent code that may "work for a range of device-platforms," and that would "extend the Player with Server-side or device-side Application specific logic." (Ex. 7, Weadock Supp. Dec. ¶¶ 86-87; Ex. 3, '755 Patent at 17:66-18:3). Such an understanding of device-dependent code would be consistent with extrinsic dictionaries, such as the *IBM Dictionary of Computing*, which defines device-dependence as "reliance on the characteristics of devices in writing and executing programs or in performing functions." (Ex. 21 at XMO_WIX00075827). Code that executes differently on different devices relies on the characteristics of different device is "specific to the operating system, programming language, or platform of a device" (consistent with the *Shopify* Court's construction), and, unlike Wix's proposal, is not unduly limiting. Finally, Wix's proposal is confusing—which "particular device platforms" are device-dependent code limited to run on? This vagueness and confusion should be avoided.

### 4. web component

| Express Mobile's Proposed Construction | Wix's Proposed Construction |
|---|---|
| one or more functionalities associated with one or more web page elements to be displayed on a device | software object, which has a clearly defined interface, conforms to a prescribed behavior common to all components within an architecture, is meant to interact with other components, and encapsulates certain functionality or a set of functionalities |

Express Mobile's construction, "one or more functionalities associated with one or more

web page elements to be displayed on a device," is consistent with the claims and specification. (Ex. 6 ¶ 83; Ex. 7 ¶ 64; Ex. 3, '755 Patent at Claims 1, 12, 37:9-10, 38:16-17, 8:22-26, 22:15-17, 22:40-43, 25:6-15; *see also id.* at 2:33-34, 9:16-20, Figs. 3E & 3F). For example, the specification underscores that web components comprise functionalities that are associated with, for example, web services or UI objects displayed on a device (Ex. 3, '755 Patent at 8:22-26, 22:15-17, 22:40-43, 25:6-15), and Figures 3E and 3F of the '755 patent address various web component functionalities, such as displaying maps, reporting weather information, and gathering movie information. (Ex. 3, '755 Patent at Figs. 3E, 3F, 2:33-34). Web component functionalities can be associated with web page elements, such as textboxes. (Ex. 3, '755 Patent at 9:16-20). Consistent with these disclosures, the claims note that "web components" are "related to inputs and outputs of a web service obtainable over a network." (Ex .3, '755 patent at Claims 1, 12, 37:9-10, 38:16-17).

Wix's six-line construction is both unduly narrow and confusing to a jury. (Ex. 6 ¶ 84; Ex. 7 ¶¶ 65-68; Ex. 13, Schmandt Decl. ¶ 148). It contains numerous requirements that are either not referenced in the specification or are confined to preferred embodiments. Wix's construction uses language such as "encapsulates" and "architecture" that is hardly discussed in the specification, and never in reference to "web components." Wix's construction also introduces potential ambiguity—what is a "clearly defined interface"? Wix's construction also improperly adds an "intent" aspect to the meaning of "web component" when it says that the software "is meant to interact with other components."

//
//
//
//
//
//
//
//

PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF        CASE NO. 19 CIV. 06559 (RS)

STEPTOE & JOHNSON LLP
One Market Plaza, Spear Tower, Suite 3900
San Francisco, CA 94105

Respectfully submitted,

DATED: February 12, 2021

STEPTOE & JOHNSON LLP

By: */s/ Christopher A. Suarez*

Laurie Edelstein (Bar No. 164466)
STEPTOE & JOHNSON LLP
One Market Plaza
Spear Tower, Suite 3900
San Francisco, CA 94105
Phone: (415) 365-6700
Fax: (415) 365-6699
ledelstein@steptoe.com

James R. Nuttall (admitted *pro hac vice*)
Michael Dockterman (admitted *pro hac vice*)
Katherine H. Johnson (admitted *pro hac vice*)
Tron Fu (admitted *pro hac vice*)
Robert F. Kappers (admitted *pro hac vice*)
STEPTOE & JOHNSON LLP
227 West Monroe Street, Suite 4700
Chicago, IL 60606
Phone: (312) 577-1300
Fax: (312) 577-1370
jnuttall@steptoe.com
mdockterman@steptoe.com
kjohnson@steptoe.com
tfu@steptoe.com
rkappers@steptoe.com

Christopher A. Suarez (admitted *pro hac vice*)
STEPTOE & JOHNSON LLP
1330 Connecticut Ave NW
Washington, DC 20036
Phone: (202) 429-3000
Fax: (202) 429-3902
csuarez@steptoe.com

Timothy Devlin (admitted *pro hac vice*)
DEVLIN LAW FIRM LLC
1526 Gilpin Avenue
Wilmington, Delaware 19806
Telephone: (302) 449-9010
Facsimile: (302) 353-4251
tdevlin@devlinlawfirm.com

*Attorneys for Plaintiff Express Mobile, Inc.*

STEPTOE & JOHNSON LLP
One Market Plaza, Spear Tower, Suite 3900
San Francisco, CA 94105

PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF                    CASE NO. 19 CIV. 06559 (RS)