**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| EXPRESS MOBILE, INC.,<br><br>        Plaintiff,<br>    v.<br><br>EXPEDIA, INC. ET AL.,<br><br>        Defendant. | Case No. 6:20-cv-801-ADA |
| v.<br><br>EBAY INC.,<br><br>        Defendant. | Case No. 6:20-cv-802-ADA |
| v.<br><br>FACEBOOK, INC.<br><br>        Defendant. | Case No. 6:20-cv-803-ADA |
| v.<br><br>GOOGLE LLC,<br><br>        Defendant. | Case No. 6:20-cv-804-ADA |
| v.<br><br>ATLASSIAN CORP. PLC ET AL.,<br><br>        Defendant. | Case No. 6:20-cv-805-ADA |

**PLAINTIFF'S REPLY CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     DISPUTED TERMS ........................................................................................... 1

    A.      "virtual machine" .................................................................................... 1

    B.      "at least one run time file" ...................................................................... 4

    C.      "run time engine" / "runtime engine" ..................................................... 5

    D.      "time lines" .............................................................................................. 6

    E.      "A method to allow users to produce Internet websites on and for computers having a browser and a virtual machine capable of generating displays, said method comprising:" ........................................................... 8

    F.      "Application" / "application" .................................................................. 9

    G.      "Player" / "player" ................................................................................. 10

    H.      "registry" ............................................................................................... 12

    I.      "UI object" ............................................................................................. 13

    J.      "An authoring tool configured to . . . a Player ...................................... 14

III.    CONCLUSION .................................................................................................. 15

# TABLE OF AUTHORITIES

**Cases**

*Abbott Lab'ys v. Andrx Pharms., Inc.*,
    473 F.3d 1196 (Fed. Cir. 2007) ............................................................................... 6

*Ancora Techs., Inc. v. LG Elecs. Inc.*,
    No. 1-20-CV-00034-ADA, 2020 WL 4825716 (W.D. Tex. Aug. 19, 2020) ........................... 8

*Baxalta Inc. v. Genentech, Inc.*,
    972 F.3d 1341 (Fed. Cir. 2020) ........................................................................... 6, 13

*Broadridge Fin. Sols., Inc. v. Inveshare, Inc.*,
    2012 WL 1245723 (D. Del. Apr. 11, 2012) .............................................................. 12

*Collaborative Agreements, LLC v. Adobe Sys. Inc.*,
    No. A-14-CV-356, 2015 WL 2250391 (W.D. Tex. May 12, 2015) ......................................... 8

*Dig. Retail Apps, Inc. v. H-E-B, LP*,
    No. 6-19-CV-00167-ADA, 2020 WL 376664 (W.D. Tex. Jan. 23, 2020) ............................ 8, 9

*Digital–Vending Servs. v. Univ. of Phx.*,
    672 F.3d 1270 (Fed. Cir. 2012) ............................................................................. 11

*Express Mobile, Inc. v. GoDaddy.com*,
    No. 3-19-cv-01937 (D. Del. June 1, 2021) ............................................................... 13

*Express Mobile, Inc. v. Svanaco, Inc.*,
    No. 2:17-cv-00130-JRG-RSP, 2018 WL 746472 (E.D. Tex. Feb. 7, 2018) ............................ 3

*Ilife Techs., Inc. v. Nintendo of Am., Inc.*,
    2017 WL 525708 (N.D. Tex. Feb. 9, 2017) ................................................................ 14

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
    381 F.3d 1111 (Fed. Cir. 2004) ........................................................................... 4, 7

*Interpols Network Inc. v. Aura Interactive Inc.*,
    No. SACV 12-00832-JVS (JPRx), 2013 WL 12133639 (C.D. Cal. June 7, 2013) ............. 6, 11

*Medicines Co. v. Mylan, Inc.*,
    853 F.3d 1296 (Fed. Cir. 2017) ............................................................................. 6

*MEMS Tech. Berhad v. Int'l Trade Comm'n*,
    447 F. App'x 142 (Fed. Cir. 2011) .......................................................................... 8

*Multiform Desiccants, Inc. v. Medzam, Ltd.*,
    133 F.3d 1473 (Fed. Cir. 1998) ............................................................................. 7

ii

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)............................................................. 5

*Shotkam LLC v. Tachyon, Inc.*,
    No. H-20-1070, 2021 WL 23311 (S.D. Tex. Jan. 4, 2021)....................... 15

*Sinorgchem Co., Shandong v. Int'l Trade Comm'n,*
    511 F.3d 1132 (Fed. Cir. 2007)............................................................. 7

*Ventana Med. Sys., Inc. v. Biogenex Lab'ys, Inc.*,
    473 F.3d 1173 (Fed. Cir. 2006)............................................................. 11

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996)............................................................. 5

## I.      INTRODUCTION

The Court should adopt Plaintiff's proposed constructions—in every instance, Plaintiff's constructions are simpler, clearer, and more accurate than Defendants' proposed constructions. Defendants repeatedly seek to import bulky, improper limitations into the claims, arguing that the improper limitations are "consistent" with the intrinsic or extrinsic record. But consistency is not the test: the plain language of the claims governs and cannot be altered by reference to examples or other "consistent" disclosures. Absent lexicography or a clear disclaimer, courts do not alter the plain language of the claims with narrowing constructions.

## II.     DISPUTED TERMS

### A.      "virtual machine"

Defendants concede that "virtual machine" is a well-known term to a POSITA. ECF No. 61 ("Resp.") at 2.[1] Nevertheless, they argue that the Court must construe the term because a juror—after sitting through days of testimony from the parties' experts describing the underlying technology—would head back to deliberations wondering whether the term might encompass a toaster or a printing press. *Id.* at 3. Defendants are incorrect. A "virtual machine" is plainly a machine that is virtual or abstract rather than physical, and thus no construction is necessary.

Defendants seek to inject an extraneous limitation found nowhere in the 1500-page intrinsic record: "that executes intermediate code." Defendants concede that "virtual machine" is not limited to a Java virtual machine, but now argue that *every* virtual machine executes intermediate code. But numerous virtual machines do not execute intermediate code, including, e.g., interpreters and JavaScript virtual machines such as Google's V8 engine. *See* Ex. 1, (Weadock Supp. Decl.), ¶¶ 11-13. Indeed, Defendants do not dispute that certain JavaScript virtual machines

---

[1] ECF numbers cited herein refer to filings in the *Facebook* matter, Case No. 6:20-cv-803.

do not execute intermediate code. As such, Defendants are left to argue that the specification purportedly disparages all JavaScript virtual machines, an argument that is incorrect and was already rejected by the *Shopify* court. ECF No. 57-33 at 4.

The specification does not disparage all JavaScript virtual machines. Defendants argue, based on inventor testimony, that JavaScript virtual machines did not exist at the time the patent was filed. Resp. at 4. It is thus unclear why Defendants believe the patentee disparaged something that they contend did not exist. Moreover, the specification indicates that the invention would be compatible with various full-featured programming languages as browsers developed over time. *See* ECF No. 57 ("XMO Br.") at 5 (citing '397 at 32:21-25, 62:33-36)).[2] Even assuming the specification disparaged earlier versions of JavaScript, it evolved into a full-featured programming language around the time of the invention. Ex. 1, ¶¶ 13-16. As such, the intrinsic record demonstrates that JavaScript and other full-featured languages were contemplated as being within the scope of the '397 patent. *Id.* Consistent with this understanding, the extrinsic evidence shows that modern JavaScript virtual machines are fully consistent with the claimed virtual machine, which is "capable of generating displays" of webpages in a browser. *See* '397 at 65:44-46; Ex. 1, ¶ 14. And, nevertheless, the specification's alleged disparagement of JavaScript virtual machines is not a reason to exclude the numerous other virtual machines that do not execute intermediate code.[3] *See* Ex. 1, ¶¶ 11-13, 17.

---

[2] Defendants' argument that the specification's mentioning of full-featured programming languages has nothing to do with virtual machines is nonsensical, as these programming languages can be implemented via virtual machines. Moreover, Defendants' argument is belied by their expert's sworn testimony. Ex. 1, ¶ 14.

[3] Defendants dismiss some virtual machines identified by Plaintiff's expert because he did not cite to evidence in opining that certain Basic, Lisp, Tcl, and Ruby virtual machines did not execute intermediate code. For the avoidance of doubt, technical literature confirms Plaintiff's expert is correct. Resp. at 5; Ex. 1, ¶ 11.

Defendants' "browser" argument incorrectly posits that the claims require a virtual machine and separate browser, and a JavaScript virtual machine is part of a browser, and JavaScript virtual machines do not execute intermediate code, and, as such, all virtual machines must execute intermediate code. Resp. at 4. A POSITA would recognize the existence of virtual machines other than JavaScript virtual machines that do not execute intermediate code. Ex. 1, ¶¶ 11-13. Moreover, if Defendants are correct (they are not), it would be unnecessary to reintroduce "intermediate code" in the claims.

Dictionary definitions further demonstrate that a "virtual machine" does not require execution of intermediate code. Recognizing this, Defendants resort to dictionary definitions for a *different* term, "abstract machine." In any event, those definitions confirm that abstract machines are not limited to the specific class that utilizes intermediate code. Ex. 1, ¶¶ 20-22. Moreover, Defendants' expert, who now relies on the narrower cherry-picked definitions, previously testified that an abstract or hypothetical machine was only meant to distinguish the term from an actual physical machine, which is consistent with the general definitions of "abstract machine" and further confirms that no construction is necessary for "virtual machine." *See* Ex. 1A at 67:11-21.

While one magistrate judge construed the term to require intermediate code, others have not. XMO Br. at 6-7. Judge Payne included the "intermediate code" limitation only because the weight of extrinsic evidence before him suggested that a virtual machine executes intermediate code. *Express Mobile, Inc. v. Svanaco, Inc.*, No. 2:17-cv-00130-JRG-RSP, 2018 WL 746472, at *4 (E.D. Tex. Feb. 7, 2018). Since that early 2018 decision, Plaintiff has presented additional extrinsic evidence in this case and others demonstrating that not all virtual machines execute intermediate code. As such, no court has since adopted the erroneous "intermediate code" language

or required a virtual machine to execute any specific type of code. *See* ECF Nos. 57-33, 57-34.[4]

Lastly, Defendants define "intermediate code" as "more human-readable code written by a programmer." Resp. at 2. A juror would be confused as to what code qualifies as "more human-readable" and when this vague threshold is reached.

**B.    "at least one run time file"**

Defendants' two extraneous limitations should be rejected. ***First***, not all run time files are necessarily executed. All parties recognize that "at least one rune time file" must include a run time engine that is executed. But all parties also recognize that "at least one run time file" may include ***additional*** run time files. The question before the Court is whether these additional run time files are ***necessarily*** executed. Defendants' leading argument is that the "run time ***files***" should be improperly limited because the patentee purportedly inferred during prosecution that a "run time ***engine***" requires execution. Resp. at 6-7. But there is no dispute that a run time engine is executed. Defendants also argue that the specification discloses "a database of user settings" as being executed, and then make two logical leaps by its incorrect summary of the record: Defendants incorrectly assume (1) that ***all*** run time files are either a run time engine or user settings and (2) that ***all*** user settings are executed. *Id.* Defendants also argue that other portions of some claims require run time files to be executed. If true, Defendants would not need to seek to improperly reintroduce a superfluous limitation. Defendants next recite one sentence of the Abstract, which does not indicate that all run time files are executed and regardless does "weigh heavily when considering" the meaning of the term. *See Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1121 (Fed. Cir. 2004). That the Abstract is not helpful here is especially true because, as described in more detail in the detailed description, run time files may

---

[4] The *X.Commerce* court rejected Defendants' proposed limitation of "compiled code," which is tantamount to a "intermediate code" limitation. Ex. 1, ¶ 25.

include files such as images or audio that are undisputedly not executed. Ex. 1, ¶ 30.

Defendants concede that the specification teaches that "CAB and JAR files are downloaded from a web site" and recognize that those files "may contain other non-executable files." Resp at 7. However, Defendants argue that these non-executable run time files described in the specification are different than the claimed run time files. *Id.* Defendants do not allege lexicography or disavowal (there is none). As such, the Court should reject Defendants' proposal to construe the term to be narrower than its plain and ordinary meaning.

To the extent a run time file is executed—which is not required—there is no requirement that it be executed by a browser. While the browser may execute some run time files, the invention is not limited to these embodiments. ECF No. 57-7 ("Weadock Decl."), ¶ 39 (citing '397 patent at 5:57-59); Ex. 1, ¶ 27. Defendants only allege that one embodiment purportedly describes a browser executing a run time file. Resp. at 8. However, it is improper to limit the term to an embodiment of the specification. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1320 (Fed. Cir. 2005).

**C.    "run time engine" / "runtime engine"**

The claims recite that a run time engine "utilizes"—i.e., not necessarily reads—information from the database. '397 patent at claims 1, 2, 37, 39. Defendants concede as much (Resp. at 10), but disregard the disclosure because "the only intrinsic support . . . is ***claim language***." *Id.* (emphasis added). But the claim language that Defendants seek to brush aside is the ***most important*** intrinsic evidence and controls the inquiry. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("First, we look to the words of the claims themselves . . . to define the scope of the patented invention."). Moreover, the specification teaches utilizing the database in ways that do not necessarily involve "reading," such as by setting initial values. XMO Br. at 9-10. Defendants respond that a run time engine *could* read the database to perform that functionality (*i.e.*, that their overly narrow limitation is not necessarily "inconsistent" with the

specification). But the specification never limits the term so that the run time engine *must* read information from the database.

The proposed "generates commands to display a web page or web site" limitation is unnecessary as it reiterates functionality already described in the claims. Defendants do not disagree, but argue, with no citation, that claim language is only superfluous when it recites other claim language verbatim. Defendants are incorrect. *See, e.g.*, *Interpols Network Inc. v. Aura Interactive Inc.*, No. SACV 12-00832-JVS (JPRx), 2013 WL 12133639, at *5 (C.D. Cal. June 7, 2013) (non-verbatim language is superfluous when it includes characteristics already described in the claim).

### D.      "time lines"

Defendants argue that the Court should construe the term only because the specification includes a purported lexicographical definition. Resp. at 12-14. But the statement falls far short of the "exacting" standard required to redefine claim terms beyond their plain and ordinary meaning. *Baxalta Inc. v. Genentech, Inc.*, 972 F.3d 1341, 1349 (Fed. Cir. 2020). The mere use of the word "is," alone, does not clearly express an intent to redefine the term. *Abbott Lab'ys v. Andrx Pharms., Inc.*, 473 F.3d 1196, 1210 (Fed. Cir. 2007) (finding that "pharmaceutically acceptable polymer *is* . . does not as unambiguously signify that the description provided is definitional.") (emphasis in original). This is especially true here because when the patentees intended to define a term, they ***explicitly*** did so. *See* '397 patent at 35:46-50 ("A transformation is defined as . . ."); *Medicines Co. v. Mylan, Inc.*, 853 F.3d 1296, 1306 (Fed. Cir. 2017) (because textual format used by inventor in discussing term was different from format used for lexicographic definitions of other terms, it "lack[ed] the clear expression of intent necessary for a patentee to act as its own lexicographer."); *Abbott*, 473 F.3d at 1210 ("is" does not signal lexicography in light of clear definitional signaling for other terms).

Reading the supposed lexicographic statement in context further makes clear that it is not definitional. Ex. 1, ¶ 32. The first sentence describing an embodiment illustrated by Fig. 19 is as follows: "FIG. 19 describes the text button and image time lines and technology utilized by the build engine (27 of FIG. 3)." '168 patent at 36:20-23. The very next sentence, the supposed lexicographic statement, provides that "[a] time line is an independent asynchronous process that defines the existence of a given text button or image object." *Id*. Of course a time line in the context of an embodiment of "text button and image time lines and technology," is a time line for a text button or image object. But these statements do not indicate that the patentees intended to limit the term in all contexts.

Defendants' case law does not dictate otherwise. In *Sinorgchem Co., Shandong v. Int'l Trade Comm'n,*)—which quotes *Abbot Laboratories*—the court recognized that the word "is" ***may*** signal a lexicographic definition, and found lexicography, not because of use of the word "is" alone, but because the term was set off in the specification by quotation marks, which is "a strong indication that what follows is a definition." 511 F.3d 1132, 1136 (Fed. Cir. 2007). The court in *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.* found that the specification did ***not*** include any lexicographic statement, notwithstanding its use of the word "is." 381 F.3d 1111, 1121 (Fed. Cir. 2004). ("The tube ***is*** operatively connected to the cap . . . by . . ." is not lexicographic). The *Multiform Desiccants, Inc. v. Medzam, Ltd.,* court likewise found no lexicography. *See* 133 F.3d 1473 (Fed. Cir. 1998). And while Defendants use *Medzam* to argue that the portions of the specification outside the supposed lexicographical statement should be ignored, the *Medzam* court ***did*** rely on the specification as a whole to define the term. *See id.* at 1478 ("the specification and prosecution history do not support a meaning of [the term]"). Here nothing in the intrinsic record indicates that the patentee intended to redefine the term as Defendants suggest.

Defendants make the strained argument that the specification's numerous references to time lines referring to objects generally (*see* XMO Br. at 11-12) are actually referring to only two specific types of objects. Resp. at 13-14. In other words, Defendants are doubly wrong because they seek to read extraneous limitations into the claim by effectively rewriting the specification. Finally, Defendants' proposed limitation differs from the purported lexicographic language and should be rejected for this reason as well. Ex. 1, ¶ 33.

### E.    "A method to allow users to produce Internet websites on and for computers having a browser and a virtual machine capable of generating displays, said method comprising:"

Defendants are wrong that the preamble is "essential to understand limitations in the claim body." Resp. at 16. Claim preambles are presumed to be non-limiting. *Ancora Techs., Inc. v. LG Elecs. Inc*., No. 1-20-CV-00034-ADA, 2020 WL 4825716, at *6 (W.D. Tex. Aug. 19, 2020). The cases cited by Defendants are distinguishable because they relate to instances where the body of the claim was structurally incomplete in the absence of language from the preamble and/or the preamble was relied on to distinguish the prior art during prosecution. *Collaborative Agreements, LLC v. Adobe Sys. Inc.*, No. A-14-CV-356, 2015 WL 2250391, at *11-12 (W.D. Tex. May 12, 2015) (finding "transaction" to be limiting because the preamble defines "more than simply an intended use statement"); *Dig. Retail Apps, Inc. v. H-E-B, LP*, No. 6-19-CV-00167-ADA, 2020 WL 376664 at *8 (W.D. Tex. Jan. 23, 2020) (finding "spot checking" to be limiting because the preamble identified "verifying" and "spot checking" as distinct terms that were not interchangeable and because the patentee had relied on the preamble to distinguish prior art during prosecution); *MEMS Tech. Berhad v. Int'l Trade Comm'n*, 447 F. App'x 142, 153-154 (Fed. Cir. 2011) (finding "package" to be limiting because the term "microelectromechanical system package" was "not otherwise present in the claim and is necessary to give meaning to the claim").

Here the general rule applies because the body of claim 1 recites a structurally complete

invention, and the preamble merely supplies the environment for the claimed invention by reciting an intended use for the virtual machine. *Dig. Retail Apps*, 2020 WL 376664 at *7. Specifically, as stated in the preamble, the virtual machine is "capable of generating displays." That statement is a non-limiting statement of purpose or intended use, not a statement "essential to understand limitations or terms in the claim body." *Id.* at *8. Indeed, Claim Element 1(e) recites generating "**virtual machine commands for the display of at least a portion of said one or more web pages**." '397 patent at 65:66-66:2 (emphasis added). Accordingly, the body of the claim recites the very statement of intended use ("a virtual machine capable of generating displays") included in the preamble.

### F.   "Application" / "application"

Defendants narrowed their originally proposed construction and now attempt to inject two improper limitations: (1) that the application is "separate from the player" and (2) that the application is "interpreted or executed by the player." ***First***, any separation between an application and a player is specified by the claim language itself. Defendants do not dispute that the claims recite ***functionally*** distinct roles for the application and Player. Resp. at 16-17. And Defendants use of the superfluous phrase "separate" would only add confusion because it is unclear what ***kind*** of separation Defendants propose. XMO Br. at 17. The specification discloses an integrated Application and Player and also discloses that the Application can be extended on the Player. Ex. 1, ¶¶ 36-37. Defendants thus concede that their use of the word "separate" does not include a "physical barrier," but nevertheless fail to articulate what "separate" ***does*** mean. Resp. at 18; Ex. 1, ¶ 38. That Defendants cannot—or will not—articulate their position underscores that the unnecessary limitation would serve only to add confusion and be a means of mischief at trial.

***Second***, although a Player may, and often does, interpret or execute an Application, the specification does not ***require*** the Player to do so and, indeed, discloses several embodiments of a

Player that does not directly interpret or execute the Application. These embodiments instead play a supportive role to adapt the Application for execution on a device. *See, e.g.*, '755 patent at 8:27-35, 34:51-64; Ex. 1, ¶ 35. Plaintiff's expert also provided several examples from the perspective of a POSITA of how the Player can "intercept" the Application and/or adapt it before it is executed by another piece of software. ECF No. 57-7, ¶¶ 34-35. The specification and claims also disclose that the device, rather than the Player, may execute the Application. XMO Br. at 18 (citing '755 patent at 5:32-41, 12:6-10, 13:42-49, 34:51-64, Claims 12 ("the Application and Player are provided to the device ***and executed on the device***"), 21). Defendants ignore these disclosures and sworn testimony, simply stating (incorrectly) that "Plaintiff does not identify a single embodiment where the Application is not interpreted or executed by the Player." Resp. at 18-19. And just as the Player does not necessarily need to execute the Application, as demonstrated by, e.g., claim 12, the Player also need not interpret the Application. For example, claim 21, which depends from claim 12, expressly claims the embodiment where the "Player interprets" not the Application, but "values of the web component." '755 patent at 39:18-21. This confirms that claim 12 does not require that the Player interpret (let alone execute) the Application. Finally, the portions of the intrinsic record cited by Defendants that suggest the Application is "interpreted" by the Player reinforce that only "***one embodiment***" or "***one example*** of the operation" involves the Application being interpreted by the Player. Resp. at 18; Ex. 1, ¶ 37.

G.      **"Player" / "player"**

Defendants' new, narrower, proposed construction should be rejected. A player is not necessarily "separate from the Application" and does not necessarily "interpret[] or execute[] the Application" for at least the same reasons discussed above in relation to the "application" term. Defendants also seek to inject a third improper limitation: that a player be "device specific code." The specification makes plain that the Player does not necessarily require "device-specific code":

it describes a player with "***no device specific dependencies***." '755 patent at 1:53-67 (emphasis added). Ex. 1, ¶¶ 40-41. That the specification describes players in other embodiments being device dependent does not render moot this specific disclosure.

Each claimed player in the '755 and '287 patents is specifically described as device dependent. XMO Br. at 20 (citing '755 patent at claims 1, 12, 27; '287 patent at claims 1, 15). Therefore, reintroducing this limitation yet again in these claims would be superfluous and improper. *Digital–Vending Servs. v. Univ. of Phx.*, 672 F.3d 1270, at 1275 (Fed. Cir. 2012).[5] Conversely, the patentees chose ***not*** to require a player to be device dependent in the claims of the '044 patent. XMO Br. at 20.

Plaintiff also identified distinctions in the prosecution histories of the three patents that demonstrate the "device dependent" limitation should only be included where the patentees intended. XMO Br. at 21-22. Defendants ignore that the prosecution histories differ and rely exclusively on the prosecution history of the '755 patent where every claimed Player is ***explicitly required*** to be device-dependent code. '755 patent at claims 1, 12, 27. The later issued '044 patent claims do not include the phrase "device-dependent code." Thus, the claims themselves make clear when the player must be device-dependent code. Moreover, the prosecution history statements in the parent application (that issued as the '755 patent) are not applicable in the descendant '044 patent because the claims are materially different and do not include the phrase device-dependent code. *Ventana Med. Sys., Inc. v. Biogenex Lab'ys, Inc.*, 473 F.3d 1173, 1182 (Fed. Cir. 2006) (statement made during prosecution of ancestor application did "not apply" to downstream patent where "different claim language" was used); *Broadridge Fin. Sols., Inc. v. Inveshare, Inc.*, 2012

---

[5] To the extent that Defendants argue "device-dependent" is not superfluous of "device-specific" (*see* Resp. at 12), Defendants would be incorrect. A phrase may be superfluous of another when it is not identical. *Interpols Network*, 2013 WL 12133639, at *5.

WL 1245723, at *6 (D. Del. Apr. 11, 2012) (declining to apply disclaimer to child claims where parent claim language was not "synonymous").

Expedia, splitting with the other Defendants, showcased a new limitation for the first time in the Response, arguing that the player within claim 12 of the '755 patent must be produced by an authoring tool based solely on supposed prosecution history disclaimer. There is no disclaimer here. As Expedia recognizes, prosecution history disclaimer is found only "when the patentee explicitly characterizes an aspect of his invention in a specific manner ***to overcome prior art***." Resp. at 22 (emphasis added). In the portion of the prosecution history on which Expedia relies, the patentees explicitly recognized that a reference, McCain, ***did*** "teach[] an authoring tool that generates a device-dependent Player," and therefore distinguished the asserted references on other grounds ECF 61-20 at 11. The patentees did not assert in prosecution that an authoring tool produced a player to overcome prior art; just the opposite: they recognized that such limitation was in the prior art. As such, there is no disclaimer.

### H.     "registry"

Defendants once again make a flawed lexicography argument. Here, Defendants suggest that the specification "defines the claimed registry as 'a database, XML file, or PDL [i.e., Portable Description Language] file that exists on a computer.'" Resp. at 22 (footnote omitted); '755 patent at 8:20-22. However, as with "time lines," Defendants rely on a single embodiment in an effort to import this limitation into the claim. Specifically, Defendants point to a discussion of Figure 2A in the '755 patent, which is unambiguously termed "an embodiment of system **100** illustrating the communications between different system components . . . including a web component registry **220** . . . ." '755 patent at 7:63-66. Further, this statement relates to a "web component registry," while the claim at issue recites, in contrast, a "registry." Finally, this very construction was rejected in a related case because "[n]othing in the specification indicates the patentee's desire to redefine

12

or limit the term 'registry' to only a 'database, XML file, or Portable Description Language'" file. Mem. Op. at 18, *Express Mobile, Inc. v. GoDaddy.com*, No. 3-19-cv-01937 (D. Del. June 1, 2021), ECF 121. For these reasons, Defendants' proposed construction is improper.

Similarly, Defendants' request to limit "registry"—a thing—based on where it *resides* is an improper attempt to bake a non-infringement argument into Defendants' proposed construction, a point made clear in Defendants' expert declaration. ECF 61-1 ("Schmandt Decl."), ¶ 172 ("While Mr. Weadock contends that a 'registry can be maintained on more than one device,' he offers no support for this opinion, and it is inconsistent with how a POSA would understand the explicit disclosures in the specification") (footnote omitted). The '755 Patent uses the term "registry" in a generic manner, referring to a database. This is a well-understood term used consistent with its plain and ordinary meaning, which is of course location-agnostic. Weadock Decl., ¶ 61. Nothing in the prosecution history indicates that the novelty of the claimed invention, or any other requirement for patentability, depends on the location where information is stored in the system. Defendants' efforts to limit the scope of the term should be rejected.[6]

I.      **"UI object"**

Defendants wrongly insist that the patentees defined "UI object" in the specification. Although a patentee may "act[ ] as his own lexicographer," the standard is "exacting" and requires the patentee to have "clearly expressed" a definition of a term. *Baxalta*, 972 F.3d at 1349. Defendants do not come close to meeting that high standard here.

---

[6] Similarly, Defendants' discussion of a "Windows Registry" is a red herring. The Weadock Declaration cites to a standard, oft-cited technical dictionary—the Microsoft Computer Dictionary—for its general definition of a "registry" as "a central hierarchical database" for computer systems. Weadock Decl., ¶ 61. However, contrary to Defendants' suggestion, Mr. Weadock does not opine that the scope of "registry" is properly limited to a "Windows Registry." Indeed, while the patent mentions Windows as an exemplary operating system for device-specific routines, it clearly notes that the invention "is not so limited." '755 patent at 3:58-57.

That there is no lexicography is confirmed by the patentees' use of the qualifier, "***without***

***limitation***," within the supposed lexicographic statement. The qualifier makes clear that "UI

object" is broader than Defendants' purported definition and should not be limited to that

language.[7] Weadock Decl., ¶64-66. Moreover, the specification is clear that the language

Defendants cite relates to "one embodiment"—a fact that Defendants' ignore. '755 patent, 14:4-

21 ("one embodiment" "that permits the placement and association of objects," a subset of which

"are referred to herein, without limitation, as objects or UI (user interface) objects"). In other

words, the specification explains that *specific examples* from a *single embodiment* include "objects

placed on a canvas that are intended for interaction with a user of a device" that are "UI objects."

*See id.* That language does not purport to capture all UI objects, and does not define the term.[8]

### J.    "An authoring tool configured to . . . a Player

Defendants speculate that a change in paragraph indentation and the absence of a verb

preceding "a Player" support a wholesale alteration of the scope of Claim 1 of the '287 patent.

Resp. at 26-29. The lack of a verb preceding "a Player," in fact, demonstrates that the "Player" is

a distinct claim limitation separate and apart from the "authoring tool." This is evident from both

the prosecution history and the punctuation used throughout the body of the claim, which makes

clear that the "Player" is not required to be produced by the authoring tool.

---

[7] *See Ilife Techs., Inc. v. Nintendo of Am., Inc.*, 2017 WL 525708, at *7 (N.D. Tex. Feb. 9, 2017)
("The qualifiers 'broadly,' 'without limitation,' and 'other similar types of communications
equipment' in the specification's definition indicate that the patent was not intended to limit a
communication device to the particular list of examples provided in the definition, or even to
'existing' devices.").

[8] Defendants appear to now concede that "object" could be given its plain and ordinary meaning.
Resp. at 25. And Mr. Schmandt states that "UI" is a "term of art in computer science and web
design fields." Schmandt Decl., ¶175. Under the circumstances, there is no reason to impose
Defendants' circular construction when all parties agree that these terms have plain and ordinary
meanings. Weadock Decl., ¶63. Noticeably, Defendants and Mr. Schmandt do not disagree with
Mr. Weadock's opinion that "user interface" and "object" are "two very well-known terms." *Id.*

The MPEP confirms that Defendants' attempt to rely on paragraph indentations to limit the claim is improper. Although the MPEP notes that applicants "*may*" use "plural indentations to further segregate subcombinations or related steps," and that "*in general*," "the printed patent copies will follow the format used," "printing difficulties or expense ***may prevent the duplication of unduly complex claim formats***." MPEP §608.01(m) (emphasis added). In other words, the PTO does not mandate the use of indentations, and after examination is complete, the PTO may unilaterally adjust paragraph indentations. This makes clear that indents of a claim should not be used for claim interpretation or construction. Otherwise, the PTO could unwittingly alter the scope of patent claims.

Contrary to Defendants' assertion, the Amendment entered by the Examiner (ECF 61-26 at 3) did not alter the relationship between the authoring tool and the Player. Although it added "a Player" to Claim 1, it did not suggest that the "authoring tool" *must produce the Player*. Defendants' contention that the Amendment was intended to "make clear that the Player is associated with—and not a separate component from—the authoring tool" (Resp. at 28) is contradicted by the claim language. ***Commas*** are used to separate the functions of the authoring tool, whereas ***semicolons*** are used to define the separate claim elements, including the "computer memory," the "authoring tool," and the "Player." XMO Br. at 28. A similar dispute arose in *Shotkam* where the court held that the elements falling under the "at least one of" limitation were part of a ***list properly separated by commas***, and, in contrast, the primary claim elements were ***distinct claim elements properly separated by semicolons***. *Shotkam LLC v. Tachyon, Inc.*, No. H-20-1070, 2021 WL 23311, at *4-5. (S.D. Tex. Jan. 4, 2021). The same is true here—"a Player" in Claim 1 is separated by a semicolon, and thus a distinct claim element from the authoring tool.

## III.    CONCLUSION

Express Mobile respectfully requests that the Court adopt its constructions.

Dated:  July 8, 2021

Respectfully submitted,

*/s/ Steven Rizzi*
Scott W. Hejny
Texas State Bar No. 24038952
shejny@mckoolsmith.com
McKool Smith, P.C.
300 Crescent Court, Suite 1500
Dallas, Texas 75201
Telephone: (214) 978-4000
Telecopier: (214) 978-4044

Steven Rizzi (*pro hac vice*)
srizzi@mckoolsmith.com
Ramy Hanna (*pro hac vice*)
rhanna@mckoolsmith.com
One Manhattan West
395 9th Avenue, 50th Floor
New York, New York 10001
Telephone: (212) 402-9400
Telefax: (212) 402-9444

*Steven F. Molo*
Steven F. Molo (*pro hac vice*)
NY Bar No. 4221743
Ben Quarmby (*pro hac vice*)
NY Bar No. 4298725
Leonid Grinberg (*pro hac vice*)
NY Bar No. 5652458
MOLOLAMKEN LLP
430 Park Avenue
New York, NY 10022
(212) 607-8160 (telephone)
(212) 607-8161 (fax)
smolo@mololamken.com
bquarmby@mololamken.com
lgrinberg@mololamken.com

Rayiner I. Hashem (*pro hac vice*)
D.C. Bar No. 1046830
Sarah J. Newman (*pro hac vice*)
D.C. Bar No. 1047210
Benjamin T. Sirolly (*pro hac vice*)
D.C. Bar No. 1022426
MOLOLAMKEN LLP

*/s/ Robert F. Kramer*
FEINBERG DAY KRAMER ALBERTI
LIM TONKOVICH & BELLOLI LLP
Robert F. Kramer (*pro hac vice*)
rkramer@feinday.com
M. Elizabeth Day (*pro hac vice*)
eday@feinday.com
David Alberti (*pro hac vice*)
dalberti@feinday.com
Sal Lim (*pro hac vice*)
slim@feinday.com
Russell S. Tonkovich (pro hac vice)
rtonkovich@feinday.com
Marc Belloli (pro hac vice)
mbelloli@feinday.com
577 Airport Blvd., Suite 250
Burlingame, California 94010
Tel: 650-825-4300
Fax: 650-460-8443

Robert Christopher Bunt
State Bar No. 00787165
Charles Ainsworth
State Bar No. 00783521
PARKER, BUNT & AINSWORTH, P.C.
100 E. Ferguson, Suite 418
Tyler, TX 75702
(903) 531-3535 (telephone)
rcbunt@pbatyler.com
charley@pbatyler.com

The Watergate, Suite 500
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037
(202) 556-2000 (telephone)
(202) 556-2001 (fax)
rhashem@mololamken.com
snewman@mololamken.com
btsirolly@mololamken.com

*Attorneys for Plaintiff Express Mobile, Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on July 8, 2021.

*/s/ Robert F. Kramer*
Robert F. Kramer

17