# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | | |
|---|---|---|
| EXPRESS MOBILE, INC. | § | |
| Plaintiff, | § | Civil Action No. 6:20-cv-00801-ADA |
| | § | |
| v. | § | **JURY TRIAL DEMANDED** |
| | § | |
| EXPEDIA, INC., AND HOMEAWAY.COM, INC., | § | |
| Defendants. | § | |

| | | |
|---|---|---|
| EXPRESS MOBILE, INC., | § | |
| Plaintiff, | § | Civil Action No. 6:20-cv-00802-ADA |
| | § | |
| v. | § | **JURY TRIAL DEMANDED** |
| | § | |
| EBAY INC., | § | |
| Defendant. | § | |

| | | |
|---|---|---|
| EXPRESS MOBILE, INC., | § | |
| Plaintiff, | § | Civil Action No. 6:20-cv-00803-ADA |
| | § | |
| v. | § | **JURY TRIAL DEMANDED** |
| | § | |
| FACEBOOK, INC., | § | |
| Defendant. | § | |

EXPRESS MOBILE, INC.,                §
                                     §
            Plaintiff,               §    Civil Action No. 6:20-cv-00804-ADA
                                     §
v.                                   §
                                     §    **JURY TRIAL DEMANDED**
GOOGLE LLC,                          §
                                     §
            Defendant.               §
                                     §
                                     §
                                     §

EXPRESS MOBILE, INC.,                §
                                     §
            Plaintiff,               §    Civil Action No. 6:20-cv-00805-ADA
                                     §
v.                                   §
                                     §    **JURY TRIAL DEMANDED**
ATLASSIAN CORP. PLC AND              §
ATLASSIAN, INC.,                     §
                                     §
            Defendants.              §
                                     §
                                     §

**SUPPLEMENTAL DECLARATION OF CHRIS SCHMANDT IN SUPPORT OF
DEFENDANTS' SUR-REPLY CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS

I.   OPINIONS RELEVANT TO THE '397 AND '168 PATENTS............................2

    A.   Virtual Machine ............................................................................... 2

    B.   "at least one runtime file" ................................................................20

    C.   "run time engine" / "runtime engine" .......................................23

    D.   "time lines" ....................................................................................25

    E.   "means for storing information in a database" ...........................27

II.  OPINIONS RELEVANT TO THE '755, '287, AND '044 PATENTS ...............28

    A.   "Application" / "application"..........................................................28

    B.   "Player" / "player" ..........................................................................33

    C.   "registry"..........................................................................................35

    D.   "UI object" .......................................................................................35

    E.   "An authoring tool configured to . . . a Player" ..........................36

    F.   "first code" / "second code"...........................................................36

I, Chris Schmandt, declare as follows:

1.      I submit this supplemental declaration in support of the sur-reply claim construction brief submitted by Expedia, Inc., Homeaway, Inc., Facebook, Inc., Google LLC, Atlassian Corp. Plc and Atlassian, Inc. (collectively, "Atlassian"), and eBay, Inc. (collectively "Defendants") and in response to the Supplemental Declaration of Glenn E. Weadock ("Weadock Supp. Decl.") served on July 8, 2021 (D.I. 59-02).

2.      My qualifications, compensation, prior testimony, materials considered, understanding of the legal principles involved, and opinions regarding the level of ordinary skill in the art are set forth in my Declaration served on June 22, 2021 (D.I. 56-26, "Schmandt Opening Decl."), which I incorporate by reference in its entirety herein.

3.      In addition to the materials considered as part of my Opening Declaration, I have considered Mr. Weadock's supplemental opinions and the additional materials cited herein.

4.      I make this declaration based on my own personal knowledge, information, and belief, and the materials set forth below.  I would and could competently testify to the matters set forth herein if called upon to do so.

5.      I reserve the right to supplement or amend this declaration based on any new information that is received and is relevant to my opinions, including any additional claim construction briefing from Express Mobile, Inc. ("Express Mobile" or "XMO"), and any declarations or other testimony from any witness testifying on Express Mobile's behalf.

6.      I further reserve the right to supplement or amend this declaration in view of any relevant Order of the Court or any papers served or filed by Express Mobile in this case, or in any other case brought by Express Mobile relating to the Asserted Patents.

## I.  OPINIONS RELEVANT TO THE '397 AND '168 PATENTS

### A.  Virtual Machine

| Defendants' Construction | Express Mobile's Construction |
|---|---|
| Abstract machine that is emulated in software and that executes intermediate code | No construction necessary<br>*Alternatively*, an abstract machine that is emulated in software |

7.      Mr. Weadock's supplemental declaration leaves most of the opinions in my original declaration unaddressed and unrebutted, and therefore does not give me cause to revise any of my opinions.

8.      In particular, Mr. Weadock's supplemental declaration fails to identify a single source from the claimed 1999 priority date of the '397 patent or earlier that identifies any virtual machine that does not execute intermediate code.

9.      With respect to the extensive twenty-paragraph background section on virtual machines in my original declaration,[1] Mr. Weadock's sole comment is that "while Mr. Schmandt's 'background' section may describe some specific types of virtual machines, I disagree that it provides an overview of all virtual machines."[2]  Mr. Weadock fails to provide any specific disagreements with the "background" section, leaving it otherwise unrebutted.

10.     In my prior declaration, I pointed out that Mr. Weadock claimed that BASIC, Lisp, Tcl, and Ruby were "all virtual machines that existed at the time of the invention" that did not use intermediate code but failed to provide any citation or support for this claim (or even to

---

[1] Schmandt Opening Decl. ¶¶ 65–84.

[2] Weadock Supp. Decl. ¶ 10.

identify the "virtual machines" in question).[3]  Mr. Weadock's supplemental declaration

acknowledges this omission in his original declaration,[4] but despite attempting to remedy it, he

still fails to identify a single source that stated that there were BASIC, Lisp, Tcl, and Ruby

virtual machines at the time of the invention that did not use intermediate code.  As demonstrated

in detail below, none of the sources that Mr. Weadock cites in his supplemental declaration

support this claim.

      11.     First, Mr. Weadock cites the Wikipedia page

https://en.wikipedia.org/wiki/Interpreter_computing).[5]  As an initial matter, Wikipedia is not a

source that would be used by a POSA.  In addition, Mr. Weadock cites the *current* version of the

Wikipedia page, which postdates the claimed date of invention of the '397 patent by more than

two decades.  Moreover, the line he cites does not even mention virtual machines at all, much

less claim that early versions of the Lisp programming language and BASIC dialects used virtual

machines.  The line cited by Mr. Weadock also does not cite any sources for this claim or specify

which versions of the Lisp programming language or BASIC dialects it is referring to.

      12.     Second, Mr. Weadock cites an excerpt from the book "Concepts of Programming

Languages" by Robert W. Sebesta.[6]  The cited book was published in 2016, and therefore does

not constitute evidence of how a "virtual machine" would have been understood in 1999.[7]  In

---

[3] Schmandt Opening Decl. ¶ 113 (quoting Weadock Declaration in support of Express Mobile, Inc.'s Opening Claim Construction Brief (D.I. 51-7, "Weadock Decl.") ¶ 33).

[4] Weadock Supp. Decl. ¶ 11.

[5] Weadock Supp. Decl. ¶ 11 (citing Kramer Declaration in support of Express Mobile, Inc.'s Reply Claim Construction Brief (D.I. 59-1, "Kramer Supp. Decl.") Ex. ¶ 1C).

[6] Weadock Supp. Decl. ¶ 11 (citing Kramer Supp. Decl. Ex. 1U).

[7] Kramer Supp. Decl. Ex. 1U at PDF page 5.

addition, the cited excerpt, which discusses Common Lisp, does not mention the words "virtual machine" at all.[8]  But most significantly, the cited excerpt makes clear that the version of Common Lisp being discussed *did* use intermediate code.  It says:[9]

> Lisp implementations have a front end called the *reader* that **transforms the text of Lisp programs into a code representation**.  Then, the macro calls in the code representation are expanded into code representations.  The output of this step is then either interpreted or compiled into the machine language of the host computer, or perhaps into an intermediate code than can be interpreted.

Mr. Weadock points to the final clause ("or perhaps into an intermediate code that can then be interpreted"), while ignoring the fact that the text makes clear that this passage explains that an intermediate code is always used:  The intermediate code is the "code representations" that lie between the "text of Lisp programs" and "the machine language of the host computer."  The passage explains that in some cases that intermediate code is transformed into a further intermediate code that can be interpreted, but even when that is not done, the reader transforms the text of Lisp programs into an intermediate representation.  Thus, even post-priority date texts cherry-picked by Mr. Weadock support Defendants' proposed construction, not Plaintiffs'.

13.    Third, Mr. Weadock cites without quoting another portion of the same book.[10]  Again, this book long post-dates the priority date of the '397 patent, and does not mention virtual machines.[11]  I discuss it further below.

---

[8] *Id.* at PDF pages 13-15.

[9] *Id.* at PDF page 14 (emphasis added)

[10] Weadock Supp. Decl. ¶ 11 (citing Kramer Supp. Decl. Ex. 1D).

[11] Kramer Supp. Decl. Ex. 1D at PDF pages 6, 60.

14.     Fourth, Mr. Weadock cites a December 15, 2008 webpage called "Fun with Ruby's Abstract Syntax Trees" from the website rubyinside.com.[12]  This source long post-dates the claimed invention date of the '397 patent, and does not mention virtual machines anywhere.[13]

15.     Fifth, Mr. Weadock cites to what appears to be a draft copy of a book called An Introduction to Scheme and its Implementation, available at https://www.cs.utexas.edu/ftp/garbage/cs345/schintro-v14/schintro_112.html.[14]  Again, this excerpt does not discuss what version of Scheme it is talking about, and in any event does not mention or discuss virtual machines.[15]

16.     Sixth, Mr. Weadock cites to an online book copyrighted 2003-2005 by Peter Saibel.[16]  Again, this source post-dates the claimed invention date of the '397 patent, does not mention the words "virtual machine," and does not specify what version of Lisp it is discussing.[17]

17.     Seventh, Mr. Weadock cites a paper by the well-known computer scientists Brian Kernighan and Christopher Van Wyk that refers to Tcl 7.16 as a "pure interpreter."[18]  Notably,

---

[12] Weadock Supp. Decl. ¶ 11 (citing Supp. Kramer Decl. Ex. 1E).

[13] Kramer Supp. Decl. Ex. 1E.

[14] Weadock Supp Decl. ¶ 11 (citing Kramer Supp. Decl. Ex. 1K).

[15] Kramer Supp. Decl. Ex. 1K.

[16] Weadock Supp. Decl. ¶ 11 (citing Kramer Supp. Decl. Ex. 1R).

[17] Kramer Supp. Decl. Ex. 1R.

[18] Weadock Supp. Decl. ¶ 11 (citing Kramer Supp. Decl. Ex. 1S).

not only does the cited portion not refer to Tcl 7.16 as using a "virtual machine,"[19] but elsewhere

it makes clear that virtual machines use intermediate code:[20]

> Scripting languages offer several intermediate positions, with multiple meanings even for "interpretation."  Tcl 7.6 and Scheme 7.3 are pure interpreters that repeatedly parse the source code as they run; this is extremely flexible, but slowest of all, as the graphs above show clearly. Awk translates its program into a tree that is walked during execution, Visual Basic creates an internal p-code representation, and Java and Limbo ***translate into byte codes for virtual machines (another form of p-code)***.

18.     Thus, consistent with Defendants' proposed construction, but not with Express

Mobile's, Kernighan and Van Wyk use the term "virtual machine" for programming language

implementations that use intermediate code (like p-code, discussed in my original declaration),

and do not use it with respect to pure interpreters.

19.     Eighth, and finally, Mr. Weadock cites an article in the magazine *Interface Age*

from 1980.[21]  This source does not mention or discuss virtual machines at all.

20.     Thus, Mr. Weadock is unable to cite any contemporaneous sources for his initial

claim that BASIC, Lisp, Tcl, and Ruby were "all virtual machines that existed at the time of the

invention" that did not use intermediate code.[22]  This confirms my opinion that the term "virtual

machine," as used in 1999, at the time of the claimed invention of the '397 patent, required

intermediate code.  The fact that Mr. Weadock was unable to find any support for his assertion

---

[19] Kramer Supp. Decl. Ex. 1S PDF page 4.

[20] Kramer Supp. Decl. Ex. 1S PDF page 18 (emphasis added).

[21] Weadock Supp. Decl. ¶ 11 (citing Kramer Decl. Ex. 1T).

[22] Schmandt Opening Decl. ¶ 113 (quoting Weadock Decl. ¶ 33).

despite considerable effort also demonstrates that his opinion that intermediate code was not a requirement of virtual machines in 1999 was incorrect.

21. Mr. Weadock's opinion appears to be based on confusion about the relevant time period for conducting the claim construction inquiry. He cites two third-party websites for the proposition that the V8 JavaScript engine is a "virtual machine."[23] The first is an article written on December 22, 2016, by a "Ratha KM" on the website DZone.[24] Not only does the article (which is not the type of source that a POSA would use to understand the meaning of the term "virtual machine") not provide any credentials for the author, but it is clear the site long post-dates the claimed invention of the '397 patent. The second site appears to be a personal website at https://sites.google.com/site/jennetruong0501/statistical-information/google-chrome.[25] Based on the dates of the releases listed on the site, the site appears to date to November 2014—again, long after the claimed invention date of the '397 patent.[26] Given Mr. Weadock's reliance on sources that post-date the claimed invention date of the '397 patent by more than a decade, I can only assume that he was unable to find sources contemporaneous with the invention date, further supporting my opinion that Defendants' proposed construction of "virtual machine" is correct.

22. Mr. Weadock also incorrectly claims that "Defendants and Mr. Schmandt do not dispute that Google's V8 engine is a virtual machine that does not execute intermediate code . . . ."[27] Unsurprisingly, this assertion is not supported by any citation, and it is incorrect. Because it

---

[23] Weadock Supp. Decl. ¶ 13.

[24] Kramer Supp. Decl. Ex. 1F.

[25] Kramer Supp. Decl. Ex. 1H.

[26] *Id.*

[27] Weadock Supp. Decl. ¶ 13.

is inherent in the concept of a "virtual machine," as that term was understood at the time of invention of the '397 patent," to execute intermediate code, there are no virtual machines that do not execute intermediate code.

23.     Mr. Weadock next suggests that he disagrees with my opinion that the '397 patent disparages JavaScript and makes clear that it is not suitable for the claimed invention,[28] because it has "numerous inherent limitations, "ha[s] not been designed for serious multimedia applications," "ha[s] almost no file handling ability," and that "it is virtually impossible to write a web publishing application" using it.[29]  Oddly, Mr. Weadock does not address these disclosures in the '397 patent, or explain how they represent anything other than a disparagement of JavaScript.  He instead generally talks about what he believes to be the purposes of the '397 patent,[30] and my testimony that the '397 patent "is concerned with allowing someone to build a web publishing application using a full-featured programming language," but none of the cited text from the specification or from my deposition is inconsistent with the fact that the '397 patent disparages JavaScript.  Mr. Weadock therefore leaves unrebutted my opinion that the '397 patent disparages JavaScript.

24.     Mr. Weadock also notes that the specification of the '397 patent states that "full-featured programming languages supported by browsers [would] evolve" and that "[t]his evolution of . . . technology is independent of the preferred implementation and methods of the invention."[31]  Mr. Weadock, however, misinterprets these disclosures to contend that "the

---

[28] *See, e.g.*, Schmandt Opening Decl. ¶ 91.

[29] '397 patent at 1:11–23; *id.* at 40–49.

[30] Weadock Supp. Decl. ¶ 13.

[31] Weadock Supp. Decl. ¶ 14 (citing '397 patent at 62:33–34; *id.* at 65:37–39).

patentee contemplated that other 'full-featured programming languages' could be used in browser-based website building tools, **_using virtual machines_**, like those claimed in the patent."[32]  In fact, the quoted passages make no reference to virtual machines at all, so Mr. Weadock is misinterpreting these passages from the specification.  Although Mr. Weadock says that he "disagree[s] with [my] opinion that the patentee's recognition of 'full-featured programming languages' has no connection with virtual machines," Mr. Weadock's opinion lacks any support in the '397 patent, as evidenced by the fact that none of the text he quotes describing "full-featured programming languages" references virtual machines.  In fact, as I stated in my opening declaration, the '397 patent expressly states that C++ is a "full-featured programming language," and C++ is not associated with a virtual machine—a point Mr. Weadock does not dispute.[33]  Thus, the '397 patent makes clear that a "full-featured programming language" has nothing to do with virtual machines—it gives a specific example of a "full-featured programming language" that does not use a virtual machine.

     25.    Mr. Weadock also claims that the fact that the '397 patent makes clear that "full-featured programming languages" has nothing to do with virtual machines is inconsistent with my prior testimony.[34]  Mr. Weadock does not substantiate this claim, and it is unclear why he would make it, because it is obvious from reading my testimony that it is not at all inconsistent with "full-featured programming languages" having nothing to do with virtual machines.  Mr. Weadock, in apparent acknowledgement of this, makes the weaker statement that "full-featured programming languages _can be implemented_ via virtual machines, as for example with Java at

---

[32] Weadock Supp. Decl. ¶ 14 (emphasis added).

[33] Schmandt Opening Decl. ¶ 90 (citing '397 patent at 1:22–25).

[34] Weadock Supp. Decl. ¶ 14.

the time of the patent,"[35] but of course the fact that a full-featured programming language *can be implemented* via a virtual machine does not mean that all full-featured programming languages have virtual machines, or in particular, that JavaScript, the language disparaged by the '397 patent, has or had a virtual machine.

26.    Mr. Weadock goes on to say that "[a]s of the priority date, JavaScript was not yet a full-featured language . . . ."[36]  This is a 180° turn from Express Mobile's position in prior litigation, in which its expert agreed that "JavaScript had already evolved into a full-featured language as of 1999 . . . ."[37] and Express Mobile explained that it agreed with me on this point.[38] Another Express Mobile expert correctly opined that browser-based JavaScript engines behaved in essentially the same way as early as 1995 as they do today, and thus that under Express Mobile's proposed construction, the JavaScript engines available as of the date of invention would be virtual machines.[39]  Thus, the '397 patent's disparagement of JavaScript indicates that the '397 patent did not consider interpreted languages like JavaScript to involve virtual machines.

---

[35] Weadock Supp. Decl. ¶ 14 (emphasis added).

[36] Weadock Supp. Decl. ¶ 15.

[37] Ex. 24, Expert Report of Bhuvan Urgaonkar ¶ 43, filed as *Shopify, Inc. v. Express Mobile, Inc.*, No. 1:19-cv-00439-RGA, D.I. 257 at PDF page 81.

[38] Ex. 25, Express Mobile's Brief in Opposition to Shopify's Motion for Summary Judgment at 20, filed as *Shopify, Inc. v. Express Mobile, Inc.*, No. 1:19-cv-00439-RGA, D.I. 273 at PDF page 27.

[39] Ex. 26, Rebuttal Expert Report of Kevin Almeroth ¶¶ 87–88 (explaining that as of 1999 "a web developer could have used JavaScript to implement the teachings of the claimed invention of the '397 and '168 patent" and that "JavaScript Virtual Machines" and "were also known in the art as of 1999," and indeed were "first created by Brendan Eich in 1995"), filed as *Shopify, Inc. v. Express Mobile, Inc.*, No. 1:19-cv-00439-RGA, D.I. 220-2, at PDF page 79.

27.     Mr. Weadock also attempts to salvage his reliance on an article by someone named Al Berg called "Applets and Network Security: A Management Overview," found in a book called "Local Area Network Handbook."[40]  However, he provides no substantive response to my observations that neither the article nor the book is focused on virtual machines or JavaScript, but rather on the potential security threats from "applets," and does not suggest what credentials Mr. Berg had for his opinion.  Indeed, the term "applet" is usually used in the context of Java, but not JavaScript, further casting doubt on the reliability of the article.  His sole response—"I disagree"—is entirely non-substantive and provides no reason why the article is a reliable source for what the term "virtual machine" meant in 1999.  Furthermore, Mr. Weadock has no response to my observation that sources from the relevant time period that were focused on JavaScript made clear that JavaScript interpreters were not considered to be virtual machines, conceding the point.[41]

28.     Mr. Weadock also fails to respond to the points I made with respect to the lecture notes he relies on.  First, he asserts that it is appropriate to rely on lecture notes made for undergraduate teaching.[42]  He fails to address the point that he and I agree that a person of ordinary skill in the art would have had at least a degree in computer science or equivalent experience and so would have been unlikely to turn to undergraduate course notes as a reference material, and that the course notes are not from the relevant field.

29.     Second, in response to my point that "the lecture notes only meant to assist an oral lecture and the content therein was not necessarily presented," Mr. Weadock states, "I disagree

---

[40] Weadock Supp. Decl. ¶ 16.

[41] Schmandt Opening Decl. ¶ 107.

[42] Weadock Supp. Decl. ¶ 17.

that a professor would generate incorrect lecture notes or not intend to discuss the content therein."[43]  This is a non sequitur; the point was that Mr. Weadock has no idea how the elliptical and fragmentary notes were actually delivered.  In fact, Mr. Weadock himself acknowledges the point:  When confronted with the fact that the lecture notes state that interpreters only "simulate" virtual machines without *being* virtual machines, as Mr. Weadock contends, Mr. Weadock responds by admitting, "I am not sure what a simulation of a virtual machine might be . . ."[44]  That is precisely the point:  Mr. Weadock does not understand the lecture notes because they were meant to guide an oral lecture, not be stand-alone references.

30.     In my opening declaration, I pointed out several reasons why they support Defendants' proposed construction of virtual machine and not Mr. Weadock's, including the fact that they specify that a virtual machine has its own "machine language," that each of its examples of explicit virtual machines uses intermediate code, and that interpreters are described as only simulating virtual machines.[45]  Of these, Mr. Weadock addresses only the last, and his attempted rebuttal is misplaced.  While he admits that he is not sure what the lecture notes mean, he nevertheless opines that a simulation of a virtual machine "would not be distinguishable from a virtual machine."  Mr. Weadock provides no support for this claim, and I disagree.  A simulation may implement only *certain features* of the process or thing being simulated:  For example, a flight simulation will typically include certain features of flying an airplane (e.g., certain aspects of flight dynamics and the control panel) while not including other features (e.g., communications with ground control).  Thus, the lecture notes are more logically read to state

---

[43] Weadock Supp. Decl. ¶ 17.

[44] Weadock Supp. Decl. ¶ 18.

[45] Schmandt. Opening Decl. ¶ 111.

that interpreters merely simulate certain features of virtual machines, but are not themselves virtual machines—precisely the opposite of Express Mobile's position.

31.     Mr. Weadock, in acknowledgement that the lecture notes he cited undermine his position, states that "[i]n any case, a textbook on the matter confirms that pure interpreters are virtual machines . . . ."[46]  The textbook he cites, however, is from 2012, more than a decade after the claimed invention date of the '397 patent, further underscoring his inability to find evidence from the relevant time frame—an ability that is due to the fact that, as of 1999, "virtual machine" did not mean what Express Mobile contends it means.[47]

32.     Even though it long post-dates the claimed invention date of the '397 patent, the textbook—Concepts of Programming Languages by Robert W. Sebesta (2012)—contains several disclosures that support Defendants' proposed construction.

33.     The textbook states that an "interpreter program acts as a software simulation of a machine" and "obviously provides a virtual machine for the language."[48]  As with the lecture notes discussed above, even if one of ordinary skill in the art were to read this textbook, he or she would recognize that the term "virtual machine" is being used in general sense as a pedagogical tool to explain the concept of abstraction, not to define interpreters to be virtual machines in the technical sense.  Indeed, the portion of the textbook on which Mr. Weadock relies is from the introductory chapter, which gives a high-level conceptual overview of the material that will be covered with greater specificity in the remainder of the textbook (*i.e.*, it is not discussing the relevant concepts at a granular level of detail).

---

[46] Weadock Supp. Decl. ¶ 18.

[47] Kramer Supp. Decl. Ex. 1D at PDF page 6.

[48] *Id.* at 28.

34.     As is the case with the lecture notes Mr. Weadock cites, other excerpts in the textbook support Defendants' proposed construction that requires intermediate code in the instruction set of a virtual machine, consistent with a virtual machine emulating processor functionality.  For example, even in the introductory chapter, Figure 1.2 suggests that compilers and interpreters are not properly characterized as virtual machines.[49]



35.     The above figure taken from the Sebesta book (Kramer Supp. Decl. Ex. 1D) illustrates the looseness of the author's terminology in this introductory chapter.  For example, the compiled C language provides a "virtual C computer" which can only mean that the programmer writes in C and does not have to think about what happens during execution.  I note further that for the Java programming language, the Java Virtual Machine *is* shown explicitly. The figure also shows the Scheme language, which is interpreted (as shown) with reference to a "Scheme virtual computer" (just the same as with all the languages, whether interpreted or

---

[49] Kramer Supp. Decl. Ex. 1D at 25.

compiled) and additionally shows, correctly, the Scheme interpreter component.  We can also see that VB.NET and C# are compiled to run on the .NET common run time language.  This parallels the visual representation of the Java programming language, which is no surprise at all, as the common runtime is considered by Smith & Nair alongside the Java VM in their description of HLL virtual machines.  And in the subsequent chapters, where the textbook explains the concepts related to programming languages with greater granularity and specificity, it confirms that virtual machines are associated with intermediate code.[50]

36.     Moreover, whereas the Programming Languages textbook cited by Express Mobile is principally concerned with "introduc[ing the reader to] the main constructs of contemporary programming languages and [providing] the reader with the tools necessary for the critical evaluation of existing and future programming languages[,]"[51] other textbooks are more squarely focused on virtual machines.  A POSA interested in the meaning of "virtual machine" would have consulted a textbook on virtual machines, not compilers.  The textbooks concerned with virtual machines support Defendants' proposed construction (under which a virtual machine emulates a physical processor, such as by executing intermediate code in the instruction set of the virtual machine) and reflect that interpreters that lack those properties are not properly characterized as virtual machines.

37.     For example, Iain Craig's 2006 textbook entitled Virtual Machines contrasts interpreters with virtual machines:

---

[50] Ex. 27, Robert Sebesta, *Concepts of Programming Languages* (10th ed. 2009) at 93 ("Any language can be translated to an intermediate form and 'run' on any platform that has a virtual machine for that intermediate form."), 141 (referring to an "intermediate language and its associated virtual machine").

[51] Kramer Supp. Decl. Ex. 1D at vi.

> An interpreter can operate on the source structure of a program (as many LISP interpreters do) or can execute an internal form (for example, polish notation), while virtual machines combine both compilation and interpretation. Virtual machines consist of a compiler and a target architecture implemented in software. It contains a core that deals with the execution of code that has been compiled into the instruction set for the virtual machine's software architecture. The core executes these instructions by implementing the operations defined by the instruction set (which can be seen as a form of emulation or interpretation).[52]

Consistent with my understanding—and the understanding of a person of ordinary skill in the art—this passage reflects two defining facts about virtual machines as compared to interpreters. First, the passage reflects that virtual machines execute code that has been translated from another programming language into the instruction set for the virtual machine (e.g., they could execute intermediate code) similar to a processor, because the passage explains that virtual machines "deal[] with the execution of code that has been compiled into the instruction set for the virtual machine's software architecture."[53] Second, the passage confirms that software that performs only interpretation (*i.e.*, the "pure interpreter" posited by Mr. Weadock) is not a virtual machine because its first sentence contrasts interpreters with virtual machines.

38.    With respect to the dictionary definitions, in my opening report, I pointed out that each of the dictionaries that Mr. Weadock cited define "virtual machine" consistent with Defendants' proposal, not Express Mobile's.[54] Mr. Weadock's rebuttal is to argue that I relied on "dictionary definitions for a different term, 'abstract machine.'"[55] But the definitions of

---

[52] Ex. 28, Iain D. Craig, *Virtual Machines* (2006) at 1.

[53] *Id.* When the authors refer to the virtual machine consisting of a compiler part, this is in reference to high level language virtual machines (the text concerns programming languages) in which a compiler produces bytecode, and the bytecode is executed, i.e. interpreted onto the instruction set of the native processor.

[54] Schmandt Opening Decl. ¶¶ 93–98.

[55] Weadock Supp. Decl. ¶ 20.

"virtual machines" in these dictionaries included the term "abstract machine," as I pointed out in my initial declaration.[56]  Mr. Weadock does not dispute that these dictionary definitions support Defendants' proposed construction, and not Express Mobile's.

39.     Mr. Weadock only addresses one dictionary definition, that taken from the New Penguin dictionary.  Here again, though, Mr. Weadock fails to offer any substantive criticisms. In response to my noting that the third definition required the virtual machine to have its own invented MACHINE LANGUAGE or PSEUDO-CODE," Mr. Weadock simply states that he "disagree[s] that it requires all virtual machines to execute intermediate code," without explaining any basis for his disagreement.[57]

40.     Mr. Weadock also claims that all four definitions conform to Express Mobile's construction.[58]  But Mr. Weadock does not quote the definitions, much less explain how they conform to Express Mobile's proposed construction.  Express Mobile's proposed constructions—a machine that is virtual, or "abstract machine that is emulated in software"—is obviously different from "[a] technique used by some MULTITASKING operating systems, in which each concurrent application appears to be running on its own computer" (definition 1), "[a] mechanism supported by all the Intel 80x86 family of microprocessors from the 80386 onward that allows the processor to emulate multiple virtual 16-bit computers with their own private address spaces" (definition 2), or "[s]ometimes . . . a software emulator used either to run programs written in the machine code of one CPU on a different CPU type (for example DEC's FX132) or to run programs written for one operating system under a different one (for example

---

[56] Schmandt Opening Decl. ¶¶ 94–96, 98.

[57] Weadock Supp. Decl. ¶ 19.

[58] Weadock Supp. Decl. ¶ 19.

SOFTWINDOWS)" (definition 4).  The only one of these definitions that Mr. Weadock addresses is the fourth, but the definition does not mention or require a machine, whether physical or virtual—it simply discusses software that executes programs written for one type of computer on another.  Indeed, such a definition would be inconsistent with Mr. Weadock's claim that JavaScript interpreters are virtual machines, since JavaScript interpreters do not execute programs written for one type of computer on another.

41.     Instead of contemporaneous dictionaries, Mr. Weadock relies on modern-day general purpose websites like Wolfram Mathworld and Wikipedia.[59]  These newly cited extrinsic definitions do not favor a different construction of the term "virtual machine" because they are not the types of references a person of ordinary skill in the art would rely on to ascertain the meaning of a claim term in the '397 patent.  For example, Exhibit 1M to the Kramer Declaration is an excerpt from the present-day Wolfram MathWorld website, which aims to be "the web's most extensive *mathematical* resource," has "thousands of contributors," and post-dates the '397 patent by about two decades.[60]  Exhibit 1P is the current Wikipedia page for "Abstract machine," which is not peer-reviewed, is not targeted to the field of computer science, and post-dates the filing date of the '397 patent by about two decades.  Indeed, Wikipedia did not even exist in 1999.  The final text that Mr. Weadock cites also post-dates the claimed invention date of the '397 patent by many years,[61] and does not discuss the term "virtual machine" at all.

---

[59] Weadock Supp. Decl. ¶¶ 20–21.

[60] Kramer Supp. Decl. Ex. 1M (https://mathworld.wolfram.com/about/).

[61] Kramer Supp. Decl. Ex. 1Q at PDF page 6.

42.     Mr. Weadock also attempts[62] to rehabilitate the definitions given in Blackie's Dictionary of Computer Science, which as I pointed out[63] support Defendants' proposed construction and not Express Mobile's, despite long post-dating the claimed invention date of the '397 patent.  But he fails to account for the fact that the first definition in Blackie's Dictionary is "[a]n abstract machine for which an interpreter exists," and it further defines "abstract machine" to be "[a] design for a processor that represents a model for processing abstract machine language," whose "instruction set can use instructions that more closely resemble the compiled language than the instructions used by an actual computer."[64]  The instructions for the abstract machine are intermediate code, as I explained in my opening declaration.  Thus, a virtual machine requires an abstract machine, which in turn requires intermediate code.

43.     In response to my pointing out that a prior expert hired by Express Mobile, Andre Kruetzfeldt, confirmed that intermediate code is a definitional requirement of a virtual machine, Mr. Weadock attempts to argue that Mr. Kruetzfeldt's testimony "was premised on a broad definition of 'intermediate code' under which an interpreter which interprets straight from human-readable source code into machine code could be considered to use intermediate code."[65] Mr. Weadock is incorrect.  Mr. Kruetzfeldt plainly understood that he was being asked about an interpreter that interprets human-readable source code into machine code without an intermediate representation, and he testified that such an interpreter is not a virtual machine:

> Q. I am talking about an interpreter that takes source code and interprets it directly into machine code without an intermediate

---

[62] Weadock Supp. Decl. ¶ 23.

[63] Schmandt Opening Decl. ¶ 98.

[64] *Id.*

[65] Weadock Supp. Decl. ¶ 24.

representation. That would not be a virtual machine; correct?

> A. ***I would not see that as a virtual machine***. That is an interpreter or emulator.[66]

44.     Finally, Mr. Weadock argues that the Court in the *X.Commerce* case rejected Defendants' proposed construction, but that is incorrect.[67]  In that case, the defendants argued for a narrower construction, "an abstract machine emulated in software that executes ***compiled*** code."[68]  Mr. Weadock claims that "[i]ntermediate code is a form of compiled code," but he has it backwards:  In fact, compiled code is a type of intermediate code, because it refers to how the code is created, not what it is.[69]  Mr. Weadock also does not mention that Express Mobile's proposed construction was rejected in *Express Mobile, Inc. v. Svanaco, Inc.*, No. 2:17-CV-00130-JRG-RSP, 2018 WL 746472, at *5 (E.D. Tex. Feb. 7, 2018).

**B.**     **"at least one runtime file"**

| Defendants' Construction | Express Mobile's Construction |
|---|---|
| one or more files, including a run time engine, that are downloaded or created, and executed by a browser to display a webpage when the browser is pointed to a webpage | one or more files, including a run time engine, that are downloaded or created when the browser is pointed to a web page or website |

---

[66] ECF No. 62-15, Kruetzfeldt Tr. at 69:6-13 (emphasis added).  Additionally, Mr. Kruetzfeldt did not testify that all interpreters are virtual machines as Mr. Weadock suggests. Instead, Mr. Kruetzfeldt testified that every interpreter can be a virtual machine, which is true, but requires intermediate code in the instruction set of the interpreter. ECF No. 62-15 (Kruetzfeldt Tr.) at 67:19-69:13.  All references to ECF numbers herein are to those in *Express Mobile, Inc. v. Facebook, Inc.*, No. 6:20-cv-803-ADA (W.D. Tex.).

[67] Weadock Supp. Decl. ¶ 25.

[68] *Id.* (emphasis added)

[69] *Id.*

45.     Mr. Weadock maintains that the claimed runtime files need not be executed, and need not be executed by a browser.  I disagree with Mr. Weadock's opinions for the reasons set forth in my June 22, 2021 declaration and for the additional reasons set forth below.

46.     First, based on the specification and file history, a POSA would recognize that to be considered a runtime file, a file must be executed.  As I explained in my opening Declaration, the independent claims of the '397 patent all refer to runtime files that generate virtual machine commands.[70]  This would not be possible unless the runtime files are executable.[71]

47.     Mr. Weadock incorrectly suggests that I am conflating "runtime engine" with "runtime file."[72]  As Mr. Weadock acknowledges, the runtime engine is itself a runtime file, and it is undisputedly executed,[73] which would support the POSA's view that a file must be executed for it to be considered a claimed runtime file.  While the file history specifically refers to the runtime engine generating virtual machine commands[74] (which necessarily requires execution), the independent claims of the '397 patent all require that the claimed runtime files that generate virtual machine commands.  In particular, claim 37 requires "one or more run time files" and then specifies that "said run time files utilize information stored in said external database to generate virtual machine commands."[75]  A POSA would recognize from the plural usage of "run

---

[70] Schmandt Opening Decl. ¶ 119.

[71] *Id.*

[72] Weadock Supp. Decl. ¶ 28.

[73] *Id.*

[74] Schmandt Opening Decl. ¶ 119, n. 6.

[75] '397 patent at claim 37.

time files" that *all* the claimed runtime files must generate virtual machine commands and therefore be executed, not just some of them as Mr. Weadock contends.

48.     Mr. Weadock criticizes my opinion that the non-executable files in downloaded CAB or JAR files are not the claimed runtime files,[76] but he does not point to any portion of the specification that characterizes these files as runtime files.  The mere fact that an image file may be "used to display web pages" does not make it a claimed runtime file in view of the specification and file history, all of which points to the conclusion that the claimed runtime file must be executed.  Indeed, the claims distinguish between the virtual machine commands generated by the runtime files and the subsequent display of the webpage based on the virtual machine commands.[77]  An image file, for example, may be used for the display of a webpage, but this is a separate and distinct requirement from that of the runtime files generating virtual machine commands, which necessitates an executable file.

49.     Thus, as discussed above and in my opening declaration, the language of the claims support my opinion that runtime files must be executed in order to generate the claimed virtual machine commands.  These commands are then executed by the virtual machine (which may implicate non-executable files like image files) to display the webpage.  But the image file itself does not generate virtual machine commands and thus, a POSA would recognize that it, like other non-executable files, does not correspond to the claimed runtime files.

50.     Second, a POSA would recognize that the claimed runtime files must be executed by the browser.  Mr. Weadock maintains that something else could execute the runtime files, but

---

[76] Weadock Supp. Decl. ¶ 28.
[77] '397 patent at claims 1, 2, 37.

he never identifies what that would be.[78]  Indeed, having something other than a browser execute the runtime files would be inconsistent with the patentee's repeated emphasis on the browser-based environment of the claimed invention.[79]  Furthermore, as part of the "run time process" described in the specification, code is utilized to "sniff" the browser-type and determine which code to send the browser.[80]  A POSA would recognize that determining the browser-type is only necessary if the browser itself is executing the code.  Indeed, later in the same section of the specification, and consistent with this interpretation, the patentee refers to causing "the browser to immediately execute the run time engine."[81]  Thus, the specification explicitly refers to the browser executing the run time engine, which both sides agree is a runtime file.  While this is not the only runtime file contemplated by the specification, there is nothing in the specification or file history that would suggest to a POSA that something other than the browser executes the runtime files.[82]

C.    "run time engine" / "runtime engine"

| Defendants' Construction | Express Mobile's Construction |
|---|---|
| a file that is executed at runtime that reads information from the database and generates commands to display a web page or web site | a file that is executed at runtime that utilizes information from the database |

[78] Weadock Supp. Decl. ¶ 27.

[79] *See, e.g.*, 397 patent at 5:57-59, 32:21-25, 45:5-43, 62:33-40; *see also* XMO Opening Br., D.I. 51 at 2-3 (emphasizing browser-based nature of invention).

[80] '397 patent at 45:5-17.

[81] '397 patent at 45:36-37, 45:42-43; *see also* Fig. 28 (stating that the "browser immediately executes the runtime engine").

[82] Mr. Weadock's assertion that a browser "calling" the runtime engine does not mean the runtime engine is executed by the browser is inconsistent with the portions of the specification cited above.  *See* Weadock Supp. Decl. ¶ 27.  I maintain my opinion that a POSA would recognize that "calling" in this context means that the browser executes the runtime engine directly.  Mr. Weadock again speculates that some intermediate software might be involved, but fails to identify any support for his speculation in the specification or file history.

51.     Mr. Weadock's supplemental declaration offers nothing new compared to his opening declaration and he fails to meaningfully respond to the opinions set forth in my opening declaration.  For the reasons set forth in my opening declaration, my opinion remains that the claimed runtime engine must read from the database.[83]

52.     Mr. Weadock again emphasizes a discussion in the prosecution history of the runtime engine being thought of as a "shell" and argues that I did not address this point in my declaration.  Mr. Weadock is incorrect.  As discussed in my opening declaration, nothing in the prosecution history supports Mr. Weadock's view that if the runtime engine is considered a "shell," it does not read from the database.[84]  While Mr. Weadock discounts my opinions as based on "other intrinsic evidence" (which Mr. Weadock does not address), the same section of the prosecution history referring to the "shells" Mr. Weadock emphasizes confirms that code in the shell does, in fact read from the database.  Specifically, the prosecution history confirms that the shell, characterized as the runtime engine, includes code for a DRAW command, which "includes overhead enabling it to read a database and execute sequentially."[85]  Thus, not only does the portion of the prosecution history not support Mr. Weadock's opinion, it expressly refutes it.

53.     Contrary to Mr. Weadock's opinions, this "reads from" requirement is entirely consistent with the language of the claims, which refer to a run time file that "utilizes"

---

[83] Schmandt Opening Decl. ¶¶ 123–127.

[84] Schmandt Opening Decl. ¶ 127.

[85] D.I. 56-33, Ex. 6, '397 patent File History, Jan. 17, 2002 Appl. Amendment at XMO_00000901.

information from a database[86] or data being "extracted" from a database.[87] Data that is read from

the database can then be utilized and data that is read from a database is also extracted from it.

While the claims do not explicitly recite that the runtime engine reads from the database, this

requirement is set forth in numerous portions of the file history describing the claimed runtime

engine, discussed above and in my opening report.[88]  Mr. Weadock offers no response to these

portions of the prosecution history and my opinion remains that a POSA would understand that

the claimed runtime engine must read information from the database.

54.     I understand that Express Mobile has suggested that generation of "commands to

display a web page or web site" is the same or represents equivalent functionality as generating

"the web-site" as described in Claim 1 of the '168 patent.  *See* D.I. 51 at 10; D.I. 59 at 6; '168

patent at Claim 1.  However, a POSA would have understood that generating a web-site is

distinct from and complementary to generating commands to display a web site.  Specifically, a

POSA would understand that the generation of commands to display a web site is what leads to

the generation of the web-site.

**D.     "time lines"**

| Defendants' Construction | Express Mobile's Construction |
|---|---|
| a sequence of changes that define the attributes of a text button or image object as the changes occur | No construction necessary |

55.     Mr. Weadock argues that when the patentee explicitly said what a timeline *is*, that

the statement was not definitional and is limited to the discussion of the embodiment set forth in

Fig. 19 of the patent.  I disagree with Mr. Weadock's opinion and maintain that a POSA would

---

[86] Weadock Supp. Decl. ¶ 31.

[87] *Id.*

[88] Schmandt Opening Decl. ¶¶ 123–126.

take the patentee's words at face value.  Indeed, nothing in the statement "[a] time line is an independent asynchronous process that defines the existence of a given text button or image object" suggests that the definition was exemplary only or confined to particular embodiment.  A POSA, reading this statement, would recognize that no qualifying language, e.g., "in this embodiment," "as one example," is used prior to the description of what a time line is.

56.     Mr. Weadock suggests that the patentee's statement should not be treated as definitional because, for other terms, the patentee expressly used the term "defined."[89]  But I understand that the use of the word "define" is not necessary for the patentee to set forth his definition of a term.  And Mr. Weadock fails to acknowledge that when the patentee intended for a statement to be limited to particular embodiments, he knew how to do that as well.[90]  Based on the patentee's explicit recitation of what a time line "is," it remains my opinion that a POSA would view this statement as definitional and time lines must refer to text buttons or image objects.

57.     Mr. Weadock repeats the arguments from his opening declaration that the "sequence of changes" portion of Defendants' proposed construction is incorrect.[91]  I disagree for the reasons set forth in my opening report and for the following additional reasons.

58.     First, Mr. Weadock suggests that Defendants' proposed construction of time lines does not account for the possibility of a single change.[92]  As an initial matter, I note that the claims of the '168 patent refer to "time lines," plural and thus, it would make no sense to have a

---

[89] Weadock Supp. Decl. ¶ 32.

[90] *E.g.*, '397 patent at 6:21-21, 11:1 (referring to specific "implementations")

[91] Weadock Supp. Decl. ¶ 33.

[92] Weadock Supp. Decl. ¶ 33.

single change for multiple time lines.  In any event, I also disagree that an image object that undergoes a single change would be considered to be a "time line."  Mr. Weadock identifies no support in the specification or prosecution history for such a hypothetical time line and the specification actually defines such an embodiment as a transformation, not a time line.[93]

59.     Second, Mr. Weadock argues that timelines do not involve "sequences" of changes because some changes may occur in parallel.[94]  As explained in my opening report, a "sequence of changes" does not in any way preclude multiple changes from occurring at the same time as part of the overall sequence of changes.[95]  For example, one object may change to another object and then that object may simultaneously change into two objects.  A POSA would recognize that this is still a sequence of changes, notwithstanding the fact that two of the changes occur in parallel.[96]

### E.     "means for storing information in a database"[97]

| Atlassian's Construction | Express Mobile's Construction |
|---|---|
| Subject to 35 U.S.C. §112(f): | Software code that facilitates the execution of an application on a device |

---

[93] '397 patent at 35:46-50 ("A transformation is defined as the changing of an object from one state to another based on a timer control, subject to user settings.")  Mr. Weadock cites this portion of the specification at paragraph 32 of his supplemental declaration, but makes no reference to it in the subsequent paragraph 33 where he asserts that a time line can involve a single change.

[94] Weadock Supp. Decl. ¶ 33.

[95] Schmandt Opening Decl. ¶ 134.

[96] Mr. Weadock appears to have incorrectly concluded that my opinion limits time lines to animations.  Weadock Supp. Decl. ¶ 33.  That is not the case.  My discussion of animations was based on the portion of the specification Mr. Weadock cited in his opening declaration, which explicitly address time lines associated with animations.  Weadock Opening Decl. ¶ 47 (quoting portion of specification referring to animations); Schmandt Opening Decl. ¶ 134 (responding to Mr. Weadock's opinions regarding this passage).

[97] Mr. Weadock appears to have incorrectly included this term as part of the '755 patent family, not the '397 patent family.  Weadock Supp. Decl. ¶ 46.  The term appears in claim 39 of the '397 patent, which I understand are asserted against Atlassian only.  *See* D.I. 52 at 4.

| | |
|---|---|
| Function:  Storing information in a database<br><br>Structure:  None disclosed; indefinite | |

60.     Mr. Weadock does not meaningfully respond to the opinions set forth in my opening declaration, but he maintains that this term should not be given means-plus-function treatment, despite the use of the phrase "means for."[98]  For the reasons set forth in my opening declaration, to which Mr. Weadock does not respond, I maintain my opinion that a "database" is not sufficient structure for the function of "storing information in a database." [99]

61.     Mr. Weadock correctly notes that he and I have both programmed databases in our careers.[100]  But this fact only reinforces my opinion that the database itself is not sufficient structure for performing the claimed function.  Special programming is required and such code is separate and distinct from the database itself.  Moreover, the specification of the '397 patent does not include any description of the code necessary to perform the function of the storing information in the database and for this reason, it remains my opinion that a POSA would conclude the term is indefinite.

## II.     OPINIONS RELEVANT TO THE '755, '287, AND '044 PATENTS

### A.     "Application" / "application"

| Defendants' Construction | Express Mobile's Construction |
|---|---|
| Device-independent code which contains instructions for a device, is separate from the Player, and is interpreted or executed by the Player | device-independent software code containing instructions for a device |

---

[98] Weadock Supp. Decl. ¶ 46.

[99] Schmandt Opening Decl. ¶¶ 135–140.

[100] Weadock Supp. Decl. ¶ 46.

62.     Mr. Weadock maintains his opinion that the claimed Application/application need not be interpreted or executed by Player and it is not separate from the Player.  I disagree for the reasons set forth in my opening declaration and for the additional reasons set forth below.

63.     First, the specification and file history repeatedly refer to the application being executed or interpreted by the player.  Of note, Mr. Weadock concedes that the application is device-independent code based on the specification cites col. 13, lines 45-46 as supporting evidence.[101]  While I agree that this portion of the specification refers to a "device-independent Application," Mr. Weadock ignores the fact that the same portion of the specification refers to the "appropriate device platform Player" that "receives *and executes* the device-independent Application."[102]  In my opinion, a POSA would not selectively apply some requirements of the claimed Application set forth in the specification, but disregard others, as Mr. Weadock does.

64.     Dependent claim 21 of the '755 patent, referred to by Mr. Weadock would not change a POSA's view that the Application must be interpreted or executed by the Player.  A POSA would recognize that this claim narrows independent claim 12 (from which it depends), by requiring the Player to "interpret[] dynamically received, device-independent values of the web component defined in the Application."[103]  But this simply adds additional specifics about certain values in the Application that must be present and interpreted by the player.  In contrast, independent claim 12 does not require that these values be present in the Application at all.  But

---

[101] Weadock Supp. Decl. ¶ 35.

[102] '755 patent at 13:46-49 (emphasis added).

[103] '755 patent at claim 21.

in both claims, the Player must interpret or execute the Application, for the reasons set forth in my opening declaration.[104]

65.     Mr. Weadock maintains that the device may directly execute the Application, without a Player, for the same reasons set forth in his opening declaration.[105]  But as I noted in my responsive opening declaration, none of the portions of the specification cited by Mr. Weadock expressly state that the Player does not execute or interpret the Application, and all of these passages are consistent with the requirement.[106]

66.     Mr. Weadock does not challenge the fact that the numerous portions of the specification I provided in my opening report refer to a Player that executes or interprets the Application.[107]  He suggests that these passages relate to only "some embodiments," but my point in providing these citations was to contrast the repeated and consistent descriptions of an Application executed or interpreted by the Player with the lack of *any* embodiments where this is not the case.[108]

67.     Second, Mr. Weadock maintains that the Application and Player need not be separate from one another because of the single statement in the specification that:

> In one embodiment, the architecture of Player P includes an abstraction interface that separates all device, operating system and virtual machine dependencies from the Player's Application model business logic (that is, the logic of the server-side facilities) that

---

[104] If claim 21 were intended to cover the scenario where the Player interprets the Application generally, as Mr. Weadock contends, the patentee could have just claimed a Player that "interprets the Application," and there would have been no reason to specify that the Player is interpreting "dynamically received, device-independent values of the web component."

[105] Weadock Supp. Decl. ¶ 35.

[106] Schmandt Opening Decl. ¶¶ 154–156.

[107] Weadock Supp. Decl. ¶ 35.

[108] Schmandt Opening Decl. ¶ 157.

extend the Application on the Player so that it is efficiently
integrated into a comprehensive client/server Application.[109]

68.     Mr. Weadock maintains that this passage refers to an Application "integrated with

the Player," despite the fact that the plain language from this passage says nothing of the sort, as

explained in my opening declaration.[110]  Mr. Weadock asserts however, that because the

"Application is extended **on the Player**," this embodiment contemplates an Application that is

not separate from the Player.[111]  I disagree.  A record is placed on a record player, but no one

would argue that they are not separate and distinct from one another.  Similarly, whether portions

of the server-side Application are extended onto the client to be operable on the client-side

Player (which would create the "comprehensive client/server Application" referred to in the

specification) has nothing to do with the question of whether the Application and Player are

separate from one another.

69.     Mr. Weadock attempts to explain away the repeated statements made by the

patentee during prosecution, in which the separateness of the Application and Player was

emphasized as one of the primary alleged distinctions between the claimed inventions and prior

art to McCain.[112] Mr. Weadock opines that the applicant's reference to the advantages of

"partitioning code" and the use of "two separate codes" was merely to acknowledge that "the

Application is a device-independent code that is functionally distinct from the Player."[113]

---

[109] Weadock Supp. Decl. ¶ 36 (quoting '755 patent at 7:30-43).

[110] *Id.*

[111] *Id.*

[112] Weadock Supp. Decl. ¶ 37.

[113] *Id.*

Nothing in the prosecution history supports Mr. Weadock's "functionally distinct" interpretation of the applicant's arguments.

70.     Mr. Weadock points to a portion of the prosecution history in which the applicant characterized McCain as "only providing a self-contained, device-dependent code,"[114] but that characterization is based on applicant's view that a single code set containing device-dependent and device-independent code is "device-dependent" because there is no **separate** set of device-independent code.  Indeed, elsewhere in the prosecution history, as set forth in my opening declaration, the applicant explicitly argued that McCain "clearly teaches combining all code (executable device dependent code []) as well as parameters (device-independent code) into C2 components, which are then provided to the browser to generate a display."[115]  Thus, McCain does, in fact, describe functionally distinct code (i.e., executable code and non-executable parameters), but that was not the basis on which applicants distinguished the pending claims from McCain.  Instead, the applicants argued that the invention was distinct from McCain because "[t]here is no teaching or suggestion in **McCain** of separating binary, non-binary, or executable components in different codes."[116]

71.     A POSA reading the prosecution history would recognize that, consistent with the claims and specification, the Application must be separate from the Player, so that the Player and Application can be maintained and sent entirely separate from one another, if desired, consistent

---

[114] Weadock Supp. Decl. ¶ 37.

[115] Schmandt Opening Decl. ¶ 145 (quoting from D.I. 56-29, Ex. 2, Excerpt from 9,063,755 File History, Amendment "A" Under 37 C.F.R. §1.111, Mar. 6, 2013 at 10 (XMO_00001784 at XMO_00002803).

[116] Schmandt Opening Decl. ¶ 145 (quoting from D.I. 56-29, Ex. 2, Excerpt from 9,063,755 File History, Amendment "A" Under 37 C.F.R. §1.111, Mar. 6, 2013 at 10 (XMO_00001784 at XMO_00002802) (emphasis in original).

with the touted advantages of the invention.[117]  A POSA would not consider "functionally distinct" pieces of code in the same code set to be separate from one another, because this was expressly disclosed in McCain, which applicants distinguished based on the fact that it does not disclose two sets of "different codes" as the claims require.[118]

B.     "Player" / "player"

| Defendants' Construction | Express Mobile's Construction |
|---|---|
| Device-specific code which contains instructions for a device, is separate from the Application, and interprets or executes the Application | Software code that facilitates the execution of an application on a device |

72.     Mr. Weadock repeats the same arguments from his opening report, with which I disagree for the reasons set forth in my opening report.  Mr. Weadock does not respond to the majority of my opinions, and instead reiterates his view that the repeated references in the specification to a Player being device-specific code are exemplary only.

73.     The only support Mr. Weadock provides for his opinion is a portion of the specification that he opines refers to a player with "no device specific dependencies."[119]  But as I explained in my opening declaration, a POSA reading this statement would understand that "no specific device dependencies" refers to the language, not the Player.  Mr. Weadock suggests that a POSA would not use the term "extensible" to describe a programming language, or state that a language "supports a robust application model," but I disagree.  A POSA would readily

---

[117] Schmandt Opening Decl. ¶¶ 146–147.

[118] Mr. Weadock argues that I acknowledged the claims already require the Application to be separate from the Player.  *See* Weadock Supp. Decl. ¶ 38.  Mr. Weadock is mistaken and cites to an alleged paragraph 209 of my opening declaration, which does not exist.  At paragraph 143 of my opening declaration, I do reference the fact that the claims refer to the Application and Player separately, which provides additional support for Defendants' proposed construction.

[119] Weadock Supp. Decl. ¶ 40.

understand that an extensible language refers to a language that allows users to modify or add syntax.[120]  And a language that supports a robust application model simply means that the language is well suited for writing applications.

74.    Moreover, my view of how a POSA would interpret this phrase is supported by the prosecution history, which includes a provisional application in the form of an Express Mobile User's Guide.  That document provides that "[a] thin client architecture requires that a language be adopted that manages resources efficiently, is extensible, supports a robust application model, and has no device specific dependencies."[121]  This language closely tracks the portion of the specification relied upon by Mr. Weadock and would further confirm for a POSA that "no device specific dependencies" refers to the language, not the Player.[122]

75.    As a result, this portion of the specification would not suggest to a POSA that the Player need not be device-specific code.  Instead, based on the entirety of the rest of the specification and the prosecution history, referenced in my opening report,[123] a POSA would

---

[120] *See* Ex. 29, Daniel Zingaro, *Modern Extensible Languages* (Oct. 2007), http://www.cas.mcmaster.ca/sqrl/papers/SQRLreport47.pdf, at Abstract.

[121] Ex. 30, XMO_00001784 at XMO_00002316.

[122] The quoted language from the Express Mobile User Guide also refutes Mr. Weadock's view that a POSA would not describe a language as "extensible" or supportive of "a robust application model," since the inventors themselves described languages as such.

[123] Schmandt Opening Decl. ¶¶ 160–169.

conclude that the claimed Player must be device-specific code, in addition to the other

requirements set forth in Defendants' proposed construction.[124]

C.     "registry"

| Defendants' Construction | Express Mobile's Construction |
|---|---|
| database, XML file, or Portable Description Language file that exists on a computer | No construction necessary |

76.     Mr. Weadock does not respond at all to my opinions regarding the term

"registry."  Indeed, his supplementation declaration does not mention this term at all.

Defendants' proposed construction of "registry" reflects how a POSA would understand the term

in view of the specification, for the reasons set forth in my opening declaration.[125]  To the extent

Mr. Weadock is allowed to provide any additional opinions at a future date, I explicitly reserve

the right to further respond to Mr. Weadock's opinions.

D.     "UI object"

| Defendants' Construction | Express Mobile's Construction |
|---|---|
| object(s) placed on a canvas that are intended for interaction with a user of a device | No construction necessary |

77.     Mr. Weadock does not respond to my opinions regarding the term "UI object" and

states only that he disagrees with my opinions and is still of the opinion that no construction is

necessary.  Defendants' proposed construction of "UI object" reflects how a POSA would

---

[124] Mr. Weadock's suggestion that there was a typo in my opening declaration at paragraph 164 and that I meant to say a "'thin client' is all about device independence" instead of "'thin client' is all about device dependencies" is incorrect.  Weadock Supp. Decl. ¶ 40, n. 6.  As I explained in my opening report, a POSA would distinguish between the thin client itself (which is device-dependent) and the overall thin-client architecture, which is sometimes referred to as "device independent."  The entire point of a thin-client architecture is to minimize the amount of device-dependent code on the client.  But the overall architecture still contains some dependencies in the form of the thin clients, contrary to Mr. Weadock's assertion that a thin-client architecture has "no device specific dependencies."  Schmandt Opening Decl. ¶¶ 164, 166–169.

[125] Schmandt Opening Decl. ¶¶ 170–174.

understand the term in view of the specification, for the reasons set forth in my opening declaration.[126] To the extent Mr. Weadock is allowed to provide any additional opinions at a future date, I explicitly reserve the right to further respond to Mr. Weadock's opinions.

E.    "An authoring tool configured to . . . a Player"

| Defendants' Construction | Express Mobile's Construction |
|---|---|
| an authoring tool configured to … produce a Player | No construction necessary |

78.    Mr. Weadock does not address this claim term in his supplemental declaration at all.  As I noted in my opening declaration, Mr. Weadock did not provide any technical opinions in his opening declaration.[127]  To the extent Mr. Weadock is allowed to provide any additional opinions at a future date, I explicitly reserve the right to further respond to Mr. Weadock's opinions.

F.    "first code" / "second code"

| Atlassian's Construction | Express Mobile's Construction |
|---|---|
| *First code*:  device-dependent code that is separate from the second code and interprets or executes the second code<br><br>*Second code*:  device-independent code that is separate from the first code and interpreted or executed by the first code | No construction necessary |

79.    Mr. Weadock offers two responses to my opinions set forth in my opening report, neither of which change my opinion that Atlassian's proposed construction of "first code" and "second code" reflects how a POSA would understand these terms in view of the claims, specification, and prosecution history.

---

[126] Schmandt Opening Decl. ¶¶ 175–179.

[127] Schmandt Opening Decl. ¶ 180.

80.     First, Mr. Weadock argues that the requirement for the first code to be "separate from" the second code is "ripe for confusion."[128]  I disagree.  During prosecution, the applicants characterized the first code as "a Player" and the second code as "an Application."[129]   As I have discussed with respect to the Application/application term, applicants repeatedly referred to the Player as being separate from the Application.[130]  Neither the applicants nor the Examiner shared Mr. Weadock's confusion about what the phrase "separate from" means in the context of the claimed invention and the prior art to McCain, which applicants distinguished over on this basis and I do not believe a POSA would be confused either.  For the first code and second code to be separate from one another, they must be capable of being maintained and sent separately.  This is one of the stated advantages of the invention, which was repeatedly touted as distinction over the single set of combined code disclosed in McCain.[131]

81.     Second, Mr. Weadock opines that there is no requirement for the first code to execute the second code, notwithstanding the fact that the claim requires the step of "'executing' first code" to include "processing the symbolic names of the second code."[132] As I explained in my opening declaration, a POSA would recognize that since the second code is by definition device-independent code (a requirement Mr. Weadock does not contest), it cannot be executed directly by the device and a POSA would conclude that when the first code is executed, it

---

[128] Weadock Supp. Decl. ¶ 44.

[129] Schmandt Opening Decl. ¶¶ 182–184.

[130] Schmandt Opening Decl. ¶¶ 143–152.

[131] Schmandt Opening Decl. ¶¶ 146–147.

[132] Weadock Supp. Decl. ¶ 45.

interprets or executes the second code to process the symbolic names included in the second code.[133]

82.     Mr. Weadock argues that if the first code and second code both contain machine-code, then a POSA would not consider the first code to be interpreting or executing the second code.[134]  But this hypothetical makes no sense.  If the first code and second code were both machine code, that would mean the second code is also device-dependent (depending on the machine/processor), which is contrary to the express language of claim 23 of the '755 patent.

83.     Mr. Weadock also suggests that two code modules can execute in parallel and in this circumstance, one code does not execute the other.[135]  But this hypothetical example has no support in the claims, specification, or prosecution history, none of which suggest that the first code can execute in parallel with the second code.  Instead, the claim requirement contemplates that the first code is executed first and then the second code is interpreted or executed by the first code, so that the symbolic names are processed.

84.     Mr. Weadock's assertion that there is "potential for confusion" from the word "interprets" is unfounded.  A POSA would readily understand what it means for one set of code to interpret or execute a separate set of code, as I previously discussed with the Application/application term.[136]

---

[133] Schmandt Opening Decl. ¶ 185.

[134] Weadock Supp. Decl. ¶ 45.

[135] Weadock Supp. Decl. ¶ 45.

[136] Schmandt Opening Decl. ¶¶ 153–158.  I note that while Mr. Weadock disagrees that the "interprets or executes" requirement for Application or Player is appropriate, he does not opine that the word "interprets" is confusing in Defendants' proposed constructions for those terms.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on July 23, 2021 at Winchester, Massachusetts.

CHRIS SCHMANDT

39